# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In Re:  Amla Litigation | Case Nos. 1:16-cv-6593 (JSR), 1:17-cv-111 (JSR) |

---

## DEFENDANTS' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF
## MOTION TO EXCLUDE EXPERT TESTIMONY OF PATRICK OBUKOWHO

---

**GORDON REES SCULLY MANSUKHANI LLP**
*Attorneys for Defendants L'Oréal USA, Inc. and Soft Sheen-Carson, LLC*

1 Battery Park Plaza, 28th floor
New York, New York 10004
T:  (973) 549-2500
E: jlewis@grsm.com

*Of Counsel and on the Brief:*
    Miles D. Scully
    Peter G. Siachos
    Justin D. Lewis
    JoAnna M. Doherty

# TABLE OF CONTENTS

Page

INTRODUCTION ....................................................................................................1

OBUKOWHO WARRANTS TOTAL EXCLUSION..............................................2

I.    Obukowho Should Be Wholly Excluded Because He Destroyed Key Evidence.............................................................................................2

II.    Obukowho's Report And Testimony Require Exclusion Under Rule 702 Whether This Court Applies *Daubert* or *Kumho Tire*. ............................................5

    A.    The *Daubert* Criteria Apply Because Obukowho Purports to Base His Opinions on His Practice of the Hard Science of Chemistry. ..............5

    B.    Obukowho Cannot Survive the *Kumho Tire* Analysis................................7

        1.    Other Considerations Bar Obukowho Under A *Kumho Tire* Analysis...........................................................................9

            a.    Bias Permeates Obukowho's Engagement. .......................9

            b.    Obukowho's Analysis Is Subjective. .................................10

            c.    Obukowho Assumed A Preordained Conclusion. .............11

            d.    Obukowho's Self-Contradictions Shatter His Reliability.........................................................................12

    C.    Obukowho's Know-It-When-I-See-It Methodology Is Unreliable And Unhelpful To The Fact-Finder. .........................................15

        1.    It Is Impossible to Replicate or Confirm Obukowho's Experimental Results. ...................................................16

        2.    Obukowho's Experimental Design Is Unreliable and Not Accepted. ..................................................................20

III.    None of Obukowho's Opinions Are Material to Whether This Relaxer Poses Any More Danger Than Others. .................................................22

CONCLUSION.....................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Almeciga v. Ctr. for Investigative Reporting, Inc.*,
185 F. Supp. 3d 401 (S.D.N.Y. 2016) ............................................ 1, 2, 5, 6, 7, 9, 10, 11, 12, 20

*Amorgianos v. Amtrak*,
303 F.3d 256 (2d Cir. 2002) ............................................................................. 8

*Astra Aktiebolag v Andrx Pharms., Inc.*,
222 F Supp. 2d 423 (S.D.N.Y. 2002) ......................................................................... 22

*AstraZeneca AB v. Mylan Labs., Inc.*,
490 F. Supp. 2d 381 (S.D.N.Y. 2007) ......................................................................... 20

*Barsoum v. NYC Housing Auth.*,
202 F.R.D. 396 (S.D.N.Y. 2001) ......................................................................... 4

*Beers v. General Motors Corp.*,
No. 97-cv-482, 1999 U.S. Dist. LEXIS 12285 (N.D.N.Y. May 17, 1999) ............................... 3

*Byrnie v. Cromwell Bd. of Educ.*,
243 F.3d 93 (2d Cir. 2001) ......................................................................... 3

*Cedar Petrochem., Inc. v Dongbu Hannong Chem. Co.*,
769 F Supp. 2d 269 (S.D.N.Y. 2011) ......................................................................... 2, 4

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) ......................................................................... 1, 3, 4, 5, 6, 7, 8, 13, 23, 24

*Dillon v. Nissan Motor Co., Ltd.*,
986 F.2d 263 (8th Cir. 1993) ......................................................................... 3, 4

*GenOn Mid-Atl, LLC v. Stone & Webster, Inc.*,
282 F.R.D. 346 (S.D.N.Y. 2012) ......................................................................... 3

*In re Flag Telecom Holdings, Ltd. Securities Litig.*,
236 F.R.D. 177 (S.D.N.Y. 2006) ......................................................................... 3

*In re Mirena IUD Prods. Liab. Litig.*,
713 Fed. Appx. 11 (2d Cir. 2017) ......................................................................... 6, 11

*In re NTL, Inc. Securities Litig.*,
244 F.R.D. 179 (S.D.N.Y. 2007) ......................................................................... 3

*Innogenetics, N.V. v. Abbott Labs.*,
    512 F.3d 1363 (Fed. Cir. 2008) ........................................................................ 13

*Kronisch v. U.S.*,
    150 F.3d 112 (2d Cir. 1998) ............................................................................... 2

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999)............................................................ 1, 5, 6, 7, 9, 10

*New Phone Co. v. NYC Dep't of Info. Tech. & Telecomms.*,
    2007 U.S. Dist. LEXIS 74693 (E.D.N.Y. Oct. 5, 2007)..................................... 4

*O2 Micro Int'l Ltd. v. Monolithic Power Sys.*,
    467 F.3d 1355 (Fed. Cir. 2006) ........................................................................ 13

*Rutgerswerke AG v. Abex Corp.*,
    2002 Dist. LEXIS 9965 (S.D.N.Y. 2002) ......................................................... 3

*SmithKline Beecham Corp. v. Apotex Corp.*,
    247 F. Supp. 2d 1011 (N.D. Ill. 2003) ................................................. 16, 20, 22

*State Farm Fire & Cas. Co. v Frigidaire*,
    146 F.R.D. 160 (N.D. Ill. 1992)......................................................................... 3

*Sturdivant v. Dillards, Inc.*,
    no. 5:05-cv-305 (S.D. Ala. 2006) ...................................................................... 4

*Trigon Ins. Co. v. US*,
    204 F.R.D. 277 (E.D.Va. 2001) ........................................................................ 3

*U.S. v. Williams*,
    506 F.3d 151 (2d Cir. 2007) .............................................................................. 7

**Rules**

Fed. R Civ. P. 37(c)(1).................................................................................... 2, 13

Fed. R. Civ. P. 26(a)(2) ...................................................................................... 13

Fed. R. Civ. P. 26(a)(2)(B) .................................................................................. 2

Fed. R. Civ. P. 37(b)(2)(B) .................................................................................. 4

Fed. R. Evid. 702 ........................................................................... 1, 2, 5, 7, 25

Fed. R. Evid. 702(a) ........................................................................................... 9

## INTRODUCTION

The question before the Court is what to do with a purported expert who performs quasi-experiments dressed up as science, but flouting its rules, to justify a predetermined opinion before destroying the evidence. The answer is to exclude him.

