```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------x
                                    :
In re: AMLA LITIGATION              :
                                    :
-----------------------------------x
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:_____

16-cv-6593

OPINION AND ORDER

JED S. RAKOFF, U.S.D.J.

Nine individuals from eight different states brought fifteen claims against defendants L'Oreal USA, Inc. and its subsidiary Soft Sheen-Carson LLC (collectively, "L'Oreal"). All claims are based on alleged defects in the "Amla Legend Rejuvenating Ritual Relaxer" (the "product"), which is used to chemically straighten naturally curly hair. The product is a single kit that contains five components: (1) the scalp protector, (2) a relaxer cream, (3) a shampoo, (4) a conditioner, and (5) an oil moisturizer. Plaintiffs allege that defects in the relaxer cream and scalp protector render the product unreasonably dangerous and that L'Oreal misrepresented the product's safety and breached various related warranties, causing plaintiffs to suffer economic and physical injuries.

The Court previously certified a class of New York consumers, defined as "All persons who bought one or more of the Products in New York from August 19, 2013 to the present," and a class of Florida consumers, defined as "All persons who bought one or more of the Products in Florida from December 1, 2012 to the present." See ECF No. 138. Both classes were certified under

Rule 23(b)(3) to bring unjust enrichment claims, and the New
York class to also seek $50 in statutory damages for each class
member pursuant to New York's General Business Law ("NYGBL")
§ 349. The classes were also certified under Rule 23(b)(2) to
seek injunctive and declaratory relief pursuant to Florida's
Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.204
("FDUTPA"), and NYGBL § 349. The motions for class certification
were otherwise denied. Class notice was complete on February 28,
2018 and the opt-out date was April 2, 2018.

L'Oreal now moves for summary judgment on all claims.
Following briefing and oral argument, this Court, on April 3,
2018, issued a preliminary "bottom line" order, denying in part
and granting in part L'Oreal's motion, as well as ordering
supplemental briefing on claims involving the scalp protector.
Thereafter, however, the Court held an in-court hearing with
testimony from plaintiffs' key expert, Patrick Obukowho, to
determine the admissibility of his testimony for purposes of
summary judgment, and ordered further briefing on several
issues.

Having duly considered the voluminous briefing and argument
from both parties, as well as the testimony of Mr. Obukowho, the
Court now (1) decertifies the 23(b)(3) unjust enrichment
classes; (2) decertifies the 23(b)(2) classes seeking injunctive
and declaratory relief; and (3) grants L'Oreal's motion for

2

summary judgment as to (A) all claims for injunctive and declaratory relief; (B) all claims related to the dangerousness of the relaxer cream; (C) the New York plaintiffs' unjust enrichment claims; and (D) the California plaintiffs' fraud and negligent misrepresentation claims insofar as they are premised on omissions. However, the Court denies the motion as to (1) the NYGBL claims, both on behalf of the New York class and the individual named plaintiffs; (2) all remaining claims based on the alleged dangerousness of the scalp protector and representations or warranties regarding its ability to protect scalps; and (3) all remaining claims premised on implicit misrepresentations that the product is safer than relaxers that contain lye.[1]

Summary judgment is appropriate if the "movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). There is no genuine dispute if, "drawing all reasonable inferences in favor of a non-movant, no reasonable trier of fact could find in favor of that party." Heublein, Inc.

---

[1] Both sides filed motions to strike their adversaries' expert reports. For the most part, however, the Court does not here need to decide those motions because the opinions expressed in those reports would not affect the Court's decision. Those motions, or portions thereof, that are not addressed herein are therefore denied as moot, without prejudice to either side renewing these arguments in motions in limine before the trial of the remaining claims, which is scheduled to commence on November 12, 2018.

3

v. United States, 996 F.2d 1455, 1461 (2d Cir. 1993). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

## I. Disputes of Fact

### A.    The Relaxer Cream

The basic chemistry of hair relaxers is undisputed. Compare Decl. of Peter G. Saichos dated January 19, 2018, ECF No. 162 ("Saichos Obukowho Decl."), Ex. 1 ("Obukowho Rep.") ¶¶ 21-37 with Decl. of Rosemary Rivas dated February 27, 2018, ECF No. 173, Ex. 2 ("Westman Rep.") 13-15. Hair relaxers generally use an alkaline agent, usually a strong hydroxide, to penetrate the hair's outer layer and permanently break the disulfide bonds in the hair's keratin proteins, forming new, substantially weaker bonds. The relaxer cream is then washed out with a low pH shampoo to neutralize the hydroxide, leaving the hair straighter but more fragile. Hair relaxers thus work by damaging hair. Unsurprisingly, all hair relaxers can cause hair breakage and scalp burning. Pls.' Resp. and Evidence to Defs.' Statement of Material Facts, ECF No. 181 ("56.1 Resp.") ¶ 1.

Users of hair relaxers understand these risks. L'Oreal's expert Larry Hibbard conducted a survey of hair relaxer consumers, which plaintiffs did not challenge. Hibbard determined that, after adjusting for the control, 80.2% of

4

respondents believed that no-lye hair relaxers, such as the product at issue, can irritate the scalp and 63.5% knew that it could cause hair to fall out. Decl. of Justin D. Lewis, ECF No. 156, Ex. 10 ("Hibbard Rep.") ¶ 102. Indeed, many had previously experienced scalp burning or damage to their hair when using other no-lye hair relaxers. Id. Users' baseline expectation, then, is that the product here at issue, like all hair relaxers, poses risks. The alleged difference must be one of degree.

