**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In Re:  Amla Litigation | Case Nos. 1:16-cv-6593 (JSR), 1:17-cv-111 (JSR) |

---

**DEFENDANTS' MEMORANDUM IN SUPPORT OF
MOTION FOR CLASS DECERTIFICATION**

---

**GORDON & REES, SCULLY, MANSUKHANI LLP**
*Attorneys for Defendants L'Oréal USA, Inc. and Soft Sheen-Carson, LLC*

1 Battery Park Plaza, 28th floor
New York, New York  10004
T:  (212) 269-5500
E:  jlewis@grsm.com

*Of Counsel and on the Brief:*
    Miles D. Scully
    Peter G. Siachos
    Justin D. Lewis
    JoAnna M. Doherty

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................... 1

DECERTIFICATION IS REQUIRED. ...................................................................... 1

I.     The Product's Allegedly Defective Chemical Operation Is Not A Common Question. ........ 2

      A.    There Is No Common Proof of A Universal Scalp Protector Defect. ...................... 2

      B.    Plaintiffs Now Contend That The Product's Alleged Chemical Danger Varied By Degree of Crystallization, An Individualized Function of Shelf Time. ................... 5

II.    Post-Certification Evidence Confirms The Packaging's Material Variations. ...................... 6

III.   Standing To Assert A Section 349 Claim Is Now A Purely Individual Affair. ................... 8

IV.   Defect Manifestation Here Means Individualized Causation of Physical Injury. ................ 8

V.    Choice of Law Presents Confounding Individual Issues. .................................................... 9

VI.   There Can Be No Classwide Proof of Material Deception On This Record ...................... 10

VII.  The Elements of Causation of Actual Injury Fragment Into Individual Questions. ........... 12

      A.    A Price Premium's Mere Existence Is An Individual Question On This Record. ... 13

VIII. The Collapse of Plaintiffs' Statutory Damages Model Mandates Decertification. ............. 17

IX.   Apart From The Above Individual Issues' Predominance Under Rule 23(b)(3), These Individualized Controversies Cannot Still Meet Rule 23(a)'s Prerequisites. ...................... 18

      A.    This Class Fails The Threshold Conditions Of Commonality And Typicality. ....... 18

      B.    Plaintiffs Are Inadequate Because They Disclaimed Class Members' Allegedly Valuable Personal Injury Claims to Gain Class Certification Of A $50 Theory. ... 18

CONCLUSION ....................................................................................................... 20

i

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Ackerman v. Coca-Cola Co.*,
No. 09 CV 395 (DLI) (RML),
2013 U.S. Dist. LEXIS 184232 (E.D.N.Y. July 18, 2013) ....................................................... 14

*Amara v. CIGNA Corp.*,
775 F.3d 510 (2d Cir. 2014). .................................................................................................... 1

*Amchem Prods. v. Windsor*,
521 U.S. 591 (1997) ................................................................................................................ 20

*Ault v. J.M. Smucker Co.*,
310 F.R.D. 59 (S.D.N.Y. 2015) .............................................................................................. 14

*Braune v. Abbott Lab.*,
895 F. Supp. 530 (E.D.N.Y. 1995) ........................................................................................... 9

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) ............................................................................................................ 17, 18

*Coopers & Lybrand v. Livesay*,
437 U.S. 463 (1978) .................................................................................................................. 1

*Denney v. Deutsche Bank AG*,
443 F.3d 253 (2d Cir. 2006) ..................................................................................................... 8

*Ebin v. Kangadis Food, Inc.*,
No. 13 Civ. 2311 (JSR),
2014 U.S. Dist. LEXIS 26539 (S.D.N.Y. Feb. 25, 2014) (Rakoff, J.) ................................... 14

*Goldemberg v. Johnson & Johnson Consumer Cos.*,
8 F. Supp. 3d 467 (S.D.N.Y. 2014) ........................................................................................ 13

*Gordon v. Sonar Capital Mgmt., LLC*,
92 F. Supp. 3d 193 (S.D.N.Y. 2015) (Rakoff, J.) ................................................................... 20

*Hazelhurst v. Brita Prods. Co.*,
744 N.Y.S.2d 31 (N.Y. App. Div. 2002) ................................................................................ 12

*In re Avon Anti-Aging Skincare Creams & Procs. Mktg. & Sales Practices Litig.*,
No. 13-CV-150 (JPO),
2015 U.S. Dist. LEXIS 133484 (S.D.N.Y. Sep. 30, 2015) ...................................................... 12

*In re Bayer Corp. Combination Aspirin Prods. Mktg. & Sales Practices Litig.*,
701 F. Supp. 2d 356 (E.D.N.Y. 2010) .................................................................................... 10

*In re Bextra & Celebrex Mktg., Sales Practices & Prod. Liab. Litig.*,
No. MDL 05-01699,
2007 U.S. Dist. LEXIS 102340 (N.D. Cal. Jul. 10, 2007) ....................................................... 9

ii

# TABLE OF AUTHORITIES

**Page**

*In re Bridgestone/Firestone Tires Prods. Liab. Litig.*,
288 F.3d 1012 (7th Cir. 2002) ................................................... 9

*In Re Canon Cameras Litig.*,
237 F.R.D. 357 (S.D.N.Y. 2006) (Rakoff, J.) .................................. 4, 9, 13

*In re Ford Motor Co. E-350 Van Prods. Liab. Litig.*,
No. 03-4558,
2012 U.S. Dist. LEXIS 13887 (D.N.J. Feb. 6, 2012) .............................. 11

*In re Rezulin Prods. Liab. Litig.*,
201 F.R.D. 61 (S.D.N.Y. 2002) ................................................... 20

*In re Scotts EZ Seed Litig.*,
304 F.R.D. 397 (S.D.N.Y. 2015) ................................................. 15, 16

*LaVigne v. Costco Wholesale Corp.*,
284 F. Supp. 3d 496 (S.D.N.Y. 2018) ............................................. 6

*Matter of Josey v. Goord*,
9 N.Y.3d 386 (N.Y. 2007) ....................................................... 19

*Mazzei v. Money Store*,
829 F.3d 260 (2d Cir. 2016). .................................................... 1

*McLaughlin v. Am. Tobacco Co.*,
522 F.3d 215 (2d Cir. 2008) .................................................. 13, 16, 18

*Newman v. RCN Telecom Servs.*,
238 F.R.D. 57 (S.D.N.Y. 2006) ................................................ 11, 12

*Oscar v. BMW of N. Am., LLC*,
No. 09 Civ. 11 (PAE),
2012 U.S. Dist. LEXIS 84922 (S.D.N.Y. Jun. 19, 2012) ............................ 12

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*,
85 N.Y.2d 20 (N.Y. 1995) ....................................................... 11

*Prohias v. Pfizer, Inc.*,
485 F. Supp. 2d 1329 (S.D. Fla. 2007) ........................................... 14

*Rivera v. Wyeth-Ayerst Labs.*,
283 F.3d 315 (5th Cir. 2002) .................................................... 9

*Rodriguez v. It's Just Lunch, Int'l*,
No. 07 Civ. 9227,
2010 U.S. Dist. LEXIS 16622 (S.D.N.Y. Feb. 23, 2010) ........................... 14

*Schrank v. Citibank (S.D.), N.A.*,
230 F.R.D. 303 (S.D.N.Y. 2004) ................................................. 12

iii

## TABLE OF AUTHORITIES

**Page**

*Singleton v. Fifth Generation, Inc.*,
  No. 5:15-CV-474 (BKS/TWD),
  2017 U.S. Dist. LEXIS 170415 (N.D.N.Y. Sep. 27, 2017) ..................................... 16

*Small v. Lorillard Tobacco Co.*,
  679 N.Y.S.2d 593 (N.Y. App. Div. 1998) ................................. 19

*Small v. Lorillard Tobacco Co.*,
  94 N.Y.2d 43 (N.Y. 1999) .................................................... 9, 19

*Stuart v. Am. Cyanamid Co.*,
  158 F.3d 622 (2d Cir. 1998) ...................................................... 9

*Taylor v. Sturgell*,
  553 U.S. 880 (2008) ............................................................ 19

*Weinberg v. Sun Co.*,
  565 Pa. 612 (Pa. 2001) ........................................................ 10

*Weiner v. Snapple Bev. Corp.*,
  No. 07 Civ. 8742 (DLC),
  2010 U.S. Dist. LEXIS 79647 (S.D.N.Y. Aug. 5, 2010)....................... 14, 15, 16, 17

*Wurtz v. Rawlings Co., LLC*,
  No. 12-CV-1182 (JMA),
  2016 U.S. Dist. LEXIS 172680 (E.D.N.Y. Nov. 17, 2016) ..................... 11

**Statutes**

MASS. GEN. LAWS ch. 93A, § 9(3) ...................................... 10

N.J. STAT. § 56:8-19 .......................................................... 10

N.Y. GEN. BUS. LAW § 349 .............................................. *passim*

N.Y. GEN. BUS. LAW § 349(h) ...................................... 1, 19

U.S.C. § 2072(b).............................................................. 20

VT. STAT. ANN. tit. 9, § 2461 ...................................... 10

**Rules**

FED. R. CIV. P. 23 .......................................................... 1, 19

FED. R. CIV. P. 23(a) .................................................. 1, 18, 20

FED. R. CIV. P. 23(b)(3).............................................. 1, 17, 18

FED. R. CIV. P. 37(c)(1)............................................. 17, 18

## INTRODUCTION

Finding that Plaintiffs could no longer support assumptions underlying certification, the Court recently decertified four of the five class claims concerning this consumer hair relaxing product, leaving only the Rule 23(b)(3) damages claim under New York General Business Law section 349.  Dkt. 223 at 36-37.  That claim warrants decertification, too.  First, its foundational theory is not subject to classwide proof because the product's alleged universally defective chemical operation is anything but uniform.  Even if it were, the labeling varied in ways material to Plaintiffs' theories about the product's safety profile, precluding classwide determination of alleged deceptiveness.  Standing, choice of law, and defect manifestation present additional individual inquiries.  So, too, do causation and injury.  Plaintiffs cannot establish even the *fact* of a classwide price premium injury missing what their own expert prescribes:  "the market price that would exist but for the [challenged] Claims."  Class members paid grossly variant prices, some *less* than the missing but-for value, meaning no premium at all, let alone one detectable without any methodology to exclude confounding variables affecting price unrelated to the challenged labeling.  In addition, Plaintiffs' classwide $50 statutory damages model fails because they cannot establish the indispensable quantity of New York purchases in the class period.  Due to all of these decidedly predominant individual inquiries, this case can no longer satisfy even Rule 23(a), especially given Plaintiffs' inadequacy to represent class members whose valuable personal injury recoveries they disclaimed to win certification.  The Court should decertify the claim now.

## DECERTIFICATION IS REQUIRED.

Because class certification is "inherently tentative" (*Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 (1978)), a district court must "reassess" certification "as the case develops in order to ensure continued compliance with Rule 23's requirements."  *Amara v. CIGNA Corp.*, 775 F.3d 510, 520 (2d Cir. 2014).  Plaintiffs opposing decertification retain the burden to show full satisfaction of Rule 23's "rigorous analysis" by a preponderance of evidence.  *Mazzei v. Money Store*, 829 F.3d 260, 268, 270 (2d Cir. 2016).  These Plaintiffs cannot meet that burden.

1

I.      **The Product's Allegedly Defective Chemical Operation Is Not A Common Question.**

The class must be decertified because Plaintiffs cannot prove by common evidence the certified claim's indispensable foundation:  that the product's chemistry operates in a uniformly defective manner that renders the labeling deceptive.[1]  Rather, its chemical operation varies.

A.      **There Is No Common Proof of A Universal Scalp Protector Defect.**

Plaintiffs cannot establish via common proof that the scalp protector ("SP") is universally ineffective.  The sole evidence of SP defect they offered in opposition to summary judgment was Patrick Obukowho's report.  Dkt. 195-1 at 4-16 (SMF #2); *id*. at 12.  Yet, the Court has now expressly barred Obukowho from opining that the SP failed on a classwide basis, ruling that "he cannot reliably testify that the scalp protector in every kit is ineffective."  Dkt. 223 at 15.  Plaintiffs have no other classwide proof of any SP defect, especially after leaving it "undisputed" that "[a]ll chemical hair relaxers pose safety risks to hair, scalp, and skin."  Dkt. 181 at 1 (SMF #1).

In fact, neither Plaintiffs nor Obukowho have ever actually identified any specific chemical defect in the SP.  There is simply Obukowho's speculation that it is "possible" that the relaxer cream and SP might somehow react to produce grease, but he does not opine it actually happens, nor -- critically -- that such a grease would be dangerous, cause SP failure, or perform *itself* any less effectively than adequate scalp protection.  Dkt. 156-17 at 28, ¶ 75.  For all this record shows, it might be better.  *E.g*., dkt. 134-4 at 5 (no scalp discomfort for 91% of test subjects).

---

[1]  Plaintiffs' certification papers repeatedly emphasized the necessity of uniformity in the product's chemical operation.  Dkt. 105 at 3 ("Uniformly Unsafe"); dkt. 129 at 1 (product formulation was "*uniform and dangerously designed*" causing "injuries…to *all users*") (emphasis in original); *id*. at 7 ("uniformly unsafe formulation…injured Class members at the cash register"); dkt. 207 at 6 (arguing universal SP failure "in all kits").  Plaintiffs recognized that their case could not proceed as a class action unless "variations were immaterial," such that the product's chemical operation was "uniform" classwide.  Dkt. 129 at 6-7; *id*. at 15 (describing uniform chemical defect as "central issue" and "core issue"); dkt. 132 at 1 (describing "Plaintiffs' theory of liability" "that the Product uniformly fails").  They called the chemistry opinions of their "liability expert" (dkt. 151 at 9), Patrick Obukowho, the "most important[]" reason for certification.  Dkt. 132-1 at 5:14-23.

Granting certification, the Court expressly relied on Plaintiffs' theory that the product's chemistry performs uniformly as to all class members at once, such that on the question of the product's dangerous or safe character, the Court assumed the "answer will be the same for every class member" and danger would "not vary between plaintiffs."  Dkt. 138 at 5; *id*. at 25-26.

Moreover, Plaintiffs' own evidence shows that the SP's chemistry inherently operates differently among users.  As to the alleged SP defect's danger, Obukowho claims users incur just a "greater likelihood" of scalp injury.  Dkt. 195-1 at 5 (SMF #2); dkt. 156-17 at 31, ¶ 82; dkt. 156-2 at 157:21-158:3; *id.* at 159:3-160:7.  Yet, when pressed to express the degree of additional scalp danger, Obukowho declared "[y]ou cannot quantify it because everybody is different."  *Id.* at 158:4-20.  Some exhibit "sweaty skin," some "have more salt content," others are "fatigued," and so on, such that "[t]here are a lot of variance conditions that will give you different types of result that you cannot quantify." *Id.*; *see id.* at 159:3-160:7.  In other words, Plaintiffs have no classwide evidence that an alleged SP defect caused more than a *de minimis* and legally meaningless increase in scalp irritation or its risk, just like the relaxer cream theory the Court rejected.  Dkt. 223 at 12.

The miniscule rate of SP-related consumer complaints also forecloses classwide proof of a uniform SP defect.  At summary judgment the Court found the product's overall "vanishingly small" rate of consumer complaints persuasive in rejecting Plaintiffs' relaxer cream theory (dkt. 223 at 11), but discounted its probity of the SP theory.  *Id.* at 15-16.  The Court reasoned that SP failure might not prompt widespread complaints if "users already guard against letting the relaxer cream touch their scalp." *Id.*  However, that supposition contravenes *Plaintiffs' own telling* of their SP theory.  They say such contact is not just "likely to occur," but injures the scalps of "all users." Dkt. 207 at 11 ("The burns and irritation…stem from incidental scalp/skin contact with the…Relaxer Cream, an occurrence Defendants are well-aware is *likely to occur* at some point during application and/or smoothing of the Relaxer Cream so close to users' scalps") (emphasis added); dkt. 129 at 1 (to gain certification, Plaintiffs argued that "the Scalp Protector and Relaxer Cream's formulation…resulted in scalp and skin irritation and injuries…to *all users*") (emphasis in original).  The tiny complaint rate is therefore just as valid a marker for the SP as the relaxer cream

in precluding classwide proof of uniformly defective chemistry.[2]

The trivial 0.1% rate of consumer complaints prompted by any type of dissatisfaction whatsoever is small enough, but the fraction of "health-related" complaints prompted by alleged injuries that could even possibly trace to a supposedly uniform SP defect is truly miniscule.[3] Dkt. 195-1 at 16-18 (evidence at SMF #3 of 261 health-related complaints, equaling 0.04% of wholesale and 0.06% of estimated national retail sales); dkt. 156-3 at 17, ¶ VIII.A.1 (cosmetic chemistry expert calls L'Oreal's complaint surveillance "meaningful form of testing" "all areas of potential hazard" during consumers' "unsupervised usage"); dkt. 156-6 at 13-14 (unanswered public health risk assessment expert John A. Clark finds "not reporting a complaint would be the exception to the rule" on this case's facts). And that is well before discounting for complaints driven by consumer misuse of the SP or other kit components, or failure to even apply the SP. Dkt. 195-1 at 38, 42-43, 46, 51, 55, 60, 63, 71, 74 (uncontroverted evidence at SMF ##10, 12, 14, 16, 18, 20, 22, 26, 28 that nearly every Plaintiff misapplied the SP, did not apply it to her scalp, or used her own non-L'Oreal product, including "petroleum jelly," "Vaseline," or "Blue Magic").[4] Plaintiffs have no evidence that a greater portion of consumers ever reported any adverse event, let alone one traceable to supposed SP malfunction, to L'Oreal or anyone else. That precludes common proof of an unreasonably dangerous classwide SP failure. *In Re Canon Cameras Litig.*, 237 F.R.D. 357, 359 (S.D.N.Y. 2006) (Rakoff, J.) (denying certification under section 349 because "fewer than two-tenths of one percent of the cameras here in issue have been reported as having

---

[2] Plaintiffs told the Court to ignore as insignificant the 13.8% of their own survey respondents who would still have purchased this product absent alleged deception even when offered a hypothetical, safer choice. Dkt. 181 at 27-28 (incl. n. 22). Thus, on Plaintiffs' terms, the 0.1% complaint rate could burgeon 138-fold but still not reach significance as a sign of any widespread phenomenon.

[3] L'Oreal tracks reports of "hair breakage" along the strand separately from "health-related" complaints, which include reports of injury to skin, scalp, or hair loss at the bulb. Dkt. 156-6 at 5; dkt. 118-1 (categorized log of consumer contacts); dkt. 156-9 at 79-80. The SP is not applied along the hair strand. Dkts. 117-4, 117-5 (SP instructions).

[4] There is no genuine dispute that all Plaintiffs also misused other kit components or disregarded safety instructions in multiple ways. Dkt. 195-1 at 37-40, 42-44, 45-48, 49-53, 54-57, 58-61, 63-64, 66-69, 70-71, 73-75 (SMF ## 10, 12, 14, 16, 18, 20, 22, 24, 26, 28).

even arguably malfunctioned").  L'Oreal can find no other consumer class action certified against such a well-validated, undisputed, and miniscule rate of reported adverse events as this.[5]

**B.    Plaintiffs Now Contend That The Product's Alleged Chemical Danger Varied By Degree of Crystallization, An Individualized Function of Shelf Time.**

Obukowho's chemical crystallization theory also mandates decertification.  He testified that the product's safety profile, far from uniform, varies from one unit to the next as a function of the shelf time elapsed between manufacture and consumer use.  In particular, Obukowho explained that it was a mistake for a L'Oreal chemist to allegedly "sprinkle" in the "active ingredient lithium hydroxide" (LiOH) when manufacturing some batches of the relaxer cream, because LiOH sprinkling sets in motion the progressive, worsening crystallization of LiOH over time.  Dkt. 180-26 at 74:18-77:19, 78:5-8, 82:6-18, 106:7-107:23.  Such crystallization, Obukowho said, causes "scalp irritation, burning, hair loss, and breakage" (*id*. at 107:24-108:12), the *exact dangers* that Plaintiffs contend rendered the product's labeling deceptive.  Though he never viewed a single sample of the relaxer cream under a microscope, not even the one he tested (*id*. at 82:23-84:5), Obukowho was "as a matter of fact very certain" that any product units subject to LiOH sprinkling would exhibit crystallization after "a period of time," because the degree of crystallization is a function of the "aging of the product," its "shelf life," "the time line and all that."  *Id*. at 80:16-22, 82:6-18, 105:8-15, 106:7-107:23.  Plaintiffs themselves admit that "to determine the rate and time of crystal formation would require an extensive study of batches manufactured."  Dkt. 178 at 16; dkt. 180-26 at 99:6-15 (Obukowho testimony echoing this); *id*. at 102:24-103:3 ("huge study").

Thus, the product's relative safety or propensity to injure -- the exact subject of alleged deception -- varies from unit to unit as a non-uniform function of differing batches and shelf times.  For all Plaintiffs can show, the SP does perform adequately against this product's *non-crystallized*

---

[5]    Similarly, the tiny complaint rate forecloses classwide proof that any uniform trait of the product's chemistry rendered an allegedly implied "no lye" representation of relative safety deceptive.  If the product chemistry universally caused a materially greater incidence of scalp, skin, or hair injuries than labeling led consumers to expect, then complaints would far exceed 1 in 1,000.

relaxer cream, which may indeed be safer or less harsh than its competitors. Where Plaintiffs stressed at least four times that their case is "fundamentally about chemistry" (dkt. 129 at 2, 6, 15; dkt. 132-1 at 7:13-15), the chemistry theory this Court certified is no longer fit for class treatment.

## II.    Post-Certification Evidence Confirms The Packaging's Material Variations.

Material variations among the three extant versions of the product's cartons and two extant versions of its application instructions also require decertification. First, there was no common messaging regarding the SP. Only the Launch and Revised Cartons state that the SP "Protects Scalp & Skin," whereas the Bilingual Carton does not. Dkts. 117-1, 117-2, 117-3. Critically, each consumer also received materially differing instructions concerning the SP. Liability might well attach merely to sales of cartons with the original "Launch Instructions," which told users to apply the SP to the "hairline, nape of neck and ear area only." Dkt. 208-7; dkts. 117-4, 117-5. By contrast, later cartons came with the "Revised Instructions," which told users to also apply the SP "throughout scalp." Dkt. 117-5. Plaintiffs themselves admitted that the "instructions are not consistent on this point" (dkt. 207 at 9, n. 6), raising prospects that complaints of scalp irritation or unmet safety expectations inhered in differential instructions rather than chemistry.

The relaxer cream's processing time presents another packaging variation relevant both to Plaintiffs' theory of an implied "no lye" safety representation, as well as their theory that the SP does not endure as adequate protection between the relaxer cream and users' scalps. Dkt. 162-1 at ¶ 44 (alleging "excessively fast [processing time] resulting in…scalp and skin irritation"); *id.* at ¶ 46 (contending product is "too quick"); dkt. 177 at 3 (condemning "dangerously fast relaxer"); dkt. 178 at 7 ("dangerously accelerated hair processing"). Courts "view each allegedly misleading statement in light of its context on the product label or advertisement as a whole." *LaVigne v. Costco Wholesale Corp.*, 284 F. Supp. 3d 496, 512-513 (S.D.N.Y. 2018) ("The entire mosaic is viewed rather than each tile separately."). As such, liability could well attach merely to sales of the Launch Carton, which includes instructions with a longer processing time of up to 20 minutes

6

(dkts. 117-1, 117-4), but not the Revised and Bilingual Cartons, which warn of the product's "Fast relaxing processing time" right on the cartons and include instructions reducing the maximum processing time to 15 minutes.  Dkts. 117-2, 117-3, 117-5.  On Plaintiffs' theory that hair and scalp dangers are tied to relaxer processing time, reasonable consumers will draw differing conclusions about the product's relative safety or the advisability and value of an effective SP depending upon which carton they purchased.  Indeed, since certification Plaintiffs' own purported materiality expert admitted that the variable "amount of processing time" is indeed material to consumers. Dkt. 156-13 at 40:1-19.  In the same way, the fact-finder may well determine that this SP sufficed for the shorter processing time of the Revised and Bilingual Cartons with Revised Instructions, but not the longer processing time of the Launch Carton with Launch Instructions.

Additionally, as to Plaintiffs' theory of an implicit representation of relative safety, liability could attach only to the Launch Carton, labeled "for all hair types" (dkt. 117-1), but not the others indicated only for "medium to coarse hair" (dkts. 117-2, 117-3), particularly given Obukowho's admission of hair type's materiality.  Lewis decl., Ex. 1, p. 68 ("[v]arious hair types respond significantly differently to relaxer treatments"); *id.* ("fine hair…needs a shorter processing time"); *id.* at 69 ("coarse" hair needs longer).  Also, the Launch and Revised Cartons' front and side panels state "Refills to reveal visibly fuller, silkier hair," but not the Bilingual Cartons, which contain no such statement.[6]  Consumers could reasonably gather materially differing messages about relative safety from cartons indicated "for all hair types" with a longer processing time which state "visibly fuller, silkier hair," compared to cartons indicated only for "medium to coarse hair" warning of a "[f]ast relaxer processing time," especially since most hair relaxer users understand how they work from years' experience.  Dkt. 154-1 at 12-15 (SMF ##4-5).

Class certification depended on Plaintiffs' contention that there are no material differences

---

[6] Other statements the Court cited as relevant to consumer interpretation of alleged "no lye" safety messaging appear in smaller print only on the cartons' rear panel.  Dkt. 223 at 18, n. 6; dkts. 117-1, 117-2, 117-3; *see* dkt. 90 at 28, ¶ 65 (complaint writes off effect of warnings "on a side panel").

among any units of this product sold during the class period.  *E.g.*, dkt. 129 at 1 (arguing "each and every package" was "materially uniform").  Yet, it is now clear that the cartons and instructions vary in ways material to Plaintiffs' SP and relative safety theories.  Despite these variations, Plaintiffs still have no way to determine who purchased which versions of the cartons with which instructions, raising a cripplingly individual inquiry striking the heart of their certified liability theory. Dkt. 117, ¶¶ 4-13; dkt. 116, ¶¶ 4-5; Lewis decl., ¶ 3.

### III.    Standing To Assert A Section 349 Claim Is Now A Purely Individual Affair.

Answering request for admission 20, each class Plaintiff asserted that physical injuries form the injury-in-fact that confers Article III standing for class members' statutory consumer protection claims.  Lewis decl., Exs. 2-4, p. 7.  Where all class members must have standing (*Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006)), Plaintiffs' binding concession renders that basic necessity purely individual, especially in view of their straightforward admission of "unmanifested injuries for some Class Members." Dkt. 58 at 46.  This Court already determined that physical injury causation was too individual an issue by itself to permit certification even of an issues class conceived to slice off all other individual facts.  Dkt. 138 at 21-24.  Now Plaintiffs concede those same individualized physical injuries are the class members' injuries-in-fact that confer standing.  That alone mandates decertification.[7]

### IV.    Defect Manifestation Here Means Individualized Causation of Physical Injury.

On a closely related point, L'Oreal previously briefed Plaintiffs' inability to prove classwide defect manifestation.  Dkt. 206 at 6-8; dkt. 209 at 4-5.  The Court seems satisfied that manifestation is required, but differs with L'Oreal about what that means here. Dkt. 223 at 33.  To be sure, most of the case law interprets the requirement in the context of allegedly defective parts of vehicles or electronics.  There is less case law in the context of alleged chemistry defects in

---

[7]  Worse, the class definition embraces all who merely purchased the product, not just those who might hold standing from injuries caused by its use.  Dkt. 138 at 37.  That raises yet another individual issue antecedent to the threshold standing question of whose use resulted in physical injury:  namely, who actually used the product, as opposed to who merely purchased it?

drugs or consumable personal products, but the cases known to L'Oreal hold that defect manifestation means the occurrence of physical injury resulting from use. *Stuart v. Am. Cyanamid Co.*, 158 F.3d 622, 631 (2d Cir. 1998) (vaccine "defect is manifest" upon diagnosis of "vaccine-induced polio"); *In re Bextra & Celebrex Mktg., Sales Practices & Prod. Liab. Litig.*, No. MDL 05-01699, 2007 U.S. Dist. LEXIS 102340 at *210 (N.D. Cal. Jul. 10, 2007) (excerpting this Court's *Canon* decision to find that defect manifestation was development of "gastrointestinal problems" from drug); *see Braune v. Abbott Lab.*, 895 F. Supp. 530, 563 (E.D.N.Y. 1995) ("a plaintiff who was exposed to DES but never manifested any symptoms would, in most instances, never possess a cause of action"); *see also Rivera v. Wyeth-Ayerst Labs.*, 283 F.3d 315, 319-321 (5th Cir. 2002) (no Article III standing for drug defect under Texas consumer statute without showing drug manifested defect with each claimant's actual use).  L'Oreal respectfully submits that the Court's contrary take on defect manifestation here varies from the relevant authorities in a fashion that defeats the requirement's purpose of preventing excess compensation of uninjured consumers whose products functioned safely in full conformance with alleged representations. *In re Bridgestone/Firestone Tires Prods. Liab. Litig.*, 288 F.3d 1012, 1017 (7th Cir. 2002) (where injury framed "as financial rather than physical," "any recoveries by those whose products function properly mean excess compensation").  Additionally, given the Court's duty to anticipate how New York courts would answer this question of state law, L'Oreal submits that the New York Court of Appeals would very likely hold that defect manifestation here means a physical injury resulting from the product's use. *Small v. Lorillard Tobacco Co.*, 94 N.Y.2d 43, 57, 51 (N.Y. 1999) (individual proof of addiction was "inescapably the cornerstone" of section 349 theory that tobacco company deceptively "used chemicals to enhance [cigarettes'] addictive propensities").

## V.    Choice of Law Presents Confounding Individual Issues.

Plaintiffs have never met their burden to establish that New York law applies to every class member.  The class includes all who merely bought the product in New York.  Dkt. 138 at 37.

That means commuters from New Jersey and Connecticut who purchased on their lunch break in the city.  It includes others who ordered online at their out-of-state domicile from a non-New York retailer, but had it delivered to their office or an Amazon locker in New York.  There are Pennsylvanians or Ontarians who bought the product in Buffalo, and those who purchased from a New York-based online retailer or an upstate drugstore, but only after deciding to purchase at home in Vermont or Quebec after viewing advertisements there.  People from elsewhere purchased online while merely transiting New York at J.F.K., by bus, or aboard the Acela or Lake Shore Limited.  Where personal injury damages are recoverable under section 349, the class includes those whose New York purchases either did or did not lead to injury from product use at home in Newark or Stamford.  Imagination suggests even more scenarios.

The innumerable combinations and permutations of these individual considerations bear on the New York choice-of-law analysis, which demands determinations whether another jurisdiction has more significant contacts or a greater interest in protecting its citizens in each disputed transaction.  *In re Bayer Corp. Combination Aspirin Prods. Mktg. & Sales Practices Litig.*, 701 F. Supp. 2d 356, 379 (E.D.N.Y. 2010) ("Generally, consumer fraud cases are governed by the law of the state where the consumer resides.").  Simply sweeping these questions aside to apply New York law monolithically would enlarge a Plaintiffs' judgment to include people to whom L'Oreal can have no liability under New York law, thereby violating due process, while ignoring conflicts in the applicable consumer laws of other jurisdictions with potentially superior interests in protecting their own citizens.[8]  Individual inquiries are necessary.

## VI.    There Can Be No Classwide Proof of Material Deception On This Record.

Whether couched as misrepresentation or omission, Plaintiffs cannot prove section 349 material deception via common proof because the packaging varied in ways material to Plaintiffs'

---

[8]  *E.g.*, *Weinberg v. Sun Co.*, 565 Pa. 612, 618 (Pa. 2001) (Pa. consumer fraud requires reliance); MASS. GEN. LAWS ch. 93A, § 9(3) (Mass. consumer statute requires pre-suit demand); VT. STAT. ANN. tit. 9, § 2461 (Vt. consumer law requires reliance and does not provide any minimum $50 statutory damages); N.J. STAT. § 56:8-19 (no minimum $50 statutory damages).

theory.  *See* § II, *supra*.  Section 349's material deception element invokes the objective, reasonable consumer rather than requiring subjective deception, but the objective standard applies *within* the circumstances of each consumer's transaction, rather than erasing them to facilitate class liability at superficial levels of generality.  *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 27 (N.Y. 1995) ("whether a reasonable consumer *in plaintiffs' circumstances*" would be misled) (emphasis added); *Newman v. RCN Telecom Servs.*, 238 F.R.D. 57, 80 (S.D.N.Y. 2006) (if consumers' informational circumstances varied, individual section 349 trials necessary); *Wurtz v. Rawlings Co., LLC*, No. 12-CV-1182 (JMA), 2016 U.S. Dist. LEXIS 172680 at *27 (E.D.N.Y. Nov. 17, 2016) ("the relevant circumstances to be considered are the plaintiff's circumstances"); *In re Ford Motor Co. E-350 Van Prods. Liab. Litig.*, No. 03-4558, 2012 U.S. Dist. LEXIS 13887 at *52-*53 (D.N.J. Feb. 6, 2012).  As outlined above, trial might determine that the packaging's material differences concerning the SP, processing time, and hair type, all of which touch the heart of Plaintiffs' safety theories, resulted in the reasonable deception of some purchasers but not others.  Also, some consumers cannot have been reasonably deceived, regardless of which carton they purchased, because they purchased already knowing the product's alleged danger (*id*. at *55-*56), either because (1) like Ms. Hervey, they repurchased after a first, injurious use (dkt. 101 at 1-2); (2) they expected scalp danger or other injury from long histories of relaxer use (dkt. 154-1 at 12-15 (SMF ##4-5)); or (3) because they viewed what Plaintiffs call "replete" "undeniable" online warnings of "severe" danger.  Dkt. 90 at ¶¶ 79-80; dkt. 156-11 at 20-24, ¶¶ 72-90 (expert finds "purchase of beauty products is a high involvement purchase decision" motivating consumer "information search" behavior, including online research).  Just as L'Oreal could not be barred from raising these matters in a non-class trial to discern the reasonable consumer's take in an individual "plaintiff's circumstances" (*Oswego*, 85 N.Y.2d at 27), these factors join the material packaging variations to preclude any classwide finding of a uniform interpretation of alleged safety messaging.

**VII.    The Elements of Causation of Actual Injury Fragment Into Individual Questions.**

Section 349's causation and injury elements are actual; they do not summon the imaginary reasonable consumer. *In re Avon Anti-Aging Skincare Creams & Procs. Mktg. & Sales Practices Litig.*, No. 13-CV-150 (JPO), 2015 U.S. Dist. LEXIS 133484 at *19-*20 (S.D.N.Y. Sep. 30, 2015) (plaintiff "must show actual harm as to each class member caused by the defendant's conduct"); *Oscar v. BMW of N. Am., LLC*, No. 09 Civ. 11 (PAE), 2012 U.S. Dist. LEXIS 84922 at *9-*21 (S.D.N.Y. Jun. 19, 2012); *Schrank v. Citibank (S.D.), N.A.*, 230 F.R.D. 303, 311 (S.D.N.Y. 2004) ("specific causation" of "actual injury" to "each plaintiff" is individual inquiry).  Plaintiffs' price premium theory therefore requires proof that every class member actually lost the value of a price premium due to the alleged deception.  That question disintegrates into individual inquiries.

First, it is impossible for a class member whose product performed exactly as represented to have lost any alleged price premium she paid due to those representations.  All such consumers received exactly what they paid for.  *Newman*, 238 F.R.D at 75 (section 349 certification denied where putative class members allegedly overpaid for high-speed internet in part because causation of actual injury depended on individual determinations whether each class member "actually did not receive the advertised speeds"); *Hazelhurst v. Brita Prods. Co.*, 744 N.Y.S.2d 31, 33 (N.Y. App. Div. 2002) (mandating section 349 decertification because "[t]o determine if a particular class member was injured, it will be necessary to determine whether the class member received" water filter that performed as represented).  The product's Court-described "vanishingly small" complaint rate underscores this point (dkt. 223 at 11), especially where far more than 1 in 1,000 would register complaints if a beauty product uniformly failed to meet material safety representations theorized to have monetary value.  Dkt. 122 at 2-3 (like other cosmetics, hair relaxer is a high-involvement product bound up with "consumer's self-image and looks").  The rate of potentially SP-related complaints is even tinier.  Those whose SPs performed effectively

suffered no price premium injury from any deception about SP efficacy.[9]

Second, this Court's own case law shows that the richly individual question of product misuse precludes classwide adjudication of causation of any price premium injury.  In a section 349 class action, this Court held that product malfunctions caused by "customer misuse…would not result in manufacturer liability under any theory."  *Canon,* 237 F.R.D. at 360.  Thus, when Plaintiffs take the stand, L'Oreal will examine their multiple misuses of the SP and other kit components to show that they lost the value of their alleged premiums not as a result of any defect in the units they purchased, but due to their own careless misuse.  Just as it would be inconceivable to bar the presentation of such relevant evidence in an individual, non-class trial, neither can class members' widespread misuses be swept aside at the expense of due process.  *McLaughlin v. Am. Tobacco Co*., 522 F.3d 215, 232 (2d Cir. 2008) ("actual injury cannot be presumed, and defendants have the right to raise individual defenses against each class member"); dkt. 138 at 23 (Court noted "likely very common" prevalence of misuse); *id*. at 23 (among Plaintiffs, "none correctly applied the product"); *see* p. 4, *supra* (all Plaintiffs misused kit and nine of ten misused SP).  L'Oreal should not be made to abandon individualized defenses to suit class treatment of a causation and injury theory so artificially narrow that nothing matters but "the cash register."  Dkt. 177 at 20.

### A.    A Price Premium's Mere Existence Is An Individual Question On This Record.

The sole purported classwide injury under section 349 is an alleged price premium, but the *mere fact* of such an injury cannot be shown by common proof on this record.  Only by proving that all class members in fact paid more for this product as a result of the challenged labeling can Plaintiffs establish the requisite elements of causation and actual injury under section 349.  *Weiner*

---

[9]   Also, there can be no section 349 causation except for those who actually saw the allegedly misleading statements before or at purchase.  *Goldemberg v. Johnson & Johnson Consumer Cos*., 8 F. Supp. 3d 467, 480 (S.D.N.Y. 2014).  The record does not show that any Plaintiffs but Hervey even knew of the SP's existence at purchase.  Dkt. 208-6.  The rest offered no summary judgment evidence that they saw the cartons' challenged "Scalp Protector" statement.  Dkt. 195-1 at 36-37, 40-41, 44-45, 48-49, 53-54, 57-58, 61-62, 64-66, 69-70 (SMF ##9, 11, 13, 15, 17, 19, 21, 23, 25).

*v. Snapple Bev. Corp.*, No. 07 Civ. 8742 (DLC), 2010 U.S. Dist. LEXIS 79647 at *17 (S.D.N.Y. Aug. 5, 2010) (denying section 349 certification because "plaintiffs have not proposed a suitable methodology for establishing the critical elements of causation and injury on a class-wide basis").

As this Court explained, a section 349 price premium is the difference between the price the plaintiff actually paid in the deceptive transaction and the product's market value but for the alleged deception. *Ebin v. Kangadis Food, Inc.*, No. 13 Civ. 2311 (JSR), 2014 U.S. Dist. LEXIS 26539 at *5 (S.D.N.Y. Feb. 25, 2014) (Rakoff, J.) (section 349 "price premium" detected by "ascertaining the difference between [the] value of the bargain which plaintiff was induced by fraud to make and [the] amount or value of consideration exacted as price"); *Rodriguez v. It's Just Lunch, Int'l*, No. 07 Civ. 9227, 2010 U.S. Dist. LEXIS 16622 at *31 (S.D.N.Y. Feb. 23, 2010) (section 349 price premium was payment of a "higher price for the dating service, than [consumer] otherwise would have absent deceptive acts"); *Ackerman v. Coca-Cola Co.*, No. 09 CV 395 (DLI) (RML), 2013 U.S. Dist. LEXIS 184232 (E.D.N.Y. July 18, 2013) at *83, n. 32 (section 349 causation of price premium injury requires proof of "how much each class member paid and the price of a comparable beverage that the class member would have purchased absent the alleged misrepresentation"); *Prohias v. Pfizer, Inc.*, 485 F. Supp. 2d 1329, 1337 (S.D. Fla. 2007) (section 349 "price inflation theory" requires evidence of "hypothetical price at which Lipitor would sell if not for the allegedly misleading advertisements"); *Ault v. J.M. Smucker Co.*, 310 F.R.D. 59, 67-68 (S.D.N.Y. 2015) (section 349 injury could not be established classwide where plaintiff failed to propose "a reliable method for determining the existence or amount of any such price premium," which must establish "market price" "but for the alleged misrepresentation"); *Weiner*, 2010 U.S. Dist. LEXIS 79647 at *23 (methodology failed to set out comparable products for determination of premium's existence).  Plaintiffs' expert Dennis entirely agreed, opining that "[i]n the context of this litigation, 'price premium' refers to the difference between the price paid by the consumer for the Product and the market price that would exist but for the Claims."  Dkt. 156-14 at 8, ¶ 14.

14

Yet, Plaintiffs have never propounded any expert opinion or other evidence of this product's market value but for deception, nor offered any statistical methodology to isolate from other factors a price premium tied solely to the disputed labeling. As a result, they wholly lack the indispensable basis of any attempt to detect even the *existence* of a classwide price premium injury, quite before its quantification. *See Weiner*, 2010 U.S. Dist. LEXIS 79647 at *17 (in section 349 case, proving fact of actual injury is "bound up" with proof of extent of damages). In fact, their purported price premium expert *did not study prices at all*, either of this product or its competitors, let alone did he attempt to determine the product's market value but for the alleged deception. Dkt. 156-14 at 8, ¶ 14; *id* at. 10, ¶ 16 (Dennis's mere conclusion of price premium). He also admitted it was "not my objective to identify how many possible factors there are" driving this product's demand and did not examine "how much influence" other factors hold. Dkt. 156-13 at 46:2-47:25, 37:5-39:6; *In re Scotts EZ Seed Litig*., 304 F.R.D. 397, 413-414 (S.D.N.Y. 2015) (inviting section 349 decertification upon expert's inability after discovery's closure to "prove the existence of a price premium, or isolate a price premium associated" with challenged labeling via methodology that "must control for product features other than" labeling because "consumers may pay a higher price" "for many reasons that have nothing to do with specific advertising claims"); *Weiner*, 2010 U.S. Dist. LEXIS 79647 at *23 (fact of section 349 injury not provable classwide without methodology to "isolate the impact of [challenged labeling] from the other factors" that affect price); dkt. 156-11, ¶¶ 37, 46-47, 66-85, 101 (marketing professor Chiagouris details Dennis's conclusory failure to consider actual prices, "marketing mix," and other factors necessary to detect "existence" of price premium attributable to labeling).

Furthermore, it is undisputed that the other indispensable half of the price premium arithmetic -- the actual prices class members paid -- varied by more than 100%, from $5.50 or lower to $13.14 or greater. Dkt. 195-1 at 111 (SMF #42). Because Plaintiffs have not modeled this product's market price but for the alleged deception, it is impossible for them to show that

every class member actually paid a premium in excess of that value. *Weiner*, 2010 U.S. Dist. LEXIS 79647 at *23 (denying certification of section 349 price premium theory where plaintiffs' methodology did not "account for the various prices that putative class members actually paid in the determining injury on a class-wide basis"). Indeed, class members who *paid less* than the market price absent deception paid no price premium at all, and therefore incurred no section 349 injury, in a fashion that varies from each class member to the next as an individual function of the multitudinous prices they paid. *Singleton v. Fifth Generation, Inc*., No. 5:15-CV-474 (BKS/TWD), 2017 U.S. Dist. LEXIS 170415 at *69 (N.D.N.Y. Sep. 27, 2017) (denying section 349 certification because price premium injury theory "will devolve into individualized inquiries" where plaintiff "failed to propose a sufficiently-detailed and suitable model to measure the alleged price premium" by isolating alleged deception from other price factors, despite various proposals of "comparator model," conjoint analysis, and hedonic regression entirely absent here).

As *Weiner*, *Scotts EZ Seed*, *Singleton*, and *McLaughlin* illustrate, the fact of a universal price premium cannot simply be inferred from the packaging or general consumer attitudes about scalp protection's advisability (*cf*. dkt. 223 at 24-25), not least due to unrelated, confounding variables affecting the but-for and actual prices in a "market for consumer goods" that is "anything but efficient." *McLaughlin,* 522 F.3d at 224; *id.* at 230 (no classwide showing of fact of RICO price impact injury without controlling "exogenous variables" affecting price); *Scotts EZ Seed*, 304 F.R.D. at 413 ("Courts routinely reject price premium methodologies" that "do not attempt to isolate the premium due only to" deception because "consumers may pay a higher price…for many reasons that have nothing to do with specific advertising claims"). Indeed, L'Oreal can find no case certifying a classwide price premium injury theory based only on the prospect of a jury inference lacking support in any statistical methodology, much less a case where plaintiffs survived a decertification motion without such a methodology after discovery's closure.

In sum, the product's market value but for deception is indispensable to any determination

whether any class members in fact paid a premium above it, but it is unprovable on this record, particularly given Plaintiffs' failure to propose any methodology whatsoever to attempt the endeavor. "Without a reliable methodology, plaintiffs have not shown that they could prove at trial using common evidence that putative class members in fact paid a premium." *Weiner*, 2010 U.S. Dist. LEXIS 79647 at *18. Class members who variously paid less than the but-for value paid no premium and have no injury at all, rendering the *mere existence* of a section 349 price premium injury caused by alleged deception a purely individual inquiry. Decertification is justified on that basis alone. Dkt. 223 at 23 (decertifying Plaintiffs' unjust enrichment claims due in part to lack of evidence to establish necessary basis of those claims' refund damages).

## VIII.   The Collapse of Plaintiffs' Statutory Damages Model Mandates Decertification.

Even if Plaintiffs could prove that any material deception uniformly caused a price premium injury, Rule 23(b)(3) demands they demonstrate, with evidence, a reliable methodology to measure section 349 statutory damages on a classwide basis. *Comcast Corp. v. Behrend,* 569 U.S. 27, 33 (2013) ("evidentiary proof" supporting classwide damages model required for certification).[10] They propose to multiply $50 by the quantity of New York purchases, but they lack proof of the retail quantities sold in New York over the five-year class period. There is no such admissible evidence in the record. Without it, they can attempt no measure of classwide section 349 damages, requiring decertification. *See* dkt. 223 at 23 (decertifying Plaintiffs' unjust enrichment claims as "there is no evidence in the record" of scalp protector's value).

Plaintiffs' sole evidence at summary judgment was Colin Weir's flagrantly untimely declaration (dkt. 195-1 at 109 (SMF #40)), which Rule 37(c)(1) precludes. *See* dkts. 185, 198. L'Oreal moved to exclude Weir's report on those grounds.[11] The purported "IRI" statistics Weir

---

[10]   The unjust enrichment claims' decertification eliminated Plaintiffs' full refund damages model, leaving section 349's $50 statutory damages as the sole remaining class damages. Dkt. 153 at 1 (delineating proposed models); dkt. 223 at 1-2 (similar); *id*. at 23-24 (finding full refund invalid).
[11]   The Court's August 1 order did not reach the Weir motion or the statutory model's failure. The Court may have grouped the Weir exclusion motion under Rule 37(c)(1) with the various *Daubert* motions that the Court postponed by its August 1 order. L'Oreal has not yet filed a *Daubert*

attempted to interpret do not exist in the record, well before later confronting *in limine* the impossibility of "summarizing" such complex, unauthenticated, hearsay records, especially where Plaintiffs disclosed no witness to lay a foundation at trial. Lewis decl., ¶ 5. Discovery closed in December 2017 following two extensions. Dkt. 141. Continued certification requires the validity of Plaintiffs' statutory damages model upon the Court's "rigorous analysis" of not just its assumptions, but also the evidence necessary to apply it. *Comcast*, 569 U.S. at 35. Yet, they still cannot muster the roughest estimate of quantities sold in New York over the five-year class period and lack a timely-disclosed expert to try. *McLaughlin*, 522 F.3d at 231 (reversing certification because "[r]oughly estimating the gross damages to the class as a whole…would inevitably alter defendants' substantive right to pay damages reflective of their actual liability.").

In any event, given either the vacuum of retail quantity evidence or the Court-styled "vanishingly small" complaint rate for a product of now-indisputable value (dkt. 223 at 23 (Court ruling that product is not worthless)), there can be no aggregate assessment of $50 statutory damages concerning a product that costs fractions. The Second Circuit has flatly barred fluid recoveries and aggregations "that bear little or no relationship to the amount of economic harm actually caused by defendants" as a matter of due process. *McLaughlin*, 522 F.3d at 231-232.

## IX. Apart From The Above Individual Issues' Predominance Under Rule 23(b)(3), These Individualized Controversies Cannot Still Meet Rule 23(a)'s Prerequisites.

### A. This Class Fails The Threshold Conditions Of Commonality And Typicality.

For the above reasons, Plaintiffs cannot meet the basic prerequisite of commonality, and no Plaintiff typifies the class in this collection of individual controversies. FED. R. CIV. P. 23(a).

### B. Plaintiffs Are Inadequate Because They Disclaimed Class Members' Allegedly Valuable Personal Injury Claims to Gain Class Certification Of A $50 Theory.

Though Plaintiffs claim every class member suffered physical injury (dkt. 129 at 1), often

---

motion against Weir pending resolution of the Rule 37(c)(1) motion. The Court's postponement of *Daubert* motions related to other experts should not also postpone the motion to exclude Weir. Its postponement ensures further expenditure of resources that the motion's resolution might obviate.

with "pain, humiliation," and "thousands of dollars" in damages (dkt. 132 at 10), Plaintiffs disclaimed class members' damages more than $50 in order to lend causation of injury and damages the ersatz appearance of classwide uniformity.  Dkt. 105 at 20.  This choice renders Plaintiffs inadequate to represent those whose significantly more valuable personal injury and emotional distress claims Plaintiffs forfeited to gain class certification.[12]  *Small*, 94 N.Y.2d at 54-55 (by "limit[ing] their claim for damages to the purchase price…in order to shape legally *de minimis* theory," New York high court affirmed section 349 plaintiffs' disqualifying "tension" with class members with "substantial claims for personal injury"); *Small v. Lorillard Tobacco Co.*, 679 N.Y.S.2d 593, 601 (N.Y. App. Div. 1998) (section 349 economic class "will preclude" "more lucrative damages claims for personal injury" from same deceptive transaction).[13]  The conflict worsened with Plaintiffs' post-certification contention that *every user* suffered physical injuries beyond the hair fiber weakening that their expert says results from all hair relaxers.  Lewis decl., Exs. 2-4, p. 7 (responses to RFA 18); dkt. 143 at 9, n. 8 ("extensive physical injuries").

The conflict is not theoretical.  L'Oreal defends against plaintiffs incentivized by sizeable individual, non-class claims of personal injury not just in this action, but also in Louisiana state court and a diversity action in the District of Maryland.  Lewis decl., ¶¶ 7-10, ex. 7 at 28 (pleading damages of $1 million).  Further, in any later individual actions, these class members will prefer to seek personal injury damages under section 349 rather than more demanding common law theories, but Plaintiffs' classwide election of $50 will specifically establish that none have greater actual damages.  The statute grants either "actual damages *or* fifty dollars, whichever is *greater*" -- not both.  N.Y. GEN. BUS. LAW § 349(h) (emphases added).  Rule 23 cannot bend the substantive

---

[12]  "For judgments in diversity cases, federal law incorporates the rules of preclusion applied by the State in which the rendering court sits."  *Taylor v. Sturgell*, 553 U.S. 880, 891 n. 4 (2008).  Under New York's transactional approach to res judicata, once a claim is brought to final conclusion, all other claims arising out of the same transaction are barred, "even if based upon different theories or if seeking a different remedy."  *Matter of Josey v. Goord*, 9 N.Y.3d 386, 389-390 (N.Y. 2007).

[13]  Due to lack of diversity with defendants (dkt. 90, ¶¶ 19-20), New York-citizen class members will file their later suits in New York state courts bound to follow these authorities.

law that way.  *Amchem Prods. v. Windsor*, 521 U.S. 591, 613 (1997); 28 U.S.C. § 2072(b).

It does not settle this conflict to suppose that some of those with valuable personal injury claims might have received timely notice of their chance to opt out.  *See Small*, 679 N.Y.S.2d at 601 ("ability to opt out of the class is insufficient to protect…class members who would want to seek remedies other than those chosen by the representatives"); Lewis decl., ¶¶ 11-12 (notice website is six months out-of-date and notice administrator failed to issue report verifying notice plan's implementation).  After certification, Plaintiffs abandoned their effort to obtain contact information from retailers for any portion of class members.  *Id.* at ¶ 13.  None received any form of personal notice that Plaintiffs are terminating their chances to recover "thousands of dollars" (dkt. 132 at 10) for personal injuries or emotional distress under section 349.  Dkts. 148-1, 148-2. Not a single class member opted out -- none.  Siachos decl., ¶ 3.

Even if the notice plan met due process by giving notice to *some*, Plaintiffs' Rule 23(a) adequacy to "protect the interests" of *all* class members is a separate question.  No doubt many did not hear of this case and never will until they learn that their recoveries above $50 are extinguished.[14]  Having sacrificed those class members' much greater claims to certify a $50 theory, Plaintiffs are inadequate to represent them.  *In re Rezulin Prods. Liab. Litig.*, 201 F.R.D. 61, 69 (S.D.N.Y. 2002) ("those with real personal injury cases obviously have an overwhelming interest in pursuing their own lawsuits rather than being submerged in a class seeking a refund of the purchase price"); *see Gordon v. Sonar Capital Mgmt., LLC*, 92 F. Supp. 3d 193, 198 (S.D.N.Y. 2015) (Rakoff, J.) (adequacy "widely considered the most important" Rule 23(a)  requirement).

## CONCLUSION

Plaintiffs cannot meet their burden to justify continued certification of the section 349 claim.  L'Oreal therefore respectfully requests that the Court grant decertification.

---

[14]   Nor could the Court decree those who might intend to file future personal injury actions to be outside the class.  The opt-out deadline and summary judgment have passed.  Such an order would enable one-way intervention and render the class definition an unascertainable function of individuals' subjective states of mind.

Dated:  August 23, 2018

GORDON & REES, SCULLY, MANSUKHANI LLP

By:   _s/ Justin D. Lewis_
      Miles D. Scully (admitted _pro hac vice_)
      Peter G. Siachos
      Justin D. Lewis (admitted _pro hac vice_)
      JoAnna M. Doherty

1 Battery Park Plaza, 28th floor
New York, New York 10004
T:  (212) 269-5500
E:  jlewis@grsm.com

21