UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────┐
╎                             ╎
╎ In re: AMLA LITIGATION      ╎
╎                             ╎
└─────────────────────────────┘
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _____

16-cv-6593 (JSR)

OPINION AND ORDER

JED S. RAKOFF, U.S.D.J.

This litigation concerns the sale by defendants L'Oreal USA, Inc. and its subsidiary Soft Sheen-Carson LLC (collectively, "L'Oreal") of the "Amla Legend Rejuvenating Ritual Relaxer" (the "product"), a kit used to straighten curly hair. Plaintiffs, charging that the product was unreasonably dangerous and that its advertising was deceptive, brought individual claims and also sought certification of a nationwide class and several subclasses asserting claims under the laws of various states. This Court originally certified a Florida class and a New York class to pursue claims of unjust enrichment, as well as declaratory and injunctive relief. The New York class was further certified to pursue claims under New York's General Business Law § 349. In ruling on the motions for summary judgment, however, the Court decertified all class claims except the New York class claim under NYGBL § 349.

L'Oreal now moves to decertify the one remaining class. Following the parties' written briefing, the Court heard oral argument on October 17, 2018. For the reasons stated herein, the motion to decertify is partly granted, but only to the extent of

1

precluding the class from proceeding on the theory that the
product's packaging deceptively suggested it was safer than
other hair relaxers. The motion is otherwise denied.

Full familiarity with the history of this case is here
assumed. The factual allegations relevant to the present motion
are as follows:

The product is a kit consisting of five components: (1) a
scalp protector; (2) a relaxer cream; (3) a shampoo; (4) a
conditioner; and (5) an oil moisturizer. As a general matter,
relaxer creams make hair straighter by using an alkaline agent
to break the disulfide bonds in the hair's keratin proteins.
This process can cause hair to fall out and can also irritate or
burn the scalp. The purpose of a scalp protector is to prevent
or minimize such injuries by keeping the relaxer from touching
the user's scalp.

This Court previously found that a genuine dispute exists
as to whether the product's advertised scalp protector actually
protects scalps. Order dated July 31, 2018 ("S.J. Order"), at
16, ECF No. 223. The Court further found that a reasonable jury
could conclude that the inclusion of the scalp protector in the
product increased its price and therefore caused purchasers to
pay a price premium. S.J. Order 24. Taken together, a reasonable
jury could conclude that L'Oreal promised purchasers a
functioning scalp protector; that purchasers paid more as a

2

result; that the scalp protector did not, in fact, function; and that the purchasers therefore overpaid for the product.

This Court additionally found that a genuine dispute exists as to whether the packaging misleadingly implied that the product was safer than other relaxer creams. S.J. Order 22. The product is advertised as "no-lye," which is literally true - the active ingredient in the product is lithium hydroxide, not lye (i.e. sodium hydroxide). S.J. Order 18-19. However, surveys conducted by both L'Oreal and by the plaintiffs' expert J. Michael Dennis suggest that many consumers understand "no-lye" hair relaxers to be gentler and safer than relaxers that contain lye. S.J. Order 19-21. Because "the evidence strongly suggests that the product is not safer" than other relaxers, there exists a genuine dispute as to whether these collective representations deceptively implied that it was safer. S.J. Order 18. Whether, however, this provides a basis for an additional class claim is more problematic.

A class action may be maintained only if the class and class representatives satisfy the requirements of numerosity, commonality, typicality, and adequacy. F.R.C.P. 23(a). Additionally, class membership must be in some sense ascertainable. In re Petrobas Sec. Litig., 862 F.3d 250, 257 (2d Cir. 2017). Further, a class action seeking money damages, as the class here does, is permissible only if common questions of

3

law or fact predominate over individual issues and the class
action is superior to other methods for adjudicating the
controversy. F.R.C.P. 23(b)(3); Wal-Mart Stores, Inc. v. Dukes,
564 U.S. 338, 362-63 (2011). Members of a 23(b)(3) class must be
given "the best notice that is practicable under the
circumstances, including individual notice to all members who
can be identified through reasonable effort." F.R.C.P.
23(c)(2)(B). The notice must include information about the
nature of the action, the definition of the class, the claims at
issue, that a class member may be excluded upon request, and
that a class judgment will be binding upon class members.
F.R.C.P. 23(c)(2)(B). It is the obligation of the Court to
ensure continued compliance with Rule 23's requirements. See
Amara v. CIGNA Corp., 775 F.3d 510, 520 (2d Cir. 2014); F.R.C.P.
23(c)(1)(C). The burden remains on the plaintiffs to prove, by a
preponderance of the evidence, that these requirements remain
satisfied. Mazzei v. Money Store, 829 F.3d 260, 270 (2d Cir.
2016).

As noted, this Court previously found that the only
surviving class claim is a claim by a New York class for
violations of New York General Business Law § 349. That section
prohibits "[d]eceptive acts or practices in the conduct of any
business, trade or commerce or in the furnishing of any service
in [New York]." NYGBL § 349(a). In addition to enforcement

4

actions brought by the Attorney General, the statute authorizes
private actions by "any person who has been injured by reason of
any violation of this section" to recover "actual damages or
fifty dollars, whichever is greater." NYGBL § 349(h).

An action under § 349 has three elements: "first, that the
challenged act or practice was consumer-oriented; second, that
it was misleading in a material way; and third, that the
plaintiff suffered injury as a result of the deceptive act."
Stutman v. Chemical Bank, 731 N.E.2d 608, 611 (N.Y. 2000). The
test for deceptiveness is objective, asking whether the
representations or omissions were "likely to mislead a
reasonable consumer acting reasonably under the circumstances."
Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank,
N.A., 647 N.E.2d 741, 745 (N.Y. 1995). Importantly, "reliance is
not an element of a section 349 claim." Stutman, 731 N.E.2d at
612.

In its current motion, L'Oreal raises no fewer than 19
challenges to continued certification of the New York class.
Most of these challenges were unsuccessfully raised in L'Oreal's
previous motions, but the Court, in an excess of caution, has
reviewed them anew.

First, L'Oreal argues that there is no proof that the scalp
protector is universally defective, pointing out that this Court
observed in its summary judgment ruling that the plaintiffs'

5

expert, Patrick Obukowho, "cannot reliably testify that the scalp protector in every kit is ineffective" because his experiment bearing on that issue relied on the scalp protector from just one kit. Def. Mem. Supp. Mot. Decertify ("Decert. Mot.") 2, ECF No. 229. But, as this Court went on to say, "[b]oth the relaxer and the scalp protector appear to be mass produced, so one would expect any individual box to be the same as the others. L'Oreal, of course, is free to argue to the jury, including through presentation of its own experiments or other evidence, that this outcome is not . . . representative." S.J. Order 15. Plaintiffs are not obligated to produce evidence that each and every box of a mass-produced product has identical chemical properties. The mere possibility of a variance between mass-produced products presents a question for the jury; it does not mandate decertification.

Second, L'Oreal complains that the plaintiffs have not identified the specific chemical deficiency in the scalp protector that causes it to fail. Decert. Mot. 2. L'Oreal does not endeavor to explain why this should matter. If the scalp protector fails to keep the relaxer cream from reaching the scalp, thus exposing users to irritation and burns, the chemical basis for that failure is irrelevant.

Third, L'Oreal argues that the plaintiffs' evidence "shows that the [scalp protector's] chemistry inherently operates

6

differently among users." Decert. Mot. 3. The evidence shows no
such thing. Obukowho opined that the degree of risk to users
from the relaxer cream might vary as a result of differences in
sweat, salt content, and so on. See Obukowho Dep., Lewis Decl.
Exh. 2, at 159:3-160:7, ECF No. 156-2. He never suggested such
differences might affect how well the scalp protector prevents
the relaxer cream from penetrating to the skin. If L'Oreal means
to argue that there is no classwide proof that the relaxer cream
is dangerous – and therefore no proof that allowing it to touch
the skin matters – L'Oreal is mistaken. While this Court
previously concluded that there was insufficient proof that the
relaxer cream in the product is more dangerous than other
relaxer creams, there is no dispute that "all hair relaxers can
cause hair breakage and scalp burning." S.J. Order 4, 12. That
is ample basis for a jury to conclude that a working scalp
protector is important and that the allegedly defective scalp
protector here imposed a price premium on consumers.

Fourth, L'Oreal argues that the low rate of consumer
complaints about the scalp protector "forecloses classwide proof
of a uniform [scalp protector] defect." Decert. Mot. 3. The
Court was not convinced by this argument in L'Oreal's motion for
summary judgment, see S.J. Order 15-16, and it is not convinced
now. Because the product instructions caution users not to let
the relaxer cream touch the scalp, it is plausible that many

7

users would not be injured even if the scalp protector failed to work, resulting in a low incidence of complaints. L'Oreal protests that the plaintiffs have claimed that the scalp protector defect results in virtually universal injuries, but the phenomenon of litigants exaggerating the likelihood of injury is hardly uncommon. Decertification is not mandated every time a party's proof fails to entirely live up to their puffery in legal memoranda.

Fifth, L'Oreal argues that since, according to the plaintiffs' evidence, the relaxer cream becomes more crystallized, and therefore more dangerous, as a function of shelf life, the propensity to injure of any given batch is an individual question. Decert. Mot. 5-6. But as the Court has already observed, it is uncontested that any relaxer cream can cause scalp burning. Even if plaintiffs are correct that the relaxer cream becomes more dangerous as it crystallizes, a reasonable jury could conclude that the totally non-crystallized product was still capable of causing injury and therefore still required a scalp protector. L'Oreal's own survey, in which 85.4% of respondents indicated that a scalp protector should always be used before applying a no-lye relaxer, supports this conclusion. S.J. Order 24-25 (citing Lewis Decl. Exh. 10 ["Hibbard Rep."] ¶ 102, ECF No. 156-10). And while L'Oreal speculates that the scalp protector might perform adequately against non-

8

crystallized relaxer cream, that is pure conjecture without any even arguable basis in the evidence. L'Oreal is free to make this argument to the jury; it does not warrant decertification.

Sixth, L'Oreal points to supposedly "[m]aterial variations" in the product's packaging because only two of the three versions of the product state that the scalp protector "Protects Scalp & Skin." Decert. Mot. 6. But L'Oreal does not explain any meaningful distinction between a package which advertises that it contains a "scalp protector" and another package which advertises that it protects scalps, and the Court can discern none.[1] It is also not material that the cartons of two of the three product variants include the phrase "Fast relaxing processing time" and recommend a processing time of 15 rather than 20 minutes. Decert. Mot. 7. Plaintiffs' evidence tends to show that the relaxer cream penetrated the scalp protector within a few minutes, and while that evidence may be challenged, there is no evidence in the record suggesting that the scalp protector would work adequately for 15 minutes but not for 20 minutes. The jury's finding as to the scalp protector's

---

[1] At oral argument, L'Oreal claimed that some online retailers do not display the rear of the carton, where the scalp protector is mentioned, and argued that online purchasers therefore could not be exposed to the allegedly deceptive claim. Tr. Oct. 17, 2018, at 34:22-35:3. The Court is not convinced. L'Oreal did not specify which online retailers this applies to, nor point to any evidence in the record of those retailers' online displays.

9

effectiveness will therefore be uniform for all class members, whichever version of the product they purchased.

Seventh, L'Oreal notes that the instructions included with the product varied between different versions of the product. But any arguments predicated on differences between the instructions, which were inside the box, are irrelevant; class members were injured (if at all) by the payment of a price premium, which was complete before they ever opened the package and read the instructions.

Eighth, L'Oreal points out that one of the carton variations does not contain the phrase "Refills to reveal visibly fuller, silkier hair." Decert. Mot. 7. The Court agrees that, insofar as this phrase is not common to all versions of the product, plaintiffs should not rely upon it to prove class liability. But given the abundance of other challenged statements that arguably conveyed the allegedly misleading message that the product was safer than other relaxers, this minor discrepancy does not mandate decertification.

Ninth, L'Oreal points out that some cartons were labeled "for all hair types" and others for "medium to coarse hair." Decert. Mot. 7. This minor variation is not material. If the jury finds that the balance of the representations falsely implied that the product was safer than other hair relaxers,

then the product was deceptive whether it was advertised to all consumers or only to a subset.

Tenth, L'Oreal argues that customers who knew the risks of the product could not have been reasonably deceived by the deceptive packaging regarding the scalp protector. Decert. Mot. 11. This is a factual assertion, but L'Oreal offers no evidence to support it. Moreover, while it is certainly possible that many buyers understood hair relaxers to carry certain risks, it seems unlikely that any significant number of buyers understood L'Oreal's scalp protector to be ineffective at protecting the scalp, as alleged here. It seems even less likely that those buyers would pay a price premium just to obtain a scalp protector they knew to be dysfunctional. In any event, where "materiality is judged according to an objective standard," it is "a question common to all members of the class." Amgen Inc. v. Connecticut Retirement Plans and Trust Funds, 568 U.S. 455, 459 (2013).

Eleventh, L'Oreal argues that the record lacks proof that individual plaintiffs saw the labeling that advertised the scalp protector. Decert. Mot. 13 n.9. But when, as here, the challenged statements are on the packaging of the product itself, such individualized proof is unnecessary. This is not a case where a class seeks to challenge the content of a separate advertisement, to which any individual buyer may or may not have

11

been exposed. Cf. Goldemberg v. Johnson & Johnson Consumer Companies, Inc., 8 F. Supp. 3d 467, 480 (S.D.N.Y. 2014). It is reasonable to assume that any buyer of the product saw the product's packaging. If the law required individualized proof that every class member saw the challenged statements, no matter how obvious and prominent a part of the packaging, consumer class actions would be impossible to maintain.

Twelfth, L'Oreal argues that the plaintiffs have not shown that New York law applies to every class member, since the class includes anyone who bought the product in New York and is not limited to New York residents. Decert. Mot. 9-10. The Court is satisfied that New York courts would apply a New York consumer protection law to a transaction that occurred in New York.[2] For tort claims, New York applies the law of the jurisdiction with the greatest interest in the litigation. Schultz v. Boy Scouts of America, Inc., 480 N.E.2d 679, 684 (N.Y. 1985). For laws that regulate conduct, "the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders." Cooney v. Osgood Machinery, Inc., 612 N.E.2d 277, 280 (N.Y. 1993).

---

[2] Because this case arises under diversity jurisdiction, this Court applies New York conflict-of-law rules. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941).

Here, a prohibition on deceptive advertising is conduct-regulating. New York, as the site of the tort for all class members, is therefore the appropriate source of law. The New York Court of Appeals has held that § 349 applies to "transactions that take place in New York State" and "does not turn on the residency of the parties." Goshen v. Mutual Life Ins. Co. of New York, 774 N.E.2d 1190, 1196 (N.Y. 2002).

L'Oreal claims the class also includes people who, while outside New York, purchased the product online from a New York-based online retailer, or had the product delivered to a location in New York. Decert. Mot. 10. The Court disagrees. The certified class was limited to persons "who bought one or more of the products in New York." Order on Class Certification 37, ECF No. 138. The phrase "in New York" modifies the phrase "who bought," meaning that the person who bought the product was in New York at the time of the purchase. The class therefore does not include people who bought the product from outside of New York, even if the seller was located in New York or the buyer had the product shipped to New York post-purchase.[3]

---

[3] In Goshen, the New York Court of Appeals interpreted § 349 not to apply to out-of-state transactions. 774 N.E.2d at 1196. The Second Circuit has implemented that rule through a "transaction-based" test, wherein the location of the consumer is not dispositive. Cruz v. FXDirectDealer, LLC, 720 F.3d 115, 122 (2d Cir. 2013). Arguably, an online transaction with a New York business occurs in New York, thus implicating the GBL. See, e.g., id. at 123-24 (holding that transactions involving out-of-state plaintiffs "clearly" "occurred in New York" where customer communications and payment had to be sent to

Thirteenth, in what is really its only genuinely new argument, L'Oreal argues that the class representation is not adequate because the named plaintiffs disclaimed class members' damages exceeding $50 in favor of classwide statutory damages. Decert. Mot. 19. L'Oreal argues that class members will be precluded from pursuing individual actions under New York's "transactional" rules of res judicata. Decert. Mot. 19 n.12.

It may be true that, following a judgment in this case, New York law would preclude class members from recovering in connection with the purchases at issue. See Josey v. Goord, 880 N.E.2d 18, 20 (N.Y. 2007) ("[O]nce a claim is brought to a final conclusion, all other claims arising out of the same transaction or series of transactions are barred, even if based upon different theories or if seeking a different remedy.") (quoting O'Brien v. Syracuse, 429 N.E.2d 1158, 1159 [1981]); Small v. Lorillard Tobacco Co., Inc., 252 A.D.2d 1, 11 (1st Dep't 1998), aff'd 720 N.E.2d 892 (N.Y. 1999) (applying this principle to putative class action); see also Taylor v. Sturgell, 553 U.S.

_____

defendant's New York office); Ward v. TheLadders.com, Inc., 3 F. Supp. 3d 151, 168 (S.D.N.Y. 2014) (holding that plaintiffs had sufficiently pleaded § 349 claim where defendant "operated a website and maintained its bank account in New York," because communications and transactions "occurred on or through the website itself, which is equivalent to communicating or transacting directly with a New York address"). However, in light of the Court's determination that the definition of the class excludes purchases by customers located outside of New York, the Court need not decide whether § 349 claims would otherwise lie for such customers.

14

880, 891 n.4 (2008) (holding that federal courts sitting in diversity apply the preclusion rules of the state in which the court sits). And if class representatives gave up potentially lucrative individual damages claims of absent class members in order to make the class action more feasible, that might present a conflict. Here, however, the Court is satisfied that class representation is adequate.

To begin with, L'Oreal's asserted conflict appears more hypothetical than real. L'Oreal relies heavily on the plaintiffs' own language, which claimed that every user of the product suffered injuries amounting to thousands of dollars. But hyperbole is not uncommon in litigation, and the mere fact that the plaintiffs likely exaggerated the ubiquity of user injury does not compel this Court to adopt those claims as true. If absent members of the New York class really did have viable and lucrative personal injury claims, they likely would have filed these claims by now. L'Oreal points to lawsuits in Louisiana, Maryland, and Alabama, see Decert. Mot. 19; Tr. Oct. 17, 2018 at 21:12-14, but has not identified any suit by an absent member of the New York class.

The Court's confidence that there are few, if any, outstanding claims is bolstered by the fact that no class member has opted out. L'Oreal treats this fact as damaging to plaintiffs, apparently seeking to imply that the notice was

15

inadequate because class members did not receive personal notice. Decert. Mot. 20. However, in previously opposing the notice plan, L'Oreal argued that the number of purchasers in New York was likely low and that the plan was overbroad – in other words, that the notice would reach too many people, rather than too few. Def. Mem. Opp. Mot. Distrib. Class Notice 1-2, ECF No. 149.[4] This Court nonetheless approved the notice plan, which included individual notice to class members known to the parties and notice by print and online publication. Order dated Jan. 5, 2018, at 3-6, ECF No. 153. In particular, responding to L'Oreal's overbreadth argument, this Court noted that it was preferable to "err on the side of comporting with due process and providing broad notice rather than unnecessarily increasing the risk of absent plaintiffs being bound by judgment in class actions about which they did not know." Id. at 4.

Admittedly, the efforts of class counsel to locate individual class members have been less than sterling. At oral argument, L'Oreal represented that, at the time of class certification, plaintiffs had seven outstanding subpoenas to retailers seeking information about individual purchasers. Tr. Oct. 17, 2018 at 24:20-22. After certification was granted,

---

[4] While notice must be provided to individuals "who can be identified through reasonable effort," F.R.C.P. 23(c)(2)(B), L'Oreal took the position that there was "no feasible or possible way to identify" individual class members here. Def. Mem. Opp. Mot. Distrib. Class Notice 4.

16

however, plaintiffs did not follow up on those subpoenas, take
depositions, or retrieve documents. Tr. Oct. 17, 2018 at 24:17-
22. When asked about this at oral argument, plaintiffs' counsel
explained that her experience in past, unrelated litigation was
that retailers either did not have accurate contact information
for customers or did not retain records going back far enough.
Tr. Oct. 17, 2018 at 25:12-17. That is a woefully deficient
explanation. Having propounded the subpoenas, it would have cost
class counsel very little to at least follow through with them.

Also troubling to the Court is the fact that, as recently
as August 23, 2018, the notice website had not been updated
since February 8. Tr. Oct. 17, 2018 at 24:23-25. It still told
visitors that the trial in this case had taken place on April
30, 2018. Tr. Oct. 17, 2018 at 25:1-2. At oral argument,
plaintiffs' counsel was unable to offer any explanation for this
"oversight." Tr. Oct. 17, 2018 at 28:7-12.

Despite these failings, however, the Court remains
satisfied that the notice in this case was adequate. Although
the website should have been updated, the outdated trial
schedule it gave was still later than the final opt-out date,
which was April 2, 2018. Thus, any visitor to the site after
April 30 would have missed the opt-out deadline in any event,
and any harm caused by the failure to update the trial schedule
was therefore minimal.

Moreover, although the Court is mystified that plaintiffs abandoned their efforts to obtain more information about individual class members, the notice plan approved by this Court did not require plaintiffs to seek out such information. It only required individual notice to be provided to class members whose information was already in L'Oreal's or class counsel's possession. Order dated Jan. 5, 2018, at 3. According to a declaration filed by a representative of Epiq, the notice administrator, notice was sent by mail to 18 members of the New York class, as well as to 140 email addresses. Azari Decl. ¶¶ 7, 9, ECF No. 241. Notice was also published in Rochester, Buffalo, Syracuse, Albany, and New York City newspapers, and online via Facebook and the Google and Yahoo ad networks. Azari Decl. ¶¶ 10-15. The case website registered 26,801 unique visitors. Azari Decl. ¶ 18.

Given the foregoing, the Court remains satisfied that notice to class members was sufficient. If L'Oreal means to relitigate the sufficiency of the notice plan now, it is woefully untimely. The Court approved the plan in January and the opt-out deadline was in April. The case is prepared to go to trial. Decertification is not mandated by the bare possibility that a few class members might not have seen the notice and might have individual claims that they wish to bring but have not yet filed.

18

Fourteenth, L'Oreal raises concerns over whether there is adequate proof that class members were injured. To begin with, L'Oreal claims that each class plaintiff admitted that "physical injuries form the injury-in-fact that confers Article III standing for class members' statutory consumer protection claims." Decert. Mot. 8. But it bases this suggestion on the responses of plaintiffs' counsel to certain requests for admission. In actuality, plaintiffs' counsel did not concede that physical injury was what gave class members standing; they simply denied a request for admission that asserted that physical injury did not form the basis for standing. See Lewis Decl. Exhs. 2-4, ¶ 20. And while a party's admission is "conclusively established," F.R.C.P. 36(b), that is not to say that a party's denial conclusively establishes the opposite of what is denied. See Hicks v. Mercedes-Benz U.S. Intern., Inc., 877 F. Supp. 2d 1161, 1170 (N.D. Ala. 2012) ("A denial simply shows that the issue has not been conceded; it does not possess the heft of an affidavit, stipulation, interrogatory answer, or deposition testimony, let alone the 'conclusively established' status of an admission.").[5]

---

[5] When the Court raised this point at oral argument, L'Oreal responded that Rule 36 requires denials to be specific. Tr. Oct. 17, 2018 at 24:1-4. But that does not give denials independently binding effect. Rather, if a party feels that a denial is insufficient, it may move to determine the sufficiency of the answer, at which point the court may order that the matter is admitted. F.R.C.P. 36(a)(6). L'Oreal never

In any event, this Court has already concluded that there is sufficient evidence of injury to every class member: "If there is a price premium, then every purchaser of the kit paid more than they otherwise would have, so every purchaser was injured." S.J. Order 26. That satisfies Article III's injury-in-fact requirement.

Fifteenth, L'Oreal contends that there is no classwide proof that the alleged defect manifested. Decert. Mot. 8-9. The cases cited by L'Oreal almost all involve claims based on a risk of injury from a product. See, e.g., Rivera v. Wyeth-Ayerst Laboratories, 283 F.3d 315, 319 (5th Cir. 2002) (product liability claim based on allegedly defective product not cognizable where class plaintiffs conceded product was not defective as to them); Braun v. Abbott Laboratories, 895 F. Supp. 530, 563 (E.D.N.Y. 1995) (injuries resulting from exposure to diethylstilbestrol in utero cognizable only once injuries manifested). Of course the mere possibility that a product is defective will not support a cause of action. See In re Bridgestone/Firestone, Inc., 288 F.3d 1012, 1017 (7th Cir. 2002) (plaintiffs not entitled to recovery on theory that latent defect made every unit less valuable). That is the purpose of requiring the defect to "manifest." But, as this Court has

asked this Court to rule on the sufficiency of plaintiffs' answers, and so their denials are not binding.

20

already explained, plaintiffs do not here allege a latent defect; rather, "[t]hey allege that the scalp protector does not protect scalps. That defect, if it exists, was manifest from the moment of purchase." S.J. Order 33.

Sixteenth, L'Oreal argues that there cannot be classwide proof of injury because (1) some scalp protectors might have worked and (2) some scalp protectors might have failed as the result of individual misuse, rather than defect. Decert. Mot. 12-13. This is essentially a recapitulation of L'Oreal's earlier argument that there is no proof that the scalp protector failed universally. The Court's answer is the same: L'Oreal may argue to the jury that any defects were exceptional, or that failure was the result of misuse, and it will be the plaintiffs' burden to prove otherwise. This factual dispute does not mandate decertification.[6]

Seventeenth, L'Oreal repeats its argument that Small v. Lorillard Tobacco Co., 720 N.E.2d 892 (N.Y. 1999), imposes a

---

[6] L'Oreal claims that it would be unfair to preclude them from inquiring into absent class members' misuse of the product. Decert. Mot. 13. But such evidence would be relevant only if the plaintiffs planned to prove the product's defect by anecdotal proof of injuries sustained by absent class members. Rather, the plaintiffs' case will likely be built on a combination of expert testimony and anecdotal proof from named plaintiffs. As to the latter, L'Oreal will be given every opportunity to convince the jury that their injuries were the result of misuse rather than defect. And insofar as plaintiffs ask the jury to extrapolate from the named plaintiffs' individual injuries to find classwide defect, L'Oreal can ask the jury to extrapolate from the named plaintiffs' misuse. L'Oreal does not explain why it requires further "individualized" defenses against non-individualized proof.

21

physical injury requirement for claims under NYGBL § 349. This
Court has rejected this precise argument twice before, and
L'Oreal makes no effort to engage with the substance of those
rulings. See S.J. Order 32-33; Order on Class Certification 30.
The Court will explain once more. In Small, the New York Court
of Appeals held that the mere fact of deception in the course of
buying a product does not constitute injury. 720 N.E.2d at 898.
Crucially, however, the plaintiffs in that case did not "allege
that the cost of cigarettes was affected by the alleged
misrepresentation," and the Court of Appeals explicitly did not
foreclose the possibility that "a plaintiff might have a claim
for the higher price the consumer paid for the product as a
result of the misrepresentation." Id. at 898 & n.5. That is
precisely the claim here: that plaintiffs paid more than they
should have because of deceptive marketing. Thus, contrary to
L'Oreal, there is no improper conflation of deception and
injury. "The deception is the false and misleading label, and
the injury is the purchase price." Ebin v. Kangadis Food Inc.,
No. 13-cv-2311, 2013 WL 6504547, at *5 (S.D.N.Y. Dec. 11, 2013)
(Rakoff, J.); see also Irvine v. Kate Spade and Company, No. 16-
cv-7300, 2017 WL 4326538, at *5 (S.D.N.Y. Sep. 28, 2017)
(holding that plaintiffs' allegation that goods they purchased
were worth less than the prices paid was a "classic" example of
price premium injury).

L'Oreal relies on Izquierdo v. Mondelez Internat'l, Inc.,
No. 16-cv-4697, 2016 WL 6459832 (S.D.N.Y. Oct. 26, 2016). In
Izquierdo, the court held that the plaintiffs had failed to
allege injury from the defendant's practice of allegedly
packaging movie theatre candy in a way that made the boxes
appear to contain more candy than they actually did. Id. at *7.
In other words, the Izquierdo court concluded that a consumer
who expected to receive more candy than the box actually
contained was not thereby injured. Id. But Izquierdo is
distinguishable, because the plaintiffs in that case did not
"allege[] that they paid a higher price for the Candy than they
otherwise would have, absent deceptive acts." Id. Here,
plaintiffs do claim to have paid a higher price. Nothing in
Izquierdo suggests that the provision of a lesser quantity of
goods than advertised cannot serve as evidence of a price
premium.[7]

---

[7] To the extent that Izquierdo stands for the proposition that
consumers are not injured when they receive fewer goods than
advertised, this Court respectfully disagrees. See Daniel v. Mondelez
Internat'l, Inc., 287 F. Supp. 3d 177, 197 (E.D.N.Y. 2018) (holding
that "less product than promised constitutes an injury"). The Second
Circuit has held that a plaintiff is injured, within the meaning of
NYGBL § 349, when the plaintiff "purchased a product and did not
receive the full value of her purchase." Orlander v. Staples, Inc.,
802 F.3d 289, 302 (2d Cir. 2015). In doing so, the Second Circuit
approvingly cited a New York trial court decision holding that a
plaintiff had adequately pleaded a § 349 violation by alleging that
defendants sold propane in what appeared to be 20-pound tanks, but
actually contained only 15 pounds of propane. Id. (citing Lazaroff v.
Paraco Gas Corp., 967 N.S.Y.2d 867, 2011 WL 9962089, at *1, *5 [Sup.
Ct. Kings Cty. Feb. 25, 2011]). But, in any event, plaintiffs here do
not claim injury simply because the product they purchased was less

23

Eighteenth, L'Oreal argues that plaintiffs have failed to produce a reliable methodology to measure classwide damages because the only evidence of the total number of New York purchases is Colin Weir's untimely expert declaration. Decert. Mot. 17. The Court notes that the damages methodology proposed by plaintiffs – multiplying the number of New York purchases of the product by $50 – is quite reliable, since NYGBL § 349 provides for statutory damages. That is sufficient to "establish[] that damages are capable of measurement on a classwide basis." Comcast Corp. v. Behrend, 569 U.S. 27, 35 (2013) (emphasis added).

However, L'Oreal is correct that Weir's declaration is the only record evidence of total retail purchases in New York.[8] If the declaration should have been stricken as untimely, then plaintiffs have not come forward with evidence sufficient to carry their burden of showing classwide damages.[9]

---

valuable than expected, but because they allegedly paid a higher price than they would have absent the deception.

[8] Helpfully, the plaintiffs agree with L'Oreal that Weir's declaration is an expert report and do not dispute that it is the only evidence in the record of total retail sales. See Mem. Opp. Mot. Exclude 2, ECF No. 187.

[9] Although L'Oreal moved to exclude Weir's report in its summary judgment briefing, the Court denied that motion (and other Daubert motions) as moot because its resolution was not material to the Court's rulings on summary judgment.

24

Federal Rule of Civil Procedure 26(a)(2)(B) requires the timely disclosure of any expert reports. Here, the deadline for plaintiffs to file their expert reports was October 6, 2017, but Weir's report was not disclosed, nor was he even identified as a witness, until plaintiffs submitted their papers in opposition to L'Oreal's motion for summary judgment on March 6, 2018. When a party fails to disclose a witness, the witness may not be used "unless the failure was substantially justified or harmless." F.R.C.P. 37(c). In deciding whether to exclude belatedly disclosed evidence, the court must weigh four factors: (1) the party's explanation for failure to timely disclose; (2) the importance of the testimony of the precluded witness; (3) the prejudice suffered by the opposing party; and (4) the possibility of a continuance. Patterson v. Balsamico, 440 F.3d 104, 117 (2d Cir. 2006).

As to the first factor, the explanation for the untimely disclosure, plaintiffs report that they were told by defense counsel that L'Oreal receives third-party retail sales data, see Rivas Decl. Exh. 2 ¶ 2("Rutherford Decl."), ECF No. 188-2, and that defense counsel orally promised to produce such data during discovery but failed to do so, see Pl. Mem. Opp. Decert. 17. Plaintiffs claim to have realized it was necessary to introduce retail sales data only after the December 20, 2017 deposition of Angela Rutherford, L'Oreal's F.R.C.P. 30(b)(6) witness, at which

25

point it was clear that L'Oreal would not be producing evidence of retail sales. However, even assuming arguendo that defense counsel did in fact represent to plaintiffs that sales data would be forthcoming, there is still no excuse for plaintiffs' failure to seek this Court's assistance to obtain such data in a timely fashion, or to update their disclosures pursuant to F.R.C.P. 26(e).

As to the second factor, however, Weir's report and testimony is crucially important. Without it, there would be no evidence of record supporting classwide damages and the class action might have to be discontinued. Complete exclusion would therefore be a harsh penalty.

As to the third factor, the Court finds that L'Oreal has suffered minimal, if any, prejudice from the delay. L'Oreal's main claim to prejudice is that it needs to depose Weir and to hire a rebuttal expert to prepare a report. Plaintiffs represent (and L'Oreal does not contest) that the IRI sales data upon which Weir's report was based was disclosed in July 2017. Pl. Mot. Opp. Decert. 17. Although Weir's identity and report were not disclosed until March of 2018, the instant motion was filed in late August. Because of scheduling conflicts, trial will not begin until 2019. By the time of trial, there will have been more than enough time for L'Oreal to depose Weir and hire a rebuttal expert. That should dissipate whatever prejudice

initially attached to the belated disclosure. And as for the fourth factor, the rescheduling of the trial means that a continuance has, in effect, already been granted.

In short, while the Court is not fully satisfied by plaintiffs' counsel's explanation for the delay, the Court concludes that the belated disclosure of Weir's report was harmless and that exclusion would be inappropriate. Therefore, Weir will be permitted to testify as an expert at trial, and the plaintiffs will have admissible evidence to support their damages model. L'Oreal will be permitted to depose Weir and to retain a rebuttal expert if it so chooses. If L'Oreal does hire a rebuttal expert, plaintiffs will have a chance to depose that expert after the filing of the expert's report. Accordingly, the parties shall submit to the Court, by no later than November 9, 2018, a proposed schedule for all this additional discovery.

Nineteenth, L'Oreal argues that the plaintiffs have failed to calculate the product's market price but for the alleged deception and therefore cannot prove that every class member paid a price premium. Decert. Mot. 13-15. The argument goes as follows: The record shows that the product was sold by various vendors for various prices.[10] Plaintiffs have not adduced any

---

[10] Specifically, two named plaintiffs attested to the prices they paid for the product. Turnipseed Dep. 138:21-139:2, ECF No. 125-5 ($5.50, including a coupon for $1.50); Jacobs Dep. 65:11-13, ECF No. 125-3 (eight dollars and change). Additionally, in August of 2017, counsel for L'Oreal ordered three units of the product from three different

expert opinion as to the "fair" market price for the product absent the alleged misrepresentations. Therefore, some class members may have paid less than the fair price, and thus did not pay a price premium as a result of the alleged deception.

For the most part, the Court is not persuaded. A price premium exists when the price of a product is artificially raised by deceptive or fraudulent claims. In some cases, ascertaining whether such a premium exists will require detailed expert analysis into the factors that influence pricing, including a comparison of the prices charged for similar products and isolation of confounding variables. That is especially so when the impact of the allegedly deceptive labeling on price is unclear or speculative - as with many of the cases cited by L'Oreal. See, e.g., Weiner v. Snapple Beverage Corp., No. 07-cv-8742, 2010 WL 3119452, at *6 (S.D.N.Y. Aug. 5, 2010) (holding that plaintiffs failed to show impact of "All Natural" juice label on price); Ault v. J.M. Smucker Co., 310 F.R.D. 59, 67-68 (S.D.N.Y. 2015) (similar, for "All Natural"

---

vendors for pre-tax prices of $13.14, $8.87, and $11.99. Doherty Decl. ¶ 3(a)-(c), ECF No. 119. Finally, plaintiffs' expert Colin Weir reports that the product was sold for between $7.38 and $10.34 in New York, with a median price of $9.79. Rivas Decl. Exh. 36 ("Weir Decl.") ¶ 8, ECF No. 180-15. The Court notes that Jacobs purchased the product in Kentucky, not New York, see Jacobs Dep. 70:17-18, and that attorney Doherty did not specify the locations of the vendors from whom she purchased the product. L'Oreal is therefore incorrect when it asserts that "it is undisputed that . . . the actual prices class members paid . . . varied by more than 100%." Decert. Mot. 15 (emphasis added).

cooking oil); Ackerman v. Coca-Cola Co., No. 09-cv-395, 2013 WL 7044866, at *20 n.30 (E.D.N.Y. July 18, 2013) (similar, for "vitaminwater"); see also Oscar v. BMW of North America, LLC, 09-cv-11, 2012 WL 2359964, at *4 (S.D.N.Y. June 19, 2012) (holding that plaintiffs failed to show that car manufacturer's failure to disclose tire shortcomings affected price, where vehicle in question had many features that might be attractive to purchasers).

But this is not such a case. The product is a five-step process for relaxing hair with five corresponding components: scalp protector, relaxer cream, shampoo, conditioner, and moisturizer. If plaintiffs' allegations are to be believed, one of the components - the scalp protector - simply did not function. Nor was this an incidental or unimportant part of the kit. Indeed, as noted, a survey conducted by L'Oreal's own expert, Dr. Hibbard, found that users of relaxer cream overwhelmingly believe that a scalp protector should be applied before using the cream. Hibbard Rep. ¶ 102(iii). In other words, the inclusion of a functioning scalp protector had value to consumers. A reasonable jury could conclude, based on this evidence, that this value was reflected in the ultimate purchase price. See Orlander, 802 F.3d at 302 (holding that a price premium exists where "on account of a materially misleading practice, [the plaintiff] purchased a product and did not

29

receive the full value of her purchase"). The fact that consumers paid varying prices for the product does not alter this analysis, as a jury could reasonably conclude that no matter what the consumer paid, the price would have been lower still but for the deceptive packaging. Importantly, because NYGBL § 349 permits statutory damages, it does not matter how much the alleged misrepresentations increased the purchase price, so long as the price paid was higher than it otherwise would have been.

L'Oreal protests that an expert calculation of the but-for market price is essential in all class actions under NYGBL § 349. The Court disagrees. Such a calculation might be necessary where the impact of the challenged representations on the ultimate price is speculative or unclear. Here, however, the loss of value resulting from a non-functional component is straightforward. Suppose a consumer bought a box purporting to contain five widgets, only to discover that just four widgets were inside. Surely a lay jury is competent, without expert assistance, to conclude that the consumer has been bilked. Or, alternatively, suppose that the product at issue in this case was advertised just the same, but the box contained only the relaxer cream - no shampoo, no conditioner, no scalp protector, and no moisturizer, nothing. Would it really be necessary to adduce expert evidence as to the hypothetical price of such a

product before a jury could find in favor of the plaintiffs? The
Court thinks not. The case presented here, according to the
plaintiffs' theory, is analogous. Of course, it remains the
plaintiffs' burden to prove injury, and L'Oreal may argue to the
jury that purchasers of the product paid a fair price for what
they received.

The Court reaches a different result, however, as to
plaintiffs' alternative theory for liability, i.e., that the
product's packaging as a "no-lye" relaxer, along with various
other claims, misleadingly communicated that it was safer than
other relaxers. The value of this assertion is not readily
quantifiable, in contrast to the absence of a core component of
the kit. Plaintiffs have offered no methodology for teasing out
the impact on price of these allegedly deceptive claims.

Accordingly, the New York class remains certified to pursue
claims under NYGBL § 349 on the theory that the product
deceptively indicated that it included a scalp protector, when
in fact the scalp protector did not function or was unreasonably
dangerous. The class may not proceed on the theory that the
product's packaging deceptively communicated that it was safer
than other relaxers.

For the foregoing reasons, L'Oreal's motions to decertify
the New York class is granted only to the extent of precluding
the New York class from proceeding on a theory that the product

packaging deceptively suggested that it was safer than other hair relaxers. The motion to decertify is otherwise denied in its entirety. L'Oreal's motion to exclude the testimony of Colin Weir is also denied, but the parties must submit, by November 9, 2018, a proposed schedule for the additional discovery relating thereto. The Clerk of the Court is directed to close entry number 228 on the docket of this case.

SO ORDERED.

Dated:    New York, NY

October **29**, 2018          JED S. RAKOFF, U.S.D.J.