Patrick Obukowho destroyed critical evidence of the testing on which his opinions indispensably rely. In doing so, he irreversibly deprived Defendants of the ability to fully challenge his largely undocumented tests or the strained conclusions he drew from them. "I was not asked to save anything" by Plaintiffs' counsel, he said. Doherty decl., ex. 1 (Daubert hearing transcript (May 16, 2018)) at 18:12-20. "I never knew it would get to this trial level." *Id.*

Spoliation aside, Obukowho's purported expertise is inadmissible under Rule 702. *Daubert* controls here given that Obukowho practices the hard science of chemistry. Plaintiffs cannot evade *Daubert*'s requirements by seeking to artificially define Obukowho's discipline narrowly as hair relaxer pseudo-science, pretending his report is not an attempted application of chemistry, but then trumpet Obukowho at trial as a professional laboratory chemist cloaked in science's authority. This is the very danger of jurors' undue trust which this Court warned against in the murky discipline of handwriting analysis. *Almeciga v. Ctr. for Investigative Reporting, Inc.*, 185 F. Supp. 3d 401, 415 (S.D.N.Y. 2016) (Rakoff, J.) ("aura of unassailability that the imprimatur of 'science' confers" "distorting the truth-finding process").

Even if the Court adopts a *Kumho Tire* analysis, Obukowho's unreliable report and testimony require exclusion. His entire engagement is permeated by his bias to reverse engineer the pre-ordained conclusion Plaintiffs' counsel paid him to confirm, leading him into glaring self-contradictions of his previous public pronouncements and among his testimony in this case. He even said that he would arrive at the same conclusions no matter what the "tests" showed.

1

There is no evidence in the record that a professional chemist could reliably reach conclusions about the chemical propensity of a hair care product to cause its users' physical injuries to scalp, skin, or hair based on the subjective, shoddy testing protocols Obukowho devised, let alone based solely on a review of the product's ingredients.

Though he purports to conclude that this hair relaxer poses users additional dangers compared to the product category, none of his testimony is actually material to that question because he admittedly could not quantify or measure the marginal danger and tested no competing hair relaxers. For all Obukowho can unhelpfully tell jurors, this product's marginal danger is *de minimis*, legally meaningless, and indistinguishable from the risk vs. utility trade-off of any hair relaxer.

It is clearer than ever that Plaintiffs failed in their burden as Obukowho's proponents because there is far short of a preponderance of record evidence that he satisfies Rule 702's requirements. *Almeciga*, 185 F. Supp. 3d at 415. This Court should exercise its important gatekeeping responsibility to exclude Obukowho's unreliable report and testimony in whole.

<u>**OBUKOWHO WARRANTS TOTAL EXCLUSION.**</u>

**I.     Obukowho Should Be Wholly Excluded Because He Destroyed Key Evidence.**

Obukowho's inexplicable destruction of evidence by itself forecloses any finding of his reliability to testify as an expert in this matter, but also amply justifies the sanction of his total exclusion. Preservation and disclosure of evidence considered by an expert is so sacred that the preferred remedy for destruction or withholding of such evidence is exclusion of the entire opinion, even where such a preclusive effect results in summary judgment. FED. R. CIV. P. 26(a)(2)(B); FED. R CIV. P. 37(c)(1); *Cedar Petrochem., Inc. v Dongbu Hannong Chem. Co*., 769 F Supp. 2d 269, 278 (S.D.N.Y. 2011); *Kronisch v. U.S.*, 150 F.3d 112, 126 (2d Cir. 1998); *Dillon*

*v. Nissan Motor Co., Ltd.,* 986 F.2d 263, 269 (8th Cir. 1993)[1]; *Beers v. General Motors Corp.*, No. 97-cv-482, 1999 U.S. Dist. LEXIS 12285, at *5 (N.D.N.Y. May 17, 1999).  Regardless of whether destruction of evidence was willful, the deprived right of the Court and Defendants to inspect and challenge the missing evidence is on its face irreparably prejudicial.  *Beers*, 1999 U.S. Dist. LEXIS 12285, at *2.[2]

Plaintiffs and Obukowho had a duty to preserve[3] and produce the instruments and results of Obukowho's experiments[4] – evidence that is so fundamental to Obukowho's opinions and Plaintiffs' case that its absence creates a prejudicial vacuum, with nothing to fill the void.  Obukowho should have been aware of this duty, as this is not his first time serving as an expert witness.[5]  Instead, he destroyed key evidence, apparently with Plaintiffs' blessing.  Doherty

---

[1] In *Dillon*, plaintiff's expert examined key evidence (a car) that was destroyed before defendant's expert could.  The court affirmed the exclusion of photographs, a mock-up, and a videotape of the expert's inspection because the original evidence was not provided to defendants.  *Dillon*, 986 F.2d at 263-269; *see also State Farm Fire & Cas. Co. v Frigidaire*, 146 F.R.D. 160, 163 (N.D. Ill. 1992) (first-hand knowledge of evidence is "far more probative…than photographs" and experts should not be permitted to "destroy such evidence and then substitute his or her own description of it."); *Byrnie v. Cromwell Bd. of Educ.*, 243 F.3d 93, 107 (2d Cir. 2001); *Rutgerswerke AG v. Abex Corp.*, 2002 Dist. LEXIS 9965, at *42 (S.D.N.Y. 2002); *Trigon Ins. Co. v. US*, 204 F.R.D. 277, 286 (E.D.Va. 2001) (destruction of draft report warrants preclusion).

[2] In *Beers*, the plaintiff's expert irreparably altered key evidence (an engine) in the course of investigating the plaintiff's injury.  *Id.* at *3.  The court found that the expert had been, at a minimum, negligent in preserving crucial evidence.  *Id.* at *9.  Though there was no evidence of bad faith, the court excluded the expert, finding that a lesser sanction did not cure the prejudice.

[3] *GenOn Mid-Atl, LLC v. Stone & Webster, Inc*., 282 F.R.D. 346, 355 (S.D.N.Y. 2012) (parties must preserve material over which they have legal and practical control); *In re NTL, Inc. Securities Litig.*, 244 F.R.D. 179, 185 (S.D.N.Y. 2007) (obligation to preserve attaches to material prepared by third parties); *In re Flag Telecom Holdings, Ltd. Securities Litig.*, 236 F.R.D. 177, 180 (S.D.N.Y. 2006) (control is construed broadly).

[4] Plaintiffs controlled this evidence, as demonstrated by their request that Obukowho take and preserve a picture of one of his (purported) five pairs of pH strip tests.  Doherty decl., ex. 1 at 32:5-7.

[5] Contrary to his May 16, 2018 *Daubert* hearing testimony that he has never served as an expert at "this level" (Doherty decl., ex. 1 at 18:2-4), Obukowho testified as an expert at a *Daubert*

decl., ex. 1 (*Daubert* transcript (May 16, 2018)) at 18:14-20 ("I was not asked to save anything. I never knew it would get to this trial level…I was not instructed to save all experiments."); *id.* at 5:8 (testifying that "there was no need" to bring the Product sample he evaluated); dkt. 180-26 at 71:6-72:21 (Obukowho was not shown his deposition notice or asked to bring expert file to his deposition). The sole surviving remnants showing that testing even occurred are a single blurry copy of a photograph of a pair of pH strips and a photograph of a copy of Obukowho's superficial lab notes (one page of which is suspiciously altered[6]), which show that if Obukowho did perform experiments, they were completely lacking in basic experimental detail and did not conform to the scientific method. Obukowho destroyed, or Plaintiffs withheld, the rest of the testing evidence, including processed hair swatches and pH strips, the experimental Product sample, and Obukowho's original lab notebook, which Plaintiffs still have never produced. Doherty decl., ex. 1 at 3:13-5:8, 18:14-16, 33:22-25. It is difficult to imagine evidence that could be more relevant, or more prejudicial if destroyed or withheld. It is almost as though Plaintiffs did not want anyone to analyze or challenge this evidence, and its destruction at Obukowho's hand indicts the suspect methodology upon which his entire report is based.

Destruction of highly probative evidence justifies a strong sanction.[7] Total exclusion of Obukowho is the only remedy, as the destruction of evidence supporting his opinions is at least as serious as, if not more than, the failure to answer or respond to discovery. *Dillon,* 986 F.2d at 269. In any event, Defendants did request the destroyed evidence in Rule 34 requests and a

---

hearing in a class action captioned as *Sturdivant v. Dillards, Inc.,* no. 5:05-cv-305 (S.D. Ala. 2006). *See* Doherty decl., ex. 2.

[6] A copy of Obukowho's Relaxer Crème lab notes, with emphasis added, appears at Doherty decl., ex. 3.

[7] FED. R. CIV. P. 37(b)(2)(B); *Cedar Petrochem.*, 769 F Supp. 2d. at 288; *New Phone Co. v. NYC Dep't of Info. Tech. & Telecomms.*, 2007 U.S. Dist. LEXIS 74693, at *50-51 (E.D.N.Y. Oct. 5, 2007); *Barsoum v. NYC Housing Auth.*, 202 F.R.D. 396, 399 (S.D.N.Y. 2001).

deposition notice that demanded Obukowho's complete file, including test results, products, photographs, videos, experimental data, and studies that contributed to his opinions.  Doherty decl., ex. 4.   In response, Plaintiffs produced a mere 22 pages (seven of which are duplicates), among which are lab notes that appear to have been altered and some, but not all, articles authored by Obukowho.  Doherty decl., ex. 5.

The only evidence that could possibly support Obukowho's opinions has been destroyed. It is not enough to exclude only Obukowho's unreliable tests, as doing so would only enhance the prejudice by removing the best evidence for challenging his credibility and exposing his bias, while simultaneously allowing him to testify, unrestrained, wrapped in the authority of science without adhering to its rules.  Even if an adverse inference were imposed, Plaintiffs would be free to have complex scientific issues decided upon Obukowho's subjective interpretations (such as how hair samples felt or looked to him), general feelings, and memories that may have faded with the passage of time.  The only remedy befitting the destruction of such key evidence is Obukowho's total exclusion, even before confronting his inadmissibility under Rule 702.

## II.     Obukowho's Report And Testimony Require Exclusion Under Rule 702 Whether This Court Applies *Daubert* or *Kumho Tire*.

### A.     The *Daubert* Criteria Apply Because Obukowho Purports to Base His Opinions on His Practice of the Hard Science of Chemistry.

Plaintiffs have emphasized repeatedly that their case is "fundamentally about chemistry." Dkt. 129 at 2, 6, 15; dkt. 132-1 at 7:13-15.  Obukowho is a practitioner of the hard science of chemistry whose opinions are subject to *Daubert* and its factors, not *Kumho Tire*.  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593-94 (1993).  This Court has already recognized that chemistry is a field of "scientific inquiry" (*Almeciga,* 185 F. Supp. 3d at 416), and that the *Kumho Tire* analysis applies only when "the testimony offered is not scientific in nature."  *Id.* at

423; *see Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) ("experts who are not scientists").  Otherwise, *Daubert* controls.  For his part, Obukowho left no doubt:  he is a "trained chemist" "absolutely" "dealing in precision and science."  Doherty decl., ex. 1 at 24:23-25, 58:23; *see* Doherty decl., ex. 2 at 94:7 (Obukowho is "trained to believe...scientific evidence").

Still, at the May 16 hearing, the Court questioned whether the "science of the products here involved" is too undeveloped to apply *Daubert*, such that *Kumho Tire* might control. Doherty decl., ex.1 at 90:21.  However, the relevant scientific field of reference implicated here is chemistry, not "hair relaxer chemistry" or "no-lye hair relaxer chemistry."  An expert cannot evade scrutiny under the *Daubert* criteria by redefining his "relevant scientific community" (*Daubert*, 509 U.S. at 593-94) at such a narrow level of specificity that the purported field of inquiry virtually merges with its application to the case itself.

For example, in recently affirming *Daubert* exclusion of experts' theories regarding a uterine implant's capacity to perforate the uterus, the Second Circuit looked to the theories' reception "in the wider obstetrics and gynecological scientific community."  *In re Mirena IUD Prods. Liab. Litig*., 713 Fed. Appx. 11, 15 (2d Cir. 2017).  Just as the court did not confine the relevant field of scientific inquiry to uterine implant science for purposes of considering the experts' admissibility (*id*.), this Court should not permit Obukowho to bypass the *Daubert* criteria by narrowing his scientific field from chemistry to hair relaxer chemistry.  Indeed, this Court recently cautioned against narrowly defining the relevant scientific community, "because, just as astrologers will attest to the reliability of astrology," adopting too narrow a definition of the relevant field of inquiry will render *Daubert's* peer review factor "a charade."  *Almeciga* 185 F. Supp. 3d at 420 ("key question" is "what constitutes a 'peer'").

**B.** **Obukowho Cannot Survive the *Kumho Tire* Analysis.**

Even if the Court determines to analyze Obukowho's opinions under *Kumho Tire*, the circumstances of this case and the nature of Obukowho's opinions still require the Court to apply the *Daubert* factors within the *Kumho Tire* analysis. As this Court has recognized, "the particular questions that [*Daubert*] mentioned will often be appropriate for use in determining the reliability of challenged expert testimony." *Almeciga,* 185 F. Supp. 3d at 424 (quoting *Kumho Tire*, 526 U.S. at 152). Thus, in *Almeciga*, this Court applied the *Daubert* criteria to exclude handwriting analysis under *Kumho Tire* even though, quite unlike the chemistry disputed here, the *Almeciga* handwriting analysis bore "none of the indicia of science." *Almeciga*, 185 F. Supp. 3d. at 419; *id*. at 424 ("the Court finds that the *Daubert* criteria suit the instant inquiry well"). As Defendants demonstrated in previous briefing (dkt. 161; dkt. 193; dkt. 206 at 1-4; dkt. 209 at 1-2), and illustrated anew at the recent hearing and in these papers, Obukowho's methods and opinions cannot satisfy the *Daubert* criteria of adequate testing, peer review, consideration of error rates, observance controlling scientific standards, or general acceptance among chemists.

However, Obukowho warrants exclusion even under a *Kumho Tire* analysis untethered from the *Daubert* criteria. It was Plaintiffs' burden as proponents of Obukowho's testimony to "establish[] by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied." *Almeciga,* 185 F. Supp. 3d at 415 (quoting *U.S. v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007). Most critically, there is no evidence in the record apart from Obukowho's own say-so that his methodology satisfies "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field" of chemistry. *Kumho Tire*, 526 U.S. at 152; *id*. at 157 (district court correctly found that tire failure analysis did not meet standards of automotive engineering where only the expert "himself claimed that his method was accurate"). As detailed

in section II.C., *infra*, Obukowho's inadmissible junk science tests exemplify his unreliability as an expert witness on the whole.

Least of all is there any preponderant evidence that, absent responsible testing, chemists can reliably reach the conclusion that a hair relaxer's chemical performance causes its users undue incidence of scalp, skin, and hair injuries simply by reviewing its ingredients.  Doherty decl., ex. 1 at 71:7-19 (Obukowho reviewed the ingredients "[a]nd immediately I formed my opinion"); *id.* at 72:2 (his opinion would be the same without the hair swatch test).  The "analytical gap" between input and conclusion in such a superficial "methodology" is a canyon bridged only by Obukowho's *ipse dixit*.  *See Amorgianos v. Amtrak*, 303 F.3d 256, 266, 268-271 (2d Cir. 2002) (affirming summary judgment and exclusion of opinions that chemical exposure caused disputed injuries even where, unlike here, experts cited scholarly publications and other bases for conclusions).

Moreover, Obukowho's deposition belies his new insistence that he can reliably arrive at his conclusions about this product's alleged danger even if his slapdash tests are excluded.  Before Plaintiffs' counsel grew worried about the testing, Obukowho made laboratory experimentation sound indispensable to his undertaking:  "As a relaxer chemist one of the primary goals when we are trying to evaluate errors or problems with the relaxer cream is to conduct experiment [sic], in-house experiment."  Dkt. 180-26 at 57:22-25.  Similarly, he testified that a "study must be in place to be able accurately determine" rate of the product's alleged crystallization.  *Id.* at 99:6-15; *id.* at 102:24-103:3 ("I would be speculating…unless there is a huge study of all the batches made."); *id.* at 103:20-21 (same).  And, at the *Daubert* hearing, he flatly refused to say whether hair bleaches cause damage "because I've not prepared an experiment on that."  Doherty decl., ex. 1 at 44:12-15.  Yet, now Obukowho wants the Court to

believe he can reliably make categorical pronouncements about the Product's chemical performance, including its alleged likelihood to physically injure to all of its users, simply by reading the ingredients.

Whether Obukowho's knowledge is framed as "scientific," "technical," or "specialized" (FED. R. EVID. 702(a)), another key portion of his deposition irrefutably establishes that venturing opinions about the propensity of hair relaxers to cause physical injuries is not within his purported expertise as a professional chemist. He bragged to having formulated the chemical composition of "[t]housands" of relaxers, but when asked whether the several examples he named had ever caused their users to experience scalp burning or hair loss, Obukowho repeatedly answered, "I don't know." Did he ever try to find out? No, he said, because "[i]t is not in my duty to find out." Dkt. 180-26 at 37:6-41:10. Obukowho cannot reliably apply the relevant principles of chemistry to reach conclusions about this product's alleged physical dangers when he so clearly testified that it is not even his business to look into the dangers of relaxers *he himself designed*.

### 1.    Other Considerations Bar Obukowho Under A *Kumho Tire* Analysis.

#### a.    Bias Permeates Obukowho's Engagement.

In *Almeciga*, this Court set out several other considerations relevant to the *Kumho Tire* approach which join to bar Obukowho's opinions. First, Obukowho's entire engagement appears to be tainted with bias. *Almeciga*, 185 F. Supp. 3d at 424. There is no indication that Plaintiffs' counsel and Obukowho complied with the "well-established principle that experts must, to the maximum extent possible, proceed blindly" "without knowledge of the result sought by the party seeking to retain them." *Id.* at 425. Instead, he was retained explicitly with the purpose to identify "issues" with the product formulation. Doherty decl., ex. 1 at 70:19-21. Accordingly, his lab notes indicate that his "objective" was to confirm Plaintiffs' counsel's hope that testing

would "determine excessive penetration of relaxer active ingredients."   Dkt. 162-4 at 2. Explaining why he took no photos or video of the hair swatches he tested before discarding them, Obukowho said, "I already saw what I wanted."   Doherty decl., ex. 1 at 4:18-24. Plaintiffs' counsel, who pay Obukowho a $5,000 monthly retainer (*id*. at 16:15-18), did not instruct him to "save anything" from his tests.   *Id*. at 18:12-20.   Obukowho did not have his opinions tested by an independent laboratory.   *Id*. at 58:19-24 ("Because I'm a trained chemist and I know what I'm looking for.").   Obukowho's claim that his opinion would not change if objective measurement showed this Product to create no more damage than any other relaxer on the market is another example of his bias, and yet another justification for exclusion.   *Id*. at 43:4-17; *see id*. at 56:12-18 (opinion regarding scalp protector would not have changed even if his pH test showed longer period of efficacy).   There was no need to test other products for comparison or control, he testified, because this Relaxer was his "prime target."   Dkt. 180-26 at 55:24-56:10.

### b.   Obukowho's Analysis Is Subjective.

Second, even under *Kumho Tire*, "the subjectivity and vagueness that characterizes [Obukowho's] analysis severely diminishes the reliability of [his] methodology."   *Almeciga*, 185 F. Supp. 3d at 425.   He conceded that his opinions, whether based on his review of the Product's ingredients or the hair swatch test, were entirely subjective.   Doherty decl., ex. 1 at 20:21-21:1. Similarly, the pH test of the scalp protector "was more of a visual test" than a timed measurement of color change, let alone an actual objective measurement of pH value.   *Id*. at 52:17-24; dkt. 180-26 at 144:8-145:15 (tiny pH test strips were "so small" they could not hold "enough sample" to actually measure pH objectively).   Even though virgin hair was indispensable to his hair swatch test, he had nothing but his subjective feeling to indicate that the years-old swatches he ordered had never undergone chemical treatments, and did not bother to even examine them under a microscope.   *Id.* at 13:5-15:11.   He simply "kn[e]w what type of hair

I was looking for and what I got met that standard." *Id*. at 14:16-20.  Same with his usage of the "medium hair type." *Id*. at 21:16-18.  Defending the arbitrary ratio of relaxing cream to hair mass his test employed, he admitted that relaxer use in general "is very subjective application." *Id*. at 22:20-24:16.   Making matters worse, Obukowho inexplicably threw away the hair swatches (*id*. at 3:13-19), took no photos or video of his swatch test (*id.* at 4:18-24), and only took one photograph of one pair of pH test strips out of five (*id*. at 32:3-4, 34:7-35:8; dkt. 180-33), making it impossible to even question his subjective judgment, let alone determine to what degree bias colored his opinions.  Obukowho said it best when, under this Court's questioning, he admitted that the entire endeavor of trying to judge whether a hair care product's danger outweighs its utility is a matter of personal opinion:   "This whole process is subjective." Doherty decl., ex. 1 at 37:23-39:4.

### c.      Obukowho Assumed A Preordained Conclusion.

Third, Obukowho's analysis assumes away the key issue in dispute, such that his conclusions were "effectively preordained."  *Almeciga*, 185 F. Supp. 3d at 425.  Plaintiffs' chemical theory of unreasonable danger depends not on the mere identity of the product's ingredients, but on whether this Relaxer's chemistry actually performs dangerously in consumer use.  Obukowho, paid to "identify any issues" with the formula, took a look at the ingredients and immediately reached the conclusion that the product would perform dangerously to users' scalp, skin, and hair.  Doherty decl., ex. 1 at 71:9-21.  Only then did he concoct his tests, but not to assess the chemicals' actual performance disinterestedly, but rather to confirm his prejudgment of their danger.  *Id*. ("And immediately I formed my opinion and immediately decided on the type of test I need to do to confirm what I thought."); *In re Mirena*, 713 Fed. Appx. at 13 (affirming exclusion of causation opinions that "assumed the existence of the very fact in dispute" and "then worked backwards").  Illustrating that, Obukowho testified to being

uninterested in how competing products' scalp protector components might perform in his pH testing because, even "if every relaxer came back with the same results," it simply would not change his opinion that this product failed.  Doherty decl., ex. 1 at 35:12-20.

### d.      Obukowho's Self-Contradictions Shatter His Reliability.

Fourth, Obukowho's opinions are invalidated by "striking contradictions" between his reasoning in this matter and his previous published pronouncements.  *Almeciga*, 185 F. Supp. 3d at 426.  To take the most glaring, his central opinion that this Product poses unwarranted danger contradicts his admissions that all relaxers, and indeed all chemical hair treatments, are dangerous.  In his book, which is supposedly a survey of "what is out there in literature, in lectures and generally" (Doherty decl., ex. 1 at 41:16-21), Obukowho announced that "[i]t is an established fact that both lye and no-lye relaxers cause damage to the hair, and to date there is no known technology to completely eliminate these damaging effects."  Dkt. 162-2 at 5 (p. 95).  "Unfortunately," his book continues, "there are currently no relaxers on the market that do not inflict some degree of damage."  *Id*. at 6 ("epilogue"); *id*. at 3 (p. 91) ("hair will sustain damage from relaxer treatment" just "[a]s it would from any chemical treatment"); *id*. at 4 (p. 92) ("hair nevertheless experiences damaging effects when exposed to relaxer treatment").   These observations contradict his litigation-inspired theory that the alleged danger of this Relaxer stands out.

Other contradictions pepper the record.  Obukowho's report declares that the Product "causes more hair damage, scalp burns and irritation" than other relaxers (dkt. 162-1 at 5, ¶ 16), but he testified that if testing showed this Relaxer to create no more damage than any other, "that would not have affected my opinion" because his "primary goal" was "not to compare it with any other kit."  Doherty decl., ex. 1 at 43:12-17; *compare* dkt. 162-1 at 6, ¶ 19 ("summary of

conclusions" venturing that "everyone who uses the Product will have less hair fiber strength and integrity, more so than with" other relaxers); *id.* at 31, ¶ 82 ("greater likelihood" of injury "beyond other home-use relaxers").  Similarly, attempting to defend his failure to measure the extent of hair breakage this Product allegedly causes due to hair fibers' loss of mechanical strength, Obukowho testified that "[i]t is not done in our industry."  *Id.* at 47:8-18.  However, his book details just such measurement, declaring that relaxers cause "hair fibers [to] lose between 40-60% of their mechanical strength," with "many of these bonds broken irreversibly," such that "only 6-10% appear to recover after neutralization."  Dkt. 162-2 at 4 (p. 92).  Then, despite testifying that such measurements are not done in his industry, he testified a moment later that his book's measurements flowed from "my experience in this area of work."  Doherty decl., ex. 1 at 47:8-18; *compare id.* at 48:5-8.

As another self-contradiction, he pronounced at the May 16, 2018 hearing (though nowhere in his reports) that all relaxers with processing times of under "20 to 25 minutes" are "too fast," cannot be used safety, and are categorically dangerous.  Doherty decl., ex. 1 at 37:11-38:7, 60:5-8, 78:4-15; 84:16-23.  Yet, his book states that such a "lengthier time frame" "tends to create a false sense of time or security, causing many people to wait until they feel the tingle" before rinsing out the relaxer, which risks the danger of "overprocessing."  Dkt. 134-1 at 8 (p. 62).  Moreover, Obukowho's new hardline position[8] contradicts his positions as a defense expert in another class action (Doherty decl., ex. 2 at 122:12-14 (testifying that relaxer users are

---

[8] Obukowho's new theory that any relaxer that processes in less than 20 minutes is unreasonably dangerous should be excluded on the further basis that it is not contained in his report, was not disclosed or even mentioned prior to the May 16, 2018 *Daubert* hearing, and is unsupported by data, peer reviewed research, or any other reliable source.  FED. R. CIV. P. 26(a)(2) and 37(c)(1); *Innogenetics, N.V. v. Abbott Labs*., 512 F.3d 1363, 1375 (Fed. Cir. 2008) (excluding eleventh hour disclosures is appropriate); *O2 Micro Int'l Ltd. v. Monolithic Power Sys.*, 467 F.3d 1355, 1368 (Fed. Cir. 2006) (excluding opinions not disclosed in reports).

instructed to apply for 10-20 minutes)); at his deposition in this matter (dkt. 180-26 at 116:10-20 (testifying that processing time varies, and stylists "may leave it [on] a little bit longer" if they are "not getting enough relaxation.")); and as a bench chemist. Doherty decl., ex. 6 (four products formulated and developed by Obukowho,[9] each with recommended processing times under 20 minutes[10]).

In addition, at one point in the hearing, he testified, "relaxer chemistry with every manufacturer is the same. We know that for sure." Doherty decl., ex. 1 at 47:8-18; *id.* at 31:4-6 (claimed history of "visiting every company that makes relaxer"). Shortly later, attempting to defend his failure to ascertain how many relaxers use or do not use petrolatum as a scalp protector, he testified, "It's impossible. There are millions of them [relaxers] out there." *Id.* at 49:15-18. Then, in the next breath, "I cannot, because there are thousands and thousands of relaxers out there." *Id.* at 49:19-22. Thus, in Obukowho's self-serving contradictions, the scale of relaxer commerce is both small enough to permit his achievement of authoritative command of relaxer chemistry for "every manufacturer," but too immense to determine a standard scalp protector to use as a control in his pH experiment.[11] Worse still, Obukowho has no credible explanation for how he managed to see the pH strips in his scalp protector experiment turn color through the opaque Relaxer Crème. Doherty decl., ex. 1 at 54:1 ("the cream is not see through").

---

[9] Dkt. 180-26 at 38:5-9 ("We made several relaxer products…Pressing Comb in the Jar… [a]nd then there is [S]-Curl Relaxer [and]…Designer Touch Relaxer."); *id.* at 40:2, 22.

[10] Nearly all relaxers, including four designed by Obukowho (Doherty decl., ex. 6), instruct users to limit relaxer processing time to the results of a strand test, and to never exceed 20 minutes. *See* Doherty decl., ex. 7 (processing times of other hair relaxer products).

[11] The petrolatum Obukowho used a purported control did not come from any other hair relaxer kit, but simply from a tub that he keeps in his "lab," with no showing that the substance matches or resembles any standard scalp protector on the market (Doherty decl., ex. 1 at 50:3-13), particularly given Obukowho's testimony that it would be "impossible" to determine the extent of petrolatum's use for that purpose among "millions" or "thousands" of relaxers. *Id.* at 49:15-22.

C.   **Obukowho's Know-It-When-I-See-It Methodology Is Unreliable And Unhelpful To The Fact-Finder.**

All of Obukowho's opinions indispensably rely upon experiments that are impossible to replicate and find no support in the reliable practice of chemistry, let alone the scientific method. Obukowho's opinions rest on two uncontrolled, biased tests designed to result in a predetermined outcome with no concern for standard experimental design.[12]  Because Obukowho destroyed tangible evidence from these experiments, Defendants are left without any way to challenge his supposed results.  Obukowho asks Defendants and the Court to take his word that his unblinded, uncontrolled, unwitnessed, inadequately designed, unconfirmed, suspiciously[13] and imprecisely[14] documented experiments are reliable; that he actually performed them; and that they yielded results that support Plaintiffs' case.

Obukowho devised his experiments to prove the Product's alleged danger.  He made no attempt to control for the confirmation bias that goes hand-in-hand when a paid expert devises and performs a subjective experiment to prove a theory that is helpful to his own client. Obukowho should have confirmed his findings with an independent lab, videotaped or photographed his experiments to rebut challenges to his methodology and results, and described the variables and samples in his experiments with adequate detail.  Obukowho never would have

---

[12] Proper design of chemical testing requires blinding, calculated error rate, randomization, consideration of variables and extraneous factors, determination of experimental units to be used and responses to be measured, potential invalidation factors, statistical adequacy and reliability, replication, and a control. Gary W. Oehlert, *A First Course In Design and Analysis of Experiments* (2010); J. Taylor, *Principles of Quality Assurance of Chemical Measurements* (February 1985).

[13] Doherty decl., ex. 3.

[14] *Id.* (lab notes do not show that scalp protector test was replicated; timing recorded as "a few minutes" and "about 30 minutes"; shade of green missing; "subjective examination"; "approximately 2 grams"; "similar [(but not same)] experiment"; improbable relaxation times of 4, 4.5, and 5 minutes, no control to support claim that butylene/hexylene glycol caused excessive penetration).

supported his own professional research with the tests upon which his opinions in this matter rely.  Doherty decl., ex. 8 (Obukowho article noting use of control and "wide range of scientific testing" to measure oil penetration, disulfide bond breakage and permeability, including Scanning Electron Microscopy); Doherty decl., ex. 9 (Obukowho article noting that "[t]he optimum hair-fiber extension can be found by measuring the force needed to deform the fiber by 25%..."). Tellingly, he said that applying *his own* hair swatch test to another hair relaxer for purposes of comparison or control "would be a *junk experiment*."  Doherty decl., ex. 1 at 46:11-14.

Simply excluding Obukowho's unreliable experiments is not enough.  Allowing him to testify at all as a purported expert practitioner of chemistry gives the false impression that there is scientific support for his opinions, when in truth they are unreliable and unhelpful.

### 1.   It Is Impossible to Replicate or Confirm Obukowho's Experimental Results.

Obukowho agrees that the hallmark of reliable science is the ability to objectively reproduce and confirm experiments and results.  Doherty decl., ex. 1 at 17:3-6 (confirming the importance of ensuring that testing can be replicated).  Complete scientific records based upon accepted methodology enhance credibility and ensure validity.  For this reason, scientific experts are expected to apply the same scientific rigor in litigation testing as they do in the laboratory. *SmithKline Beecham Corp. v. Apotex Corp*., 247 F. Supp. 2d 1011, 1040-41 (N.D. Ill. 2003).

Obukowho's experiments are incapable of replication and rely on a subjective know-it-when-I-see-it[15] methodology.   The results are based upon a visual evaluation of elasticity

---

[15] *See* dkt. 180-26 at 60:7-13 ("Bond breakage determination is normally done when there is a need to determine if the relaxer cream formed too quick … or is not properly composed.  So my objective at that point was just to know at what point do I start seeing relaxation."); Doherty decl., ex. 1 at 26:13-15 (confirming that hair swatch test "really depends on observing the relaxation.").

(Obukowho testified in 2006 case that subjective tensile strength testing[16] is performed by hair stylists, not chemists[17]), disulfide bond breakage, and pH strip color change.[18]  Obukowho does not know the age of the experimental product sample, how it was stored, from where it was obtained, or which of the three versions of the Product was tested.[19]  Though he testified that the Product's shelf life is limited to five years, he did not even examine the unit he tested to determine its age.[20]  Because he did not take any photos of or produce the unit he tested,[21] it is impossible to confirm the amount of each component used, whether it had crystallized, or if it was simply a non-conforming unit.  Critically, even though he testified that the injuries disputed here could also be caused by the progressive, worsening crystallization of the Relaxer Crème over the varying durations of each unit's shelf time prior to use (dkt. 180-26 at 74:18-77:19, 78:5-8, 82:6-18, 105:8-15, 106:7-108:12), and that such crystallization is detected under a microscope (*id*. at 79:6-20), he never bothered to examine a single unit of this product under with

---

[16] The accepted method for tensile strength testing is through Instron or Diastron testing.  M. Gamez-Garcia, *Effects of some oils, emulsions, and other aqueous systems on the mechanical properties of hair at small deformations*, J. Soc. Chem., 44, p. 70, Jan./Feb. 1993, which appears at Doherty decl., ex. 10.

[17] Doherty decl., ex. 2 at 41:14-18.

[18] Doherty decl., ex. 1 at 21:16-18 (confirming that he visually determined that the hair samples were medium type); 20:23-25 ("By subjective, I meant when I determined the elasticity of the hair…it was a visual determination."); 26:13-15 (confirming that his test depends upon his "observing the relaxation."); 52:21-22 ("[T]he test strip was more of a visual test.").  Obukowho's testimony that chemists typically make visual determinations of elastic resistance is false according to his article, *A New Approach to Formulating Hair Relaxers* (Doherty decl., ex. 8), wherein he describes measuring bond disruption as "measuring the force required to extend the hair by 25%."  He also testified that he could have "measure[d] the loss of mechanical strength caused by [the Product]."  Doherty decl., ex. 1 at 42:21-25.

[19] Doherty decl., ex. 1 *at* 6:10-13, 7:3-8; dkt. 180-26 at 109:16-110:12 ("A friend" purchased the product for him, but he could not name the friend because "there are people who come in and out of my life.").

[20] Doherty decl., ex. 1 at 7:19-24 (shelf life of up to five years); *id*. at 8:20-24 (Obukowho did not "recall what the date was on [the] package" he tested because "I had saw [sic] the product for the first time, [Y]our Honor, when they sent it to me.  I did not read through it."

[21] Doherty decl., ex. 1 at 5:8.

his microscope.  *Id.* at 82:23-84:5; *see* dkt. 178 at 16 (Plaintiffs admit "to determine the rate and

time of crystal formation would require an extensive study of batches manufactured").

Obukowho's lab notes do not include basic experimental details or conditions that are

necessary for reliability of results, evaluation, and replication.  He does not note experimental

conditions, such as temperature of the lab, even though chemical reaction rate is directly related

to temperature.[22]  Also missing are precise details regarding the length, kink,[23] diameter,[24] age,

source or porosity of the hair samples tested, or from which area of the head the samples were

taken,[25] and he made no attempt to determine whether the hair had been previously treated,

braided, or dyed.[26]  Contrary to his common scientific practice, Obukowho did perform any pre-

treatment inspection of the hair samples.  Dkt. 180-26 at 49:24, 50:13-53:9; Doherty decl., ex. 2

at 16:19-17:5.  Even though having virgin, unprocessed hair was critical to his test (Doherty

decl., ex. 1` at 15:9-11), he could not say whether the samples came from subjects who

previously relaxed or bleached their hair.  Dkt. 180-26 at 51:10-21.  He never bothered to look at

the hair samples under a microscope to assess the extent of preexisting damage (Doherty decl.,

ex. 1 at 13:13-15:11), whether from their donors' prior hair treatments, or simply from the

ancient hair samples' minimum five years of dry starvation without the natural oils of a live

---

[22] Temperature increase causes reactants to collide more often, resulting in more energy available
to break bonds, and thus more bond breakage. It was therefore crucial for Obukowho to have
recorded and properly controlled the temperature of the lab in which he performed his tests.

[23] *See* dkt. 180-26 at 52:18-21.

[24] It is impossible to determine whether the hair sample tested by Obukowho was actually
medium-type because he did not measure its diameter, as would typically be done by a chemist
in the field.  Dkt. 180-26 at 50:7-12 (he determined hair type by "feel[ing] the hair"); *compare*
Doherty decl., ex. 10 at p. 70 (…careful selection of fibers having a diameter of $96 \pm 3$ μm was
made.  The fiber diameters were measured at only 60% RH at equilibrium conditions by
microscopy.").

[25] *See* dkt. 180-26 at 54:4; 116:17-19 ("In some areas of the hair or head you may see … relaxer
working quicker than some other areas.).

[26] Dkt. 180-26 at 48:16- 49:25; 50:13-51:6; 53:16-25.

scalp.  *Id.* at 11:19-12:6.  He also failed to document the storage, handling and preparation of the hair prior to testing.[27]

Obukowho's decision to apply 2 grams of Relaxer Crème to approximately 2 grams (another imprecision) of hair was also flawed.  Chemical reaction rate depends on concentration and surface area:  the greater the reactant concentration, the more molecules are available to collide/react, and the greater the surface area, the more opportunity for collision.  Thus, two grams of long, thin hair may react faster with a chemical than two grams of shorter, thicker hair,[28] and the scalp protector will behave differently on 98-degree human skin than on a pH strip at an unstated temperature.  Obukowho did not design his experiments to control for this.  He also did not record the force used to apply the Relaxer Crème.  Because there is no video of him performing his test, and his notes do not indicate an objective tensile force, it is impossible to determine whether the force used was excessive, which itself could have caused breakage or accelerated processing time.[29]  The imprecision in Obukowho's time and color measurements renders his experiments and opinions further unreliable.

No reasonable chemist would design an experiment that diverges so markedly with the scientific method – including Obukowho, when he is not a paid expert witness.  Doherty decl., ex. 8 at p. 64-70.  No one can replicate the subjective conditions of Obukowho's tests, least of all from his vague lab notes or testimony.  Because Obukowho's opinions depend on unreliable experiments lacking in sound or replicable methodology, his report and testimony should be

---

[27] Accepted scientific practice includes detailed description of experimental conditions and data calculation.  *See* Doherty decl., ex. 10 (using Dia-Stron rheometer to measure tensile strength, noting temperature, humidity, sample preparation details, etc.).

[28] Doherty decl., ex. 9 at p. 68 ("Fine hair has less bulk, so saturation progresses quickly.  Such hair needs a shorter processing time.  Porous hair needs less processing time….Hair with [low] sulfur [has faster] processing time").

[29] Doherty decl., ex. 2 at 36:14-16 (testifying that "during the mechanical manipulation process, you are driving [the hair relaxer] into the hair, you are inducing damage.").

excluded in full.

###  2.     Obukowho's Experimental Design Is Unreliable and Not Accepted.

Obukowho's opinions must be excluded because the experiments upon which they rest are not subject to internal controls or standards accepted in the scientific community. *Almeciga*, 185 F. Supp. 3d at 415 ("[C]ourts should ordinarily pay particular attention to whether the expert's methodology … has received general acceptance in the relevant scientific community." Generally, failure to perform blinded testing provides a basis for exclusion. *SmithKline*, 247 F. Supp. 2d at 1035 (criticizing expert for not conducting "blindfold" tests of samples). Because Obukowho's subjective experiments were conducted by a paid witness who designed them with a specific outcome in mind, the results are unreliable and should be excluded.

Moreover, the Relaxer Crème experiment lacked an objective control to prove his hypotheses that butylene and hexylene glycol "promoted the excessive fast penetration of the lithium hydroxide ion into the hair coupled with the poor emulsion design"; that crystallization rendered the Relaxer Crème dangerous over time; that the product causes excessive bond breakage; or that the Product is more dangerous than represented. *AstraZeneca AB v. Mylan Labs., Inc*., 490 F. Supp. 2d 381, 402 (S.D.N.Y. 2007) ("[f]ailure to test for alternative causes or to use control experiments may provide a basis for exclusion."); *Almeciga*., 185 F. Supp. 3d at 415 ("Courts should ordinarily pay particular attention to…whether it is subject to internal controls and standards.").

But, according to Obukowho, arriving to a "clear answer if butylene or hexylene glycol [are] responsible for speeding up the rate of reaction" required "[a] controlled experiment … where you have the same formula without one or two ingredients." Doherty decl., ex. 1 at 79:3-11 ("[I]f I'm making the relaxer formula and I want to determine the speed of penetration after

my suspicions of having the kinds of butylene and hexylene glycol, I will [sic] take the butylene and hexylene glycol out.  That becomes a control.").  Obukowho knew that, to confirm his butylene/hexylene hypothesis, he need only create a reliable control (*i.e.,* re-create the Relaxer Crème, less butylene and hexylene glycol).  *Id.* at 46:2-4 ("It could have been done if I reproduced the formula.").  Obukowho had the Relaxer Crème formula, a lab, his experience, and $5,000 per month.  *Id.* at 16:18, 58:13-15, 71:11.  It remains a mystery why he did not perform a reliable experiment to test his hypothesis, when he easily could have.

Although Obukowho told the Court that here is no control for crystallization (Doherty decl., ex. 1 at 11:16), he testified at deposition that there are indeed "various ways to determine the crystallization, you can look at it under the microscope…and do an evaporation process." Dkt. 180-26 at 78:12-17.  To be certain that crystallization had not occurred in the unit of Product used in his experiments, he should have turned on his microscope or tested units from different manufacturing batches.  By his own testimony,[30] he also could have quantified disulfide bond breakage through Electronic Scan Microscopy.  Doherty decl., ex. 1 at 42:21-25, 43:10 ("There are tests done to determine [disulfide bond breakage] in the industry."); Doherty decl., ex. 2 at 17:16-24 ("Normally, [bench chemists]…do scan electron microscope analysis of the hair.  That gives you a clear indication of the…cuticle layout of the hair, if the hair is severely damaged.  Mostly what we do is…disulfide bond breakage.").  Obukowho did not even bother to test the rate of penetration of the Product against the rate of penetration of other relaxers. Doherty decl., ex. 1 at 43:12-17.  Despite that objective testing methods were available and known to him, Obukowho instead performed pseudo-scientific tests designed to prove his biased

---

[30] When asked why he did not quantify bond breakage, he testified that "[b]ond breakage determination is normally done when there is a need to determine if the relaxer crème formed too quick or too fast, or is not properly composed."  Dkt. 180-26 at 60:7-11.

theories.[31]  By destroying the results of those experiments, Obukowho ensured that Defendants would not have an opportunity to challenge his subjective interpretations of results that could have ended this case long ago if they were favorable to Defendants.  As such, his opinions should be excluded.

In addition, Obukowho's scalp protector experiment, performed on the same, sole unit of Product used in his Relaxer Crème demonstration, is unreliable because it depends entirely upon his subjective interpretation of undocumented color change after an imprecise amount of time. *See* dkt. 180-26 at 153:3-21 ("I don't need any standard methodology...").  Obukowho cannot cite to any instance of such a test's prior use in cosmetic chemistry, let alone for this purpose. *Astra Aktiebolag v Andrx Pharms., Inc.*, 222 F Supp. 2d 423, 492 (S.D.N.Y. 2002) (pH testing is reliable only when it is supported by data sheets describing "procedure, sample size, sample description, sample temperature, calibration details for the Beetrode probe, and actual sample measurements were recorded for each experiment.").  As set forth in Defendants' supplemental papers in further support of summary judgment, Obukowho's bare conjecture that the scalp protector's formulation is improper is based on nothing more on untested possibilities and irrelevant grease patents.  Dkt. 206 at 1-4; dkt. 209 at 1-2.

### III.   None of Obukowho's Opinions Are Material to Whether This Relaxer Poses Any More Danger Than Others.

The Court also requested further briefing as "to what extent" Obukowho's testimony is material to comparing the alleged danger of this Relaxer to other products.  Doherty decl., ex. 1 at 96:9-23.  None of his testimony is material or admissible on that pivotal question.

Compared to other relaxers, Obukowho cannot opine that this Relaxer causes any more

---

[31] *SmithKline*, 247 F. Supp. 2d at 1040–41 (experts have potential bias as they "are not known for biting the hand that feeds them").

damage or poses any additional danger whatsoever because he admitted his total inability to quantify this Relaxer's supposed dangers and made no attempt to measure other products. Doherty decl., ex. 1 at 45:25 (when the Court asked, "So did you do a comparison with other products?," Obukowho answered, "No, your Honor.")

According to Obukowho, all relaxer use results in damage.  Obukowho's 2012 book admits, "As it would from any chemical treatment, hair will sustain damage from relaxer treatment because the process breaks and reconfigures the structural bonds of hair."  Dkt. 134-1 at 91; *id.* at 10[7] (epilogue) ("no relaxers on the market that do not inflict some degree of damage").  Similarly, in a trade publication, Obukowho declared that due to hair relaxers' "high chemical PH," "coupled with very aggressive active ingredients," the notion of a "nonirritating relaxer" is "[w]ishful thinking."  Dkt. 156-1; *id.* ("Nothing more" than a wish").

He reiterated these views unmistakably at the recent *Daubert* hearing:  "Yes, all relaxers are damaging.  That's correct, yes."  Doherty decl., ex. 1 at 43:18-23.  All relaxers, he testified, are "dangerous," "can cause scalp burns," "can cause hair loss," "can cause hair breakage," and "can cause loss of mechanical strength of hair" "[t]o some degree."  *Id.* at 43:24-44:11; *see also* Doherty decl., ex. 2 at 127:16-17 ("You have severe irritation with all forms of relaxer."), 33:4-10 ("The pathway of the reaction of relaxer[s generally] coming into the cortex region will be severely damaged.  You destroy the protein metrics.  You will have cuticle desegmentation, you have cuticle cracks.  You also have disulfide bond breakage.   You have perforated cuticles – the damage just goes on and on…"[32]).

Obukowho has never measured or quantified the degree to which, if at all, this Product is

---

[32] This 2006 testimony mirrors Obukowho's "speed bump" analogy, suggesting that he actually believes all relaxers, not just this Product, cause destruction at an uncontrolled rate until neutralization.

more likely to injure skin, scalp, or hair than other relaxers, or how much more loss of hair fiber strength this Product allegedly causes versus others.  Doherty decl., ex. 1 at 42:7; *id*. at 47:8-12. Having written that all relaxers cause hair fibers to "lose between 40-60% of their mechanical strength" (dkt. 134-1 at 92), Obukowho admitted that he cannot quantify how much loss this Relaxer causes.  He conceded that such an undertaking would be "bogus."  Dkt. 156-2 at 159:3-160:7.  Moreover, he admitted that hair and scalps react differently to relaxers because everybody is different.  *Id*. at 157:21-158:20.

Nevertheless, his report reached for the conclusions that this Relaxer "causes more hair damage, scalp burns and irritation" than other relaxers (dkt. 162-1 at 5, ¶ 16), and that "everyone who uses the Product will have less hair fiber strength and integrity, more so than with" other relaxers. *Id.* at 31, ¶ 82 ("greater likelihood" of injury "beyond other home-use relaxers").

However, at his *Daubert* examination, he contradicted his report and essentially conceded that he has no basis to opine that this Relaxer poses any additional danger beyond the product category:  "*All I was concerned* [was] if the relaxer in [sic] L'Oreal put out was damaging," "not to compare it with any other kit."  Doherty decl., ex. 1 at 43:12-17 (emphasis added).  He even declared that it "would not have affected my opinion" if testing showed that this Relaxer "created no more damage than any other relaxer in industry."  *Id*.

The grand illusion of this case is that the Product is somehow unique because it allegedly damages everyone marginally more than other hair relaxers in some unquantifiable, imperceptible way, even if its overwhelmingly happy users love the product and neither see nor feel any damage.  Yet, Plaintiffs' inadmissible expert simply cannot show this Product to be less safe than any other.  Plaintiffs do not deny Obukowho's inability to assert that the Product's alleged comparative marginal risk is any more than *de minimis* and legally meaningless.

24

## CONCLUSION

Obukowho is an unreliable, unhelpful witness who requires exclusion because Plaintiffs failed in their burden to satisfy Rule 702 by an evidentiary preponderance.

Dated:   June 5, 2018

GORDON REES SCULLY MANSUKHANI LLP

By: _____s/ Justin D. Lewis_____
        Miles D. Scully (admitted *pro hac vice*)
        Peter G. Siachos
        Justin D. Lewis (admitted *pro hac vice*)
        JoAnna M. Doherty

1 Battery Park Plaza, 28th floor
New York, New York 10004
T:  (212) 269-5500
E:  jlewis@grsm.com