The relaxer cream at issue here contains not only lithium hydroxide but also proprietary "pro-solvent ingredients." It is undisputed that these ingredients allow the lithium hydroxide ions to penetrate the hair faster than they otherwise would. See Decl. of Rosemary Rivas dated March 5, 2018, ECF No. 179-80 ("Rivas Opp. Decl."), Ex. 38 at 3 (L'Oreal patent for a relaxer cream containing these ingredients, stating that, "when the same or similar concentration of hydroxide-containing compounds is used as in prior art compositions, a more efficient/faster straightening or relaxing result is achieved"). Plaintiffs argue that these pro-solvent ingredients, together with the design of the emulsifier in the relaxer cream, cause the product to finish relaxing hair in less time than users can reasonably apply and remove it. Because the alkaline agent continues breaking disulfide bonds until it is removed or neutralized with a low pH shampoo, the relaxer will necessarily break more bonds than

necessary to relax the hair, thus arguably making the product unreasonably dangerous.

## 1. Expert Report of Patrick Obukowho

Plaintiffs rely almost entirely on the expert report of Patrick Obukowho, a chemist with years of experience working with hair relaxers and related products. See Obukowho Rep. ¶¶ 1-9. Obukowho's report describes a test that purports to demonstrate the speed with which L'Oreal's product relaxes hair, outlines the chemistry behind why the relaxer works so quickly, and states his conclusion that the cream is dangerously designed. L'Oreal moved to strike this report, and the Court, as noted, conducted a "Daubert" hearing at which Obukowho testified. See Transcript dated May 16, 2018, ECF No. 216 ("Daubert Tr."); see also Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).

Obukowho treated three "swatches" of medium-type African-American hair with the relaxer cream from a single box, as directed in the product instructions, and visually determined that the three swatches were completely relaxed in four-and-a-half minutes, four minutes, and five minutes, respectively. Id. at ¶ 46. According to Obukowho's report, his "experience in this art" confirms that this "was too quick for a user to fully apply the relaxer cream to the entire head." Id. Moreover, at least one version of the package represents that it "works in 13-15

6

minutes," Rivas Opp. Decl. Ex. 17, and, as L'Oreal's expert testified, "inherent in Amla's instruction is the determination that it would take somewhere between 13 and 15 minutes to both apply the product and . . . allow it to process adequately." Rivas Opp. Decl., Ex. 44 at 118:4-9.

Obukowho concluded that the reason for this "fast action" was "the penetration of the active ingredient lithium hydroxide aided by the [pro-solvent ingredients], and coupled with an emulsion that is poorly designed." Obukowho Rep. ¶¶ 47-57. This design, Obukowho opines, "is a disaster because it will initiate and promote excessive penetration of hydroxide ions and excessively fast breakage of the disulfide bonds in the hair, resulting in hair breakage, and scalp and skin irritation and burning." Obukowho Rep. ¶ 44. Indeed, Obukowho believes that any relaxer that works in less than twenty minutes is excessively dangerous. Daubert Tr. 621:5-8.

L'Oreal challenges each of Obukowho's conclusions on independent grounds, under the tests outlined in both Daubert and Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999). The Court finds that Obukowho's conclusion that the relaxers' speed renders it unreasonably dangerous is unreliable and inadmissible, even accepting for the sake of argument the admissibility of his experiment as evidence that the relaxer cream works very quickly.

7

Critically, Obukowho did not mention any experiments or studies showing how often L'Oreal's relaxer cream causes any noticeable injury, such as hair breakage or scalp irritation. Nor did he provide any evidence of how often the product causes these injuries as compared to properly designed relaxers. Absent this information, all he could do was repeat his conclusion that the product's speed inherently rendered it dangerous. See, e.g., Obukowho Rep. ¶ 44; Daubert Tr. 29:12-18 ("THE COURT: I understand it's faster. . . . But what is the danger that's associated with that that leads you to call it excessive? THE WITNESS: Excessive because in the industry it is the standard to observe a well-designed relaxer to work anywhere from 20 minutes and 25 minutes."); Saichos Obukowho Decl, Ex. 3 ("Obukowho Dep.") 60:14-17 ("Initially the hair is not elastic which means the bonds are still there, but after 4.5 minutes, 5 minutes the hair became very elastic which in my judgment was too fast.").[2]

_____

[2] See also Obukowho Dep. 55:8-15 ("[B]eing familiar with relaxer applications, how it is conducted, . . . those trained in the arts know[] time of penetration when it is too excessive or when it is not excessive."); Daubert Tr. 30:25-31:6 ("Q: You did not cite to any standard that indicated that anything shorter than 15 minutes is considered excessive in the industry, did you . . . ? A: I did not, because based upon my over 30 years' experience in doing relaxer and visiting every company that makes relaxer, I know that for sure."); id. 39:1-4 ("[B]ased upon the work we have done in the lab and having done so many relaxers in my life, a good relaxer on normal skin . . . should have a processing time between 20 minutes and 25 minutes.").

8

Rather than point to direct evidence, plaintiffs argue that Obukowho's experience suffices to render his conclusion reliable. In determining the admissibility of an expert opinion, however, the Court must "undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 267 (2d Cir. 2002). Obukowho's conclusory assertions do not permit such a review. "[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997); see also Kumho Tire, 526 U.S. at 157 (expert opinion inadmissible because the only basis for its accuracy was that the expert "himself claimed that his method was accurate").

Obukowho did opine that "everyone who uses the Product will have less hair fiber strength and integrity" than they would have if they had used a relaxer without the pro-solvent ingredients. Obukowho Rep. ¶ 19. This, he stated, is true "even when [the damage is] not apparent to users." Id. This conclusion is reliable, as it is undisputed that relaxers work by decreasing hair fiber strength and integrity, and L'Oreal's product works faster than others. 56.1 Resp. ¶ 1. But a loss of

9

molecular structural integrity that the user does not even notice is not actionable, and Obukowho offers no evidence of how often the product causes perceptible injuries, much less the type of injuries that would render the product unreasonably dangerous.

The Court therefore holds that Obukowho's conclusion that the relaxer cream is unreasonably dangerous because it works so quickly is inadmissible.[3]

## 2. Other Evidence

Plaintiffs argue that they have adduced other evidence sufficient to support a finding that the chemical mechanism Obukowho describes translates to a distribution of harm that is meaningfully more severe than that of other relaxers. The Court disagrees.

Plaintiffs cite two studies conducted by L'Oreal wherein subjects reported a statistically significant difference in discomfort between defendants' product and other, differently formulated relaxers. However, these studies, which asked subjects to rate their discomfort at various points after applying the relaxer, show only that the product is marginally

---

[3] Because, as shown below, the remainder of plaintiffs' evidence on this score is insufficient to survive summary judgment, the Court need not address the admissibility of Obukowho's experiment purporting to demonstrate the speed with which the relaxer works.

more uncomfortable than others, not that it is unreasonably
dangerous. See Rivas Opp. Decl. Ex. 40 at Appendix B (showing
that average maximum burning was approximately 4 out of 9 for
L'Oreal's product, compared to approximately  2 out of 9 for the
other); Rivas Opp. Decl. Ex. 41 at 6 ("Overall sensations were
low with both products.").

Plaintiffs next point to a few internal emails suggesting
that L'Oreal received more complaints about this product than it
did for other relaxers. See Rivas Opp. Decl. Exs. 6 & 10. Even
if that were the case, the overall number of complaints for the
product remains vanishingly small. A toll-free telephone number
appears on the side of every carton of the product, and customer
service contact information is included on the instruction
sheet. Decl. of Erin Devicenzo dated Aug. 25, 2017, ECF No. 118,
¶ 9. Yet L'Oreal received very few complaints involving health
or hair-breakage: only one-tenth of one percent of the number of
retail purchases. Compare id. ¶ 14 (number of complaints) with
Decl. of Angela Rutherford, ECF No. 123, ¶ 3 (number of retail
sales through June 2017). Admittedly, it is likely that not all
users who had a negative experience with the product reported
it. But it is also likely that some reported complaints involved
injuries that would have occurred even with a relaxer that
plaintiffs would deem properly formulated. In any case, the
scarcity of these complaints suggests that few people

11

experienced meaningfully more harm than they expected, despite the relaxer's speed.

Plaintiffs also point to L'Oreal's patent of the relaxer cream, which highlights that the pro-solvent ingredients means less hydroxide is necessary to relax the hair, making the process safer. See Rivas Opp. Decl., Ex. 38. L'Oreal did not actually reduce the amount of hydroxide in its product. But the fact that the cream could have contained less alkali does not mean that the current level is unreasonably dangerous.

At best, plaintiffs have shown only that the relaxer cream works faster than others that are differently formulated, which suggests that it breaks more bonds in the same period of time. But plaintiffs put forward no evidence indicating how often the additional exposure causes more than microscopic injuries, and no meaningful evidence indicating that L'Oreal's product causes cognizable injuries more often or more severely than other, properly formulated relaxers do. The handful of studies and communications referencing higher levels of customer complaints are insufficient for a reasonable juror to find that this product is unreasonably dangerous.

The Court therefore grants defendants' motion for summary judgment as to all claims premised on the unreasonable dangerousness of the relaxer cream.

12

## B. **The Scalp Protector**

Plaintiffs also argue that the product is unreasonably dangerous and representations to the contrary are false and misleading because the scalp protector does not "protect[] scalp & skin," as represented on the product's packaging. Second Amended Complaint, ECF No. 90 ("2AC") ¶¶ 36, 114, 132, 140, 166, 175, 208, 222, 229, 277.

Plaintiffs again rely on the expert report of Patrick Obukowho, who conducted an experiment to compare how long it takes the hydroxide in the relaxer cream to penetrate the scalp protector versus petroleum jelly, "a standard protector used in the industry for some time." Obukowho Rep. ¶ 72. Obukowho applied 1.3 grams of the scalp protector to one pH test strip and the same amount of petroleum jelly to another, and added 2 grams of the relaxer cream to each strip. Id. In his lab notes, Obukowho recorded that, after a "few minutes," the strip with L'Oreal's product turned green, indicating that the relaxer had penetrated the scalp protector. Saichos Obukowho Decl., Ex. 5 at 2. In his report, Obukowho stated that the shade of green indicated that the pH level increased to 12, the same as the relaxer itself. Obukowho Rep. ¶ 72. At the Daubert hearing, Obukowho testified that this process took "less than a minute or two." Daubert Tr. 56:5-8. By contrast, the control test strip did not change color for about 30 minutes. Obukowho Rep. ¶ 72.

13

Obukowho repeated the test five times with the same result. Obukowho Rep. ¶¶ 71-73.

L'Oreal argues that this test is unreliable and inadmissible. The Court disagrees. This is a simple experiment using reliable materials with straightforward results. In fact, the majority of defendants' objections are not to the procedure outlined in Obukowho's report and testimony nor to the reliability of his conclusions, but rather to his cavalier approach to taking notes. His lab notes do not indicate that he performed the experiment more than once and say only that the relaxer penetrated the scalp protector in "a few minutes," Saichos Obukowho Decl., Ex. 5 at 2; he only took pictures of the pH strips from one of the five experiments, Rivas Opp. Decl., Ex. 58; and he threw the pH strips away, Daubert Tr. 33:22-25.[4] These are objections to Obukowho's credibility, suggesting that the test procedure or results actually differed from what he described in his report and on the stand. These credibility arguments are matters for the jury and can be made during cross-examination and at closing argument. They are not grounds to exclude his testimony entirely.

---

[4] L'Oreal also complains that Obukowho did not include in his report the precise shade of green that the paper turned. But he did: the pH paper turned the shade that corresponds with a pH of 12. Rivas Opp. Decl., Ex. 21 ¶ 3. Nothing more specific is required.

L'Oreal also offers a series of speculative objections. For example, there may be a difference between 1.3 grams of petroleum jelly and 1.3 grams of scalp protector, meaning the experiment was not a fair comparison, or the scalp protector may function differently if applied to human skin instead of the pH paper. But the merits of these criticisms are not self-evident, and L'Oreal provides no evidence supporting them. A reliable experiment does not have to control for irrelevant variables.

The only meaningful criticisms that L'Oreal levies against the experiment is that it was not blinded and used the relaxer cream and scalp protector from a single box, which may have been an outlier. A blinded experiment would be preferable, but that error can be raised at trial. The fact that Obukowho used a single kit for all five of his experiments means he cannot reliably testify that the scalp protector in every kit is ineffective, but does not exclude the experiment entirely. Both the relaxer and the scalp protector appear to be mass produced, so one would expect any individual box to be the same as the others. L'Oreal, of course, is free to argue to the jury, including through presentation of its own experiments or other evidence, that this outcome is not be representative.

Moreover, while one would expect an unreasonably dangerous flaw in the relaxer cream to lead to numerous complaints, an inherent flaw in the scalp protector would not necessarily do

15

the same, because users already guard against letting the

relaxer cream touch their scalp. See, e.g., Rivas Opp. Decl.,

Ex. 48 (relaxer instructions) ("Keep relaxer off scalp and other

skin areas. Contact with scalp or other skin areas can cause

serious skin irritation or burns."); id. ("**Avoid applying**

**relaxer to scalp.**" (emphasis in original)).

Plaintiffs have thus shown a genuine dispute as to whether

the scalp protector in fact protects scalps from the hydroxide

in the relaxer cream, whether representations and warranties to

the contrary are misleading or were breached, whether this flaw

renders the kit unreasonably dangerous, and whether the defect

caused their physical injuries.

## C.   **Implicitly Misleading Representations**

Plaintiffs' misrepresentation claims are based on the

following statements or alleged breaches of the following

warranties:

> that the Product is a "no-lye," "anti-
> breakage" and "intense conditioning"
> "rejuvenating ritual" that is "infused with"
> a "powerful antioxidant rich in vitamins in
> minerals" and which "delivers unified
> results," has "superior respect of hair fiber
> integrity," "reveal[s] visibly fuller,
> silkier hair", "protects scalp & skin" and
> "infuses hydration & conditioning."

16

2AC ¶ 114 (Count I, Magnuson-Moss Warranty Act, 15 U.S.C. §
2301).[5] L'Oreal claims that these are not misrepresentations
because they are true.

These representations are literally true, apart, perhaps,
from those relating to the scalp protector. The relaxer cream
does not contain lye. "Anti-breakage" appears beneath the "oil
moisturizer" component, "intense conditioning" appears beneath
the conditioner, and "infuses hydration & conditioning" appears
beneath the neutralizing shampoo. Rivas Opp. Decl. Ex. 17.
Plaintiffs offer no evidence that these individual components do
not independently have these properties, and have not
established a genuine dispute as to whether the relaxer cream is
so unreasonably dangerous that they cannot serve these functions
when used as part of the kit. Plaintiffs' only argument that the
product does not involve a "rejuvenating ritual," "reveal
visibly fuller, silkier hair," or "deliver unified results" is

---

[5] See also 2AC ¶ 132 (Count II, California's Consumers Legal
Remedies Act, Cal. Civil Code § 1750); ¶ 140 (Count III,
California's False Advertising Law, Cal. Bus. & Prof. Code
§17500); ¶ 153 (Count IV, California's Unfair Competition Law,
Cal. Bus. & Prof. Code § 17200); ¶ 166 (Count V, Illinois
Consumer Fraud and Deceptive Business Practices Act, 815 Ill.
Comp. Stat. 505/1); ¶ 175 (Count VI, Breach of Express
Warranty); ¶ 208 (Count IX, Breach of Contract/Common Law
Warranty); ¶ 222 (Count 11, Fraud); ¶ 229 (Count XII, Negligent
Misrepresentation); ¶ 291 (Count XV, various other state
consumer laws).

that the relaxer cream is unreasonably dangerous - a proposition
they have not supported.

The motion for summary judgment is therefore granted to the
extent plaintiffs' claims are based on the express falsity of
any of these representations, apart from those related to the
scalp protector.

However, plaintiffs also argue that these representations,
combined with other aspects of the product's packaging,
misleadingly communicate to consumers that the product is safer
than other relaxers.[6] Although plaintiffs have not shown a
genuine dispute as to whether the product is unreasonably more
dangerous than other relaxer creams, the evidence strongly
suggests that the product is not safer. There is a genuine
dispute, then, as to whether an implied representation that the
product is safer than other relaxers would be misleading. The
question is whether there is such an implicit representation.

"Lye" is the common name for the chemical sodium hydroxide,
and is the active ingredient in many relaxers. Obukowho Rep. ¶
34; Westman Rep. at 14. The active ingredient in L'Oreal's

---

[6] In their brief, plaintiffs contend the representations
that the product is "nourishing," "conditioning," and contains
"anti-oxidants," "reinforced by the Product imagery, which
depicts a woman whose beautiful sleek hair is glowing gold like
the adjacent golden droplet of `Amla oil, contributed
significantly to the deception that the Product was more gentle,
natural, safer, and healthier than other relaxers." ECF No. 177
at 10.

18

product is lithium hydroxide; it contains no sodium hydroxide.
See Rivas Opp. Decl. Ex. 17. Describing the product as "no-lye"
is therefore technically accurate. The issue is how a normal
consumer understands that representation.

Separate from this litigation, L'Oreal conducted a study
among 406 African American women, from 18 to 49 years old, who
had used hair relaxers in the past six months. Rivas Opp. Decl.,
Ex. 47 at 4. The initial "concept evaluations" portion of the
study asked the women to evaluate the product's packaging. 57%
of respondents said that the phrase "no-lye" communicated to
them "that the product contained no/fewer chemicals" than other
relaxers, and 39% said it communicated that the product "will
not be harmful to the hair." Id. at 6. 27% of respondents
pointed to the lack of lye as the principal reason they would
like to use the relaxer. Id. at 5. Another of L'Oreal's studies
found that "women are drawn to trying Amla relaxer anticipating
that an oil-based/no lye relaxer . . . will be more soothing and
protective of a sensitive scalp than relaxers they've used
previously." Rivas Opp. Decl., Ex. 5 at 2.

Plaintiffs also rely on their own survey, as described in
the report of their proffered marketing and survey expert, J.
Michael Dennis, to argue that this representation leads
consumers to believe that the cream is safer and gentler than
relaxers that contain lye. See Decl. of Peter G. Saichos, ECF

No. 165, ("Saichos Dennis Decl."), Ex. 1 ("Dennis Rep.").

L'Oreal moves to exclude this report.

Dennis's study population was African-American women in the United States, ages 18 to 54, who had purchased a hair relaxer kit in the past five years for personal use. Id. ¶ 21. After screening questions to establish eligibility, 410 women were asked three questions regarding the "No-Lye" representation, and 407 answered all three. Id. ¶ 27. A screen shot of one question appears below:



Id. ¶ 33. The other two questions were similarly formulated, but offered the following sets of options: (1) "More safe to use," "Less safe to use," and "I would not have an expectation"; and (2) "More likely to be harmful to your scalp and hair," "Less likely to be harmful to your scalp and hair," and "I would not have an expectation." Saichos Dennis Decl., Ex. 3. According to Dennis, 80% of respondents answered that they would expect a

20

relaxer whose package makes the "No-Lye" representation to be "less harsh on your hair," 77.5% would expect that it is "more safe to use," and 77.9% that it is "less likely to be harmful to your scalp and hair." Dennis Rep. ¶ 33.

L'Oreal objects that these survey questions are unreliably leading because the provided answers force the respondent to specifically consider the safety implications of the representation, while consumers who see the representation on a package in the store may never consider that it has anything to do with health or safety. Using a control or asking open-ended questions would mitigate this concern, but Dennis did not do so. Comparable flaws have rightfully served as the basis for exclusion of similar surveys in other areas. See Johnson & Johnson-Merck Comsumer Pharm. Co. v. Smithkline Beecham Corp., No. 91-cv-0960, 1991 WL 206312, at *8 (S.D.N.Y. Oct. 1, 1991), aff'd 960 F.2d 294 (2d Cir. 1992); Coors Brewing Co. v. Anheuser-Busch Companies, Inc., 802 F. Supp. 965, 973 (S.D.N.Y. 1992); Johnson & Johnson-Merck Consumer Pharm. Co. v. Rhone-Poulenc Rorer Pharm., Inc., 19 F.3d 125, 136 (3d Cir. 1994).

However, plaintiffs have adduced significant evidence that relaxer consumers independently associate lye with dangerousness and no-lye relaxers with comparative safety, as discussed above. The risk that respondents only considered this possibility because of the listed responses is therefore relatively low,

21

making the survey results more reliable. The remainder of defendants' objections go to weight and not admissibility.

The Dennis survey regarding the no-lye representation is therefore admissible, and a genuine dispute exists as to whether that representation, alone or in combination with others on the box, meaningfully communicates to users that it is safer or gentler than relaxers that do contain lye.

## II.  Claim-Specific Arguments

The two general categories of disputed facts remaining for trial, then, are (1) whether the scalp protector does not in fact protect scalps, and (2) whether the packaging misleadingly represents or warrants in effect that the relaxer cream is safer or gentler than relaxer creams that contain lye. The Court now turns to the legal objections to plaintiffs' various claims.

### A.   23(b)(3) Class Decertification Motions

The Court previously certified two 23(b)(3) classes consisting, respectively, of New York and Florida purchasers of the kit. The classes were certified to pursue unjust enrichment claims under each respective state's laws, and the New York class to pursue statutory damages under NYGBL § 349. Though captioned as a motion for summary judgment, L'Oreal argues that plaintiffs have not adduced sufficient classwide proof of various elements to permit these classes to continue. Since plaintiffs have addressed these arguments equally extensively

and on similar terms, the Court takes the motion as also asking

for decertification, and grants that motion as to the unjust

enrichment claims of both the Florida and New York classes, but

not the NYGBL § 349 claims for statutory damages.

## 1.   Unjust Enrichment

The only classwide theory of damages that plaintiffs have

proposed for their unjust enrichment claims is a full refund, on

the ground that the product is so dangerous that it is

effectively worthless. At class certification, the Court held

that the truth of these allegations was an issue for summary

judgment, and invited plaintiffs to present a different theory

of damages in case the evidence did not ultimately support their

theory. Plaintiffs did not do so, and have not adduced

sufficient evidence for a reasonable juror to find that the

product is so dangerous that it is rendered worthless.

It is possible that classwide damages equivalent to the

value of the scalp protector are appropriate. But there is no

evidence in the record of what that value is. And the allegedly

defective nature of the scalp protector alone does not render

the entire kit so dangerous as to be worthless. Moreover, there

is no dispute that the conditioner, shampoo, and moisturizer in

the kit perform their intended functions. A full refund would

therefore be unjust. Given the absence of any other theory of

23

classwide relief, the 23(b)(3) unjust enrichment classes are hereby decertified.

## 2. **NYGBL § 349**

The New York class's statutory claims, however, present no such problem. NYGBL § 349 provides for the greater of actual damages or $50 statutory damages for anyone injured by a violation of its terms. NYGBL § 349(h). The entire product here at issue costs less than $50, so the statutory damages would necessarily be more than any price premium. Because the statutory damages apply on a classwide basis, there is no need to determine the exact amount of that price premium.

On the merits, plaintiffs have adduced sufficient evidence for a reasonable juror to find that the inclusion of the scalp protector increased the price of the product. The package advertised the scalp protector as one of the five steps in the "Amla Legend 5 Step Ritual," along with the shampoo, conditioner, moisturizer, and relaxer cream. Rivas Opp. Decl. Ex. 17. In the section of the packaging that advises consumers to "READ BEFORE PURCHASING," it is "recommended that you use Amla Scalp Protective Pre-treatment during application as indicated on the enclosed instructions." Id. In the "SAFETY WARNINGS" on the outside of the box, the kit instructs users to "[k]eep relaxer off scalp and other skin areas." Id. Setting aside the representations on the box, 85.4% of respondents in

24

the Hibbard survey, all of whom had used relaxers, indicated that a scalp protector should always be applied before using no-lye hair relaxers. Hibbard Rep. ¶ 102. A reasonable juror could therefore find that the scalp protector added value to the kit. If L'Oreal had informed consumers that the scalp protector did not work (as here alleged), then the kit would universally have cost less.

L'Oreal argues that plaintiffs cannot prove that any misrepresentation caused every class member an injury, because some class members likely would have purchased the product even in the absence of those allegedly misleading representations. This argument, however, is an attempt to impose a reliance requirement where none exists. As the New York Court of Appeals has recognized in this context, "[r]eliance and causation are twin concepts, but they are not identical." Stutman v. Chem. Bank, 731 N.E.2d 608, 612 (N.Y. 2000). In Stutman, a contract between a borrower and bank provided that the bank would not charge a fee for early payments, but the bank nonetheless charged the borrower $275 when he tried to refinance. Id. at 610. The Appellate Division dismissed the NYGBL claim, holding that the misrepresentation had no effect on the plaintiff's decision to borrow in the first instance. Id. at 612. The Court of Appeals reversed on this point, holding that reliance was not required: "Here, plaintiffs allege that because of defendant's

deceptive act, they were forced to pay a $275 fee that they had been led to believe was not required. In other words, plaintiffs allege that defendant's material deception caused them to suffer a $275 loss." Id. at 612-13. Stutman likely would have gotten the same loan from the same bank for the same amount even if the contract had provided for a $275 prepayment fee. Nonetheless, had the defendant abided by its representation, Stutman would have had $275 more dollars. This, the New York Court of Appeals held, was sufficient to show causation of an injury under § 349.

The present case is similar, although the injury is the alleged price premium, not a subsequent charge. It may be that some class members would have been willing to purchase the product for the same price even if they knew the scalp protector did not work. But that does not matter. If there is a price premium, then every purchaser of the kit paid more than they otherwise would have, so every purchaser was injured. A purchaser's individual experience after purchasing the product or idiosyncratic ex ante valuation does not matter.

For exactly this reason, courts regularly certify classes alleging § 349 violations when the injury was payment of a price premium. See, e.g., Belfiore v. Procter & Gamble Co., 311 F.R.D. 29, 62 (E.D.N.Y. 2015); Goldemberg v. Johnson & Johnson Consumer Companies, Inc., 8 F. Supp. 3d 467, 481 (S.D.N.Y. 2014); In re Scotts EZ Seed Litig., 304 F.R.D. 397, 414 (S.D.N.Y. 2015). The

New York 23(b)(3) class therefore remains certified as to its NYGBL claim for statutory damages.

## B. Injunctive and Declaratory Relief

The Court also certified two classes under Rule 23(b)(2) to pursue claims for declaratory and injunctive relief under NYGBL § 349 and the FDUTPA. L'Oreal renews its argument, first made at the stage of class certification, that plaintiffs lack standing to seek such relief because they will not purchase the product again, so there is no threat that they will be injured by the alleged defect in the future. L'Oreal relies on a recent Second Circuit case that had not been decided when the Court certified this class. See Kommer v. Bayer Consumer Health, a division of Bayer AG, 710 F. App'x 43 (2d Cir. 2018). In Kommer, the Second Circuit affirmed the district court's holding that the named plaintiff did not have standing to pursue injunctive relief because he would not purchase the product at issue again now that he knew of the alleged deception and false advertising. Id. at 44. Several district courts have since relied on Kommer to hold that named plaintiffs who had discovered the defendants' alleged wrongdoing did not have standing to seek injunctive relief. See Daniel v. Mondelez Int'l, Inc., 287 F. Supp. 3d 177, 184-186 (E.D.N.Y. 2018); Campbell v. Freshbev LLC, No. 1:16-CV-7119, 2018 WL 3235768, at *3 (E.D.N.Y. July 3, 2018).

Although Kommer is a non-precedential summary order, and although the Court retains doubts about its conclusions, the Court feels compelled to follow its lead in deference to the Court of Appeals. Here, plaintiffs adduce no evidence that they are likely to repurchase the product, and indeed allege that they would not have purchased the product in the first place had they known of its alleged defects. 2AC at ¶¶ 12, 13, 18, 19. Plaintiffs therefore cannot reasonably contend that they may suffer a similar injury again absent an injunction. Though absent members of the class plausibly do face this future injury, the named plaintiffs themselves must have standing. See Simon v. E. Kentucky Welfare Rights Org., 426 U.S. 26, 40 (1976). Under the growing weight of case law in this circuit, they do not. The 23(b)(2) classes are therefore decertified and the motion for summary judgment as to the individual plaintiffs' injunctive and corresponding declaratory relief is granted.

## C. Unjust Enrichment

L'Oreal argues that the New York and Florida plaintiffs' unjust enrichment claims must be dismissed because they duplicate other adequate, legal remedies.

Under New York law, an unjust enrichment claim "is not available where it simply duplicates, or replaces, a conventional contract or tort claim." Corsello v. Verizon New York, Inc., 967 N.E.2d 1177, 1185 (N.Y. 2012). The Court denied

L'Oreal's motion to dismiss on this ground, permitting plaintiffs to plead in the alternative because as-yet undiscovered evidence could have shown that defendants were unjustly enriched and alternative legal claims were unavailable. At summary judgment, however, plaintiffs must actually adduce such evidence. They have not. Instead, plaintiffs point to the elements of their unjust enrichment claim that differ from the NYGBL claim, but provide no reason to believe a reasonable juror could find for them on the former but not the latter. The New York plaintiffs' unjust enrichment claims are therefore dismissed.

Florida law, however, only bars unjust enrichment claims if there is an express contract between the parties. See Williams v. Bear Stearns & Co., 725 So. 2d 397, 400 (Fla. Dist. Ct. App. 1998); State Farm Mut. Auto. Ins. Co. v. Physicians Injury Care Ctr., Inc., 427 F. App'x 714, 722 (11th Cir. 2011), rev'd in part sub nom. State Farm Mut. Auto. Ins. Co. v. Williams, 824 F.3d 1311 (11th Cir. 2014). L'Oreal has not shown that there was an express contract between themselves and the Florida plaintiff, who purchased the product from a retailer.

L'Oreal next argues that the Florida unjust enrichment claim must fail because the Florida plaintiff – Tiffany Raines – did not confer a benefit upon the defendants when she purchased the product from an intermediary retailer, as there is no

evidence that the retailer paid L'Oreal any more than it would
have in the absence of this purchase. But L'Oreal's business
model depends on consumers purchasing its product from
retailers. It is pointlessly formalistic to find that consumers
who do exactly that have not conferred a benefit upon
defendants. It does not matter if that benefit flowed through an
intermediary. See Williams v. Wells Fargo Bank N.A., No. 11-
21233, 2011 WL 4901346 at *5 (S.D. Fla. Oct. 14, 2011) ("It
would not serve the principles of justice and equity to preclude
an unjust enrichment claim merely because the 'benefit' passed
through an intermediary before being conferred on a
defendant."); Romano v. Motorola, Inc., No. 07-60517, 2007 WL
4199781 at *2 (S.D. Fla. Nov. 26, 2007) ("Defendant erroneously
equates direct contact with direct benefit in arguing that
because plaintiff here did not purchase either his phone or his
batteries from Motorola, plaintiff conferred no direct benefit
on Motorola.").

Nor is this Court convinced by L'Oreal's contention that
Florida law requires plaintiffs to exhaust all legal remedies
against the parties with whom they are in privity before
pursuing indirect unjust enrichment claims. To support this
proposition, L'Oreal cites a treatise, 11 Fla. Jur. 2d Contracts
§ 289, which cites a single case, Maloney v. Therm Alum Indus.
Corp., 636 So. 2d 767 (Fla. Dist. Ct. App. 1994). In Maloney,

the court held that a subcontractor's unjust enrichment claim
against the property owner was premature until his claims
against the contractor, which were separately ongoing, had
concluded. Id. at 769-70. Florida courts have applied this rule
to bar similar claims by subcontractors against property owners.
See Commerce P'ship 8098 Ltd. P'ship v. Equity Contracting Co.,
695 So. 2d 383, 389 (Fla. Dist. Ct. App. 1997); Universal Ltd.,
Inc. v. Spirit Constr. Servs., Inc., No. 5:08-CV-521-OC-10GRJ,
2009 WL 10670060, at *2 (M.D. Fla. June 1, 2009). But courts
have not even mentioned Maloney in other cases involving
indirect unjust enrichment. See, e.g., In re Horizon Organic
Milk Plus DHA Omega-3 Mktg. & Sales Practice Litig., 955 F.
Supp. 2d 1311, 1337 (S.D. Fla. 2013); Krzykwa v. Campbell Soup
Co., 946 F. Supp. 2d 1370, 1375 (S.D. Fla. 2013). There is good
reason not to expand this requirement beyond that specific
context. If a subcontractor has not received payment for its
services, that is normally the fault of the contractor that
hired her — the subcontractor and the original client have no
relationship. By contrast, a manufacturer that markets its
products directly to customers has a more profound obligation to
those customers than does the retailer, which is not best
situated to determine the truth of the representations on the
package or whether the product inside is defective.

31

L'Oreal also posits that Raines did not rely on the alleged misrepresentations because she testified that she "had already made a decision to purchase that relaxer" before she arrived at the shelf. Decl. of Peter Saichos dated August 25, 2017, ECF No. 125, Ex. 2 127:18-24. However, she also testified that she read the representations on the box before purchasing the product. Id. 128:2-24. There is thus a genuine dispute as to whether she would have purchased the product had it disclosed that the scalp protector did not work.

Last, L'Oreal contends that Raines caused her own injuries through misuse, and thus lost the benefit of the bargain through her own negligence. This misstates Raines' unjust enrichment claim, which is that she was injured at the cash register when she purchased the defective product.

### D. NYGBL § 349

L'Oreal repeats its argument that plaintiffs' NYGBL claim impermissibly conflates the deception with the injury, citing Small v. Lorillard Tobacco Co, 720 N.E.2d 892 (N.Y. 1999). The Court again rejects this argument. Small stands for the simple proposition that one cannot recover merely for having been deceived — the deception must have caused an injury. Id. at 898. The Small court also recognized that "the higher price the consumer paid for the product as a result of the misrepresentation" could constitute such an injury. Id. at 898

32

n.5. Numerous courts have followed that lead. See Orlander v. Staples, Inc., 802 F.3d 289, 302 (2d Cir. 2015) (approvingly citing cases in which "the issue of 'price premium' was relevant because it showed that plaintiffs paid more than they would have for the good but for the deceptive practices of the defendant-sellers"); Ackerman v. Coca-Cola Co., No. CV-09-0395, 2010 WL 2925955, at *23 (E.D.N.Y. July 21, 2010). Here, plaintiffs contend not only that they would not have purchased the product had they known of its defects - which alone would not suffice - but also that they paid a price premium given the undisclosed, defective nature of the product. That is sufficient.

L'Oreal next argues that plaintiffs' claims are impermissible because they involve latent defects, for which consumers cannot recover under New York law. See Frank v. DaimlerChrysler Corp., 741 N.Y.S.2d 9, 13-18 (App. Div. 2002) (affirming dismissal of complaint alleging that plaintiffs bought cars with seat backs that had not yet collapsed, but were prone to doing so). However, plaintiffs do not allege that the scalp protector tends to fail or fails under certain circumstances. They allege that the scalp protector does not protect scalps. That defect, if it exists, was manifest from the moment of purchase.

**E.     Fraud and Negligent Misrepresentation by Omission**

.

L'Oreal claims that the New York, Florida, Illinois, Missouri, and California plaintiffs cannot succeed on any fraud or negligent misrepresentation claims based on the omission of material facts because defendants had no duty to disclose those facts to consumers. These states define this duty in varying ways, but in most, a manufacturer that knows its product presents an unexpected safety risk when put to its normal use has a duty to disclose that fact to consumers who do not have access to that information. See, e.g., Catalano v. BMW of N. Am., LLC, No. 15-CV-4889, 2016 WL 3406125, at *3-4 (S.D.N.Y. June 16, 2016); Aubin v. Union Carbide Corp., 177 So. 3d 489, 514 (Fla. 2015); Ringelestein v. Johnson & Johnson, No. 16 C 4970, 2017 WL 2362630, at *3 (N.D. Ill. May 31, 2017); Indep. Bus. Forms, Inc. v. A-M Graphics, Inc., 127 F.3d 698, 702 (8th Cir. 1997) (applying Missouri law).

The only exception is California, where a duty to disclose only arises if there is a direct "transaction" between a manufacturer and end-consumer and negligent omission claims are otherwise barred. See Bigler-Engler v. Breg, Inc., 213 Cal. Rptr. 3d 82, 113 (Ct. App. 2017); Conte v. Wyeth, Inc., 85 Cal. Rptr. 3d 299, 316 (Ct. App. 2008). L'Oreal's summary judgment motion is therefore granted as to the California plaintiffs' fraud and negligent misrepresentation claims insofar as they are

based on omissions. The motion is denied as to the Florida, New York, Illinois, and Missouri plaintiffs.

## F.   Magnuson-Moss Warranty Act

Last, L'Oreal argues that plaintiffs' claims under the Magnuson-Moss Warranty Act (the "MMWA") must be dismissed because all but two plaintiffs failed to give defendants a pre-suit opportunity to cure the alleged defect. The MMWA states, in relevant part:

> No action (other than a class action . . . ) may be brought . . . and a class of consumers may not proceed in a class action . . . except to the extent the court determines necessary to establish the representative capacity of the named plaintiffs . . . unless the person obligated under the warranty or service contract is afforded a reasonable opportunity to cure such failure to comply. . . . In the case of such a class action . . . , such reasonable opportunity [to cure] will be afforded by the named plaintiffs and they shall at that time notify the defendant that they are acting on behalf of the class.

15 U.S.C. § 2310(e).

As the Court recognized in its ruling on the motion to dismiss, ECF No. 98 at 27, the fairest reading of this somewhat convoluted portion of the statute is that a class action, unlike individual actions, can be "brought" even if the named plaintiffs have not provided notice of or an opportunity to cure their individual claims. Notice and opportunity to cure are required, however, for the class action to "proceed" once the

35

Court determines that the named plaintiffs are adequate
representatives under Rule 23(a)(4) of the Federal Rules of
Civil Procedure. See In re Porsche Cars N. Am., Inc., 880 F.
Supp. 2d 801, 824 (S.D. Ohio 2012); Flynn v. FCA US LLC, 15-cv-
0855, 2018 WL 3303267, at *4 (S.D. Ill. July 5, 2018).

If the statute does not require named plaintiffs of
putative class actions to provide notice and an opportunity to
cure before filing suit, then those plaintiffs do not forfeit
their individual claims by failing to do so. Whether the class
is ultimately certified is irrelevant on this point. Here,
although plaintiffs did not include these claims in their class
certification motion, see ECF No. 105, they originally sought to
represent a nationwide class as to their MMWA claims, see 2AC ¶
106. They therefore were not required to give pre-suit notice.

L'Oreal does not contest that plaintiffs Jacobs and
Oravillo have now provided notice and an opportunity to cure.
The remaining plaintiffs must do the same within twenty days of
the date of this order, or their MMWA claims will be forfeited.
L'Oreal's summary judgment motion as to the MMWA claims is
denied, without prejudice to renewal at that point.

## CONCLUSION

For the foregoing reasons, the Court decertifies both
23(b)(2) classes, the Florida 23(b)(3) class, and the New York
23(b)(3) class as to its unjust enrichment claims. The New York

class remains certified to pursue statutory damages under NYGBL

§ 349. The Court dismisses all claims for injunctive and

declaratory relief, all claims related to the dangerousness of

the relaxer cream, the New York plaintiffs' unjust enrichment

claim, and the California plaintiffs' fraud and negligent

misrepresentation claims that are premised on omissions. The

motion is denied as to all remaining claims premised on the

alleged dangerousness of the scalp protector, misleading

representations or warranties regarding its functionality, and

implicit misrepresentations that the product is safer than

relaxers that contain lye. The Clerk of Court is directed to

close all open motions on the docket of this case.

SO ORDERED.

Dated:    New York, NY
          July 3[, 2018

          JED S. RAKOFF, U.S.D.J.