J1m2aml1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   In re: Amla Litigation                    16 Civ. 6593 (JSR)

4
    ------------------------------x           Trial
5
                                              New York, N.Y.
6                                             January 22, 2019
                                              10:00 a.m.
7
    Before:
8
                        HON. JED S. RAKOFF,
9
                                              District Judge
10

11                          APPEARANCES

12  LEVI & KORSINSKY, LLP
         Attorneys for Plaintiff
13  BY:  ROSEMARY M. RIVAS
    BY:  COURTNEY E. MACCARONE
14

15  GERAGOS & GERAGOS, P.C.
         Attorneys for Plaintiff
16  BY:  MARK J. GERAGOS
         LORI G. FELDMAN
17       LINDA MORENO

18

19  GORDON & REES, LLP
         Attorneys for Defendant
    BY:  MILES SCULLY
20       PETER G. SIACHOS
         JOANNA M. DOHERTY
21       KUUKU MINNAH-DONKOH

22

23  Also Present:

24  Ashley Termonfils, Technician

25

J1m2aml1

```
 1              (Case called)
 2              THE DEPUTY CLERK:  Will the parties please identify
 3    themselves for the record.
 4              MR. GERAGOS:  Good morning, your Honor.  Mark Geragos,
 5    Linda Moreno, Lori Feldman, Geragos & Geragos, for the
 6    plaintiff.
 7              THE COURT:  Good morning.
 8              MS. RIVAS:  Good morning, your Honor, Rosemary Rivas,
 9    of Levi & Korsinsky.
10              THE COURT:  Good morning.
11              MS. MACCARONE:  Good morning, your Honor.  Courtney
12    Maccarone, of Levi & Korsinsky.
13              THE COURT:  Good morning.
14              MR. SCULLY:  Your Honor, Miles Scully, on behalf of
15    L'Oréal.
16              MR. SIACHOS:  Good morning, your Honor.  Peter
17    Siachos, for L'Oréal.
18              MR. MINNAH-DONKOH:  Kuuku Minnah-Donkoh, for defendant
19    L'Oréal.
20              MS. DOHERTY:  Good morning, your Honor.  JoAnna
21    Doherty, on behalf of L'Oréal.
22              THE COURT:  Good morning.
23              First, if there are any witnesses in the courtroom,
24    they need to go to the witness room right now.
25              (Witnesses exit)
```

J1m2aml1

1          THE COURT:  Throughout the trial, witnesses are not

2     permitted in the courtroom except when they testify.

3          We have a bunch of motions *in limine*, but there is one

4     that, to be frank, seems to me to be highly important and

5     seemingly of some force, and that is the defendants' motion to

6     exclude Mr. Colin Weir.  I hope I am pronouncing his last name

7     right.  If he is excluded, I don't see how this case goes

8     forward.

9          But let me hear first from moving counsel and then

10    from plaintiffs' counsel.

11          MR. SIACHOS:  Thank you, your Honor.

12          May it please the Court:

13          Indeed, your Honor, we agree with you this motion is

14    of great force.  It is very important to this case.

15          In an effort to prove their damages, the plaintiff

16    needs to introduce purported IRI spreadsheets.  IRI stands for

17    "Information Resources, Incorporated."  These spreadsheets were

18    created by a third party.  The third party is IRI.  They are

19    not a witness to this case.  They have never been disclosed as

20    a witness to this case.  According to the witness list, they

21    will not be present at trial.  We had made a motion *in limine*

22    to exclude them, and once we did that, they were removed from

23    the witness list.  So I think we are going to have an

24    authentication issue with the IRI data.

25          Now, worse is the fact that that data, to the extent

J1m2aml1

1    it can be called data, is really just an estimate or a

2    guesstimate.  It's hearsay.  IRI is not going to be here to

3    testify about it.

4              The documents, again, have not been authenticated in

5    discovery.  There was never a witness from IRI identified, no

6    one from IRI was ever deposed and, on top of that, your Honor,

7    it is hearsay on top of hearsay, because the data that IRI uses

8    to create its projections and estimations comes from retailers.

9    So we have retailers who have scanners in their stores.  That

10   scanner information is then provided to IRI, who presumably

11   pays for it.  IRI then takes that incomplete data and does

12   anonymous, unknown projections to try to figure out what the

13   sales figures are for a product.

14             Now, Weir didn't bother to ask IRI about any of this.

15   He didn't interview them.  He didn't call them.  Nothing has

16   been done whatsoever with regard to his attempts to investigate

17   as to why the IRI spreadsheets say what they say, whether they

18   are even authentic.  In fact, he testified that the IRI

19   spreadsheets were given to him by counsel.  So he doesn't even

20   know, also, what stores reported data and which ones didn't

21   report data.  He doesn't know whether a CVS in Harlem, which

22   presumably would have had a greater amount of sales, was being

23   projected through all CVS stores or if it was a CVS store in

24   Westchester County.  Big difference, your Honor.

25             So what plaintiffs are trying to do, your Honor, what

J1m2aml1

1    I believe they are trying to do -- they can speak for

2    themselves -- is they are trying to launder or clean this

3    hopelessly, at least that's my word, hopelessly inadmissible

4    evidence, let Weir click around on a spread sheet, which we all

5    can do, let him push the plus sign, pay him $700 an hour, and

6    then suddenly he has done his voodoo over it, and the

7    spreadsheet suddenly is magically admissible?  The hearsay on

8    top of hearsay, the authentication issues, the foundation

9    issues all are great problems.

10            The Second Circuit and this court, your Honor, have

11    both found that "a party cannot call an expert simply as a

12    conduit for introducing hearsay under the guise that the

13    testifying expert used the hearsay as the basis of his

14    testimony."  That's the *Marvel Characters Comic Book* case, your

15    Honor, 726 F.3d 119 (2013).

16            So what does plaintiffs' counsel try to do to counter

17    these broadsides?  They have found a couple of cases that say

18    that IRI data may be admissible under 803(17) as market

19    reports, but the cases they find, your Honor, are cases where

20    there has been a pre-answer motion to dismiss for lack of

21    jurisdiction.  A case in particular I was looking at the *Parks*

22    *v. Tyson Foods* case, an Eastern District of Pennsylvania case

23    they cite, which is a case for summary judgment.  They are not

24    trial cases.  They are not trying to publish evidence that is

25    hearsay on hearsay to the jury that's going to be sitting right

J1m2aml1

here, your Honor.  Big difference in those cases.

And the other thing, your Honor, is that in those cases, the expert actually did something with the data.  In fact, in one of the cases they cite, the *ConAgra* case, Weir is the expert, and he didn't just do a couple of additions and subtractions and click a couple of buttons on a spreadsheet. What he did in the *ConAgra* case, he did something that sounds very fancy to me: hedonic regression analysis using IRI data, not simple math.

In that case, he determined by looking at a conjoint survey and looking at all different types of IRI data, specifically 15 different inputs of data from IRI, he looked at all that and made a very long, nice report to try to yield an estimate for classwide damages.

He did none of that here, your Honor.  Again, in the papers we state, as plaintiffs acknowledged, as Mr. Weir acknowledged in his own sworn testimony, it's simple math.  He was asked to tabulate the information.  He was asked to sum up the information.  He was asked to do simple math.  That's the plaintiffs' words, your Honor.  That's Mr. Weir's words.  Those aren't my words.  There is no histrionics or exaggeration here. That's verbatim what they said.

Now, there are a bunch of cases cited including California law which, with all due respect to Mr. Geragos and my partner, Mr. Scully, I prefer Southern District of New York

J1m2aml1

1    law.  There is a case where this court --

2            THE COURT:  Given the weather, I don't understand that

3    preference.

4            MR. SIACHOS:  It has been pretty bad.

5            There is a case, your Honor -- you might remember

6    it -- it's *Akiro v. House of Cheatham*.  It was tried before

7    your Honor.  the plaintiffs tried to get in IRI data.  I can

8    give you the cite for that, your Honor.  It is 12 Civ. 5775.

9            At docket 43, there was a motion to exclude the IRI

10    reports based on the fact that it was hearsay containing

11    statements for the truth of the matter asserted.  The other

12    side, the plaintiffs, propounded the exact same arguments that

13    were propounded here, that it is a market report, maybe it is a

14    business record, all of this is residual hearsay exception.  I

15    will get into residual hearsay exception just one moment, your

16    Honor, if you will indulge me on that, because I think it is

17    very important.  And what did your Honor do?  Again, the

18    initials at the end of that docket number are JSR.  What did

19    your Honor do?  You excluded the IRI data, the syndicated

20    retail data, at docket 62.

21            Now, in a last-ditch effort to preserve this data and

22    to preserve these -- I shouldn't call them data, I should call

23    them guesstimates, because that's exactly what they are -- to

24    preserve these projections and to try to get these into

25    evidence, the plaintiffs argue the residual hearsay exception

J1m2aml1

1    of 803(17), which, again, your Honor rejected that in the *Akiro*

2    case.  But I think it is important to go through the elements

3    of the residual hearsay, so that we can debunk that right now.

4           First of all, this court has ruled or actually the

5    Second Circuit and this court, too, has ruled that "Congress

6    intended the residual hearsay exception to be used very rarely

7    and only in exceptional circumstances."  That is the *Parsons v.*

8    *Honeywell* case 929 F.2d 901 (1991).  And to qualify for

9    admission under the residual hearsay exception, the evidence

10   must be particularly trustworthy.  It can't be hearsay upon

11   hearsay that's unauthenticated and has no foundation and is

12   extrapolations of sales data that is incomplete.  Even if you

13   just looked at that that generally, it shouldn't come in under

14   the residual exception.

15          But we then need to look at what are the elements of

16   the residual hearsay exception.  The elements are that the

17   statement has an equivalent circumstantial guarantee of

18   trustworthiness.  I think it is important to note that there is

19   better evidence out there than the IRI data.  This case is

20   three years old, your Honor.  The evidence that's out there

21   comes directly from the retailers, from the CVSs, the

22   Walgreens, the Wal-Marts, the Amazons, the places where this

23   product was actually sold.  The best source of the data is not

24   IRI, especially when the IRI spreadsheets, the purported

25   spreadsheets, set forth in this matter don't even say what

J1m2aml1

retailers it is from.  How are we to know that it is even New

York?  It just says "New York" on it.  It doesn't say "New York

State."  It doesn't say "New York City."  It doesn't say

"metropolitan New York," which could include Connecticut and

New Jersey for all we know.  So they don't meet the first

element, that it has exceptional guarantees of trustworthiness.

What we have here is data that no more than adopts and

adds up unauthenticated multiple hearsay, projected sales

estimates, modeled from unknown data by inscrutable secret

methodologies of anonymous nontestifying experts.  That's a

mouthful.

Now, the next requirement of the residual hearsay,

which kind of dovetails with the trustworthiness one, your

Honor, is the requirement that the evidence that's propounded

be more probative on the point for which it is offered than any

other evidence that the proponent can obtain through reasonable

efforts.  Well, we have kind of just covered that in the last

point.  This is not the most trustworthy evidence.  In fact,

Winn Soldani says it is untrustworthy.  Even without Winn

Soldani's testimony, Mr. Weir's own testimony shows that he did

not try to verify this data at all.  He knows nothing about it,

other than to do one plus one equals two, or whatever the

numbers are.

Interestingly, your Honor, now we say numbers.

Another thing that makes it untrustworthy, if you look at the

1    IRI numbers, it has numbers like 204.12576 units of the relaxer

2    sold.  How can you sell a fraction of a relaxer, your Honor?

3    Can you cut it up?  No, you can't cut up the box.  It is sold

4    in whole units.  So that number is not accurate.  It is a

5    projection.

6            Now, the other thing that they have a problem with is

7    that the IRI data lacks guarantees of trustworthiness under

8    807.  So they are not going to be able to get it in under that.

9    And what they try to do is get Weir to be a mere conduit to get

10   that data in.  What the plaintiffs argue, though, is that, back

11   in March, when they buried his declaration, his Exhibit 36 to

12   the second summary judgment declaration, so that made it like

13   Exhibit 65, that when we opposed that, we said this guy is an

14   expert.  We had five pages given by your former law clerk

15   through you, your Honor, Mr. Eagles, and we had five pages to

16   argue, and we argued that this guy is an expert, and we are

17   going to need our own expert, and this is unfair, and your

18   Honor should strike him and whatnot, he is eight months late,

19   but that's not the case.  Now that we have actually had the

20   opportunity to depose him, to hire our own experts, as your

21   Honor graciously allowed us to do, to actually not be ambushed

22   by this in opposition papers to summary judgment, we now know

23   he is not an expert.  He is just someone who did fourth grade

24   addition.  And that, your Honor, is the reason he simply has to

25   be excluded as a conduit.

J1m2aml1

1          The other reason he has to be excluded, your Honor, is

2     the damages methodology.  The plaintiffs argue that he is

3     needed to do their damages methodology.  Well, we are going to

4     go from the third or fourth grade to the fifth grade, because

5     that's simple multiplication.  If the jury can't do 50 times

6     whatever the number of sales were, if we even get that far,

7     then we have got major problems in this world.

8          THE COURT:  I note for the record that when I went to

9     public school back in the 18th century, you learned addition

10    and subtraction in the first grade and multiplication in the

11    second grade.

12         MR. SIACHOS:  Well, when you said, your Honor, in the

13    last trial that it's a generational thing, I said I was bad at

14    math which was it was a geographical thing, you said it was a

15    generational thing, so I agreed with you.  But now we have

16    iPhones and calculators, and presumably, if this case gets that

17    far, people will have calculators.  People will be able to

18    multiply 50 times whatever the amount of sales are, so they

19    don't need Weir to do that.

20         The final issue is a qualifications issue.  Your

21    Honor, this is probably the weakest point, so I will give it

22    short shrift.  Mr. Weir is economic expert.  He makes a living

23    supplying plaintiffs' class action bars with damages models.

24    His specialties are telecommunications and wireless technology.

25    And as we cite in his deposition testimony, he simply doesn't

J1m2aml1

1    have any expertise in analyzing IRI data, knowing whether it is

2    authentic, knowing how it was created.  In fact, we asked him

3    if he were able to determine, through sampling, the number of

4    units of the relaxer kit that were sold in the State of New

5    York, how would you do it, he said I would call Nielson or IRI.

6    I don't know how to do that.

7           We asked him how he would go about rebuilding the

8    wheel if he had to do it again.  He said, I wouldn't even

9    consider trying to figure out how many sales there were.

10          Again, all he did was do simple addition, your Honor,

11   and for those reasons, he needs to be struck.

12          THE COURT:  Thank you very much.  Let me hear from

13   plaintiffs' counsel.

14          MS. RIVAS:  Good morning, your Honor.  Rosemary Rivas

15   on behalf of plaintiffs.

16          Colin Weir was not just a conduit and he did quite a

17   bit of work in this case.  He reviewed defendants' wholesale

18   data nationwide.  He reviewed the Nielson nationwide data that

19   defendants produced during the litigation.  He compared those,

20   and he also compared them to the IRI nationwide sales data.

21   And what's interesting about that, your Honor, is defendants'

22   own wholesale data showing units is actually more.  It is a

23   higher number than the numbers reported by IRI and Nielson on a

24   nationwide basis.

25          THE COURT:  Let me, just so that I am clear,

J1m2aml1

1    ultimately in calculating damages, he just engaged in addition

2    and multiplication.

3             MS. RIVAS:  That's not correct, your Honor.

4             THE COURT:  Okay.  What else did he do?

5             MS. RIVAS:  Apart from looking at that data, he also

6    analyzed the IRI data.  When we submitted Colin Weir's report

7    back in March of 2017, the first thing Mr. Scully did was call

8    me and say, He is an expert.  We are going to move to exclude

9    him.  And I said, He is an expert because he has experience

10   with the data, which is complicated.  If I brought your Honor

11   the data, it would be a stack this high of spreadsheets, your

12   Honor.  A jury could not do the simple math.  Defendants could

13   not do the math.  In fact Mr. Siachos told me, I don't know

14   what any of this means.  I can't figure it out.  That's what he

15   said.

16             So Mr. Weir, who is a valuation expert and not just

17   for plaintiffs -- he does defense work -- he looked at that

18   data, he analyzed the data, he made sure it was IRI data, he

19   looked at the spreadsheet and made sure it had the indicia of

20   IRI data.

21             THE COURT:  I seem to recall from his deposition that

22   he had no contact with IRI, correct?

23             MS. RIVAS:  Not with regard to this project, your

24   Honor, but he has --

25             THE COURT:  No, no.  That's what counts.  And he did

J1m2aml1

not indicate it with any particularity, any knowledge of the

methodology that IRI used in this case, in the data that they

produced.

(Continued on next page)

J1M5aml1

1          MS. RIVAS:  Your Honor, it's proprietary data.

2          THE COURT:  No, no.  That's neither here nor there.

3          I don't think it is any indication he made any effort

4   to get it but let's assume he got it, he made an effort, and

5   they said we are not going to tell you.  Then you have an issue

6   to come to court on but you didn't.  And the background on

7   this, if I recall, correct me if I am wrong, is you twice blew

8   past expert report dates that the Court had set and then had

9   extended and only produced Mr. Weir's report in response to a

10  summary judgment motion where defense counsel, of course, had

11  not yet had the chance to depose him and therefore couldn't

12  make the kind of arguments that they need to make.  So, if you

13  knew, as any plaintiff's lawyer must know, that an essential

14  element of your claim is damages and, in a class action, of

15  course, it's especially important because of the nature of

16  class actions and here there were complications because it was

17  a New York class action even though the product is sold

18  nationwide so it was critical, it seems to me that, you have a

19  basis for saying or Mr. Weir saying what the methodology was

20  that was used by IRI to obtain this information, make their

21  projections, limit them to New York, etc.

22         MS. RIVAS:  Your Honor.

23         THE COURT:  Excuse me.  I am sorry.  I am anxious to

24  hear from you, I just wanted to complete the sentence.

25         MS. RIVAS:  Sorry.

J1M5aml1

```
 1              THE COURT:  And the IRI, if you had chosen, in the
 2    end, to up to take the depositions of IRI people and had they
 3    had said *we are not going to tell you, this is proprietary*
 4    *information,* then of course we would have dealt with that.  We
 5    could deal with it through confidentiality orders, we could
 6    deal with it through orders examining whether just how
 7    proprietary it really is.  The very fact it is proprietary
 8    indicates, on its face, that they must have exercised some
 9    methodology to obtain and I don't see how any expert can be
10    admitted under Daubert if you don't know the methodology.
11              MS. RIVAS:  Your Honor, if I may?
12              THE COURT:  Yes, please.
13              MS. RIVAS:  They do provide a methodology.  They tell
14    you that it's known, as Mr. Weir knows, through working with
15    the IRI data, through working with clients who use IRI data,
16    that IRI uses registered sales, registered data that it obtains
17    from retail stores that generate more than $2 million a year.
18    They also use registered sales from convenience stores that
19    generate $1 million or more a year.
20              THE COURT:  So what is proprietary?
21              MS. RIVAS:  The algorithm that they apply.
22              THE COURT:  To make their projections?
23              MS. RIVAS:  Right.  But, your Honor --
24              THE COURT:  Isn't that the key element of your damages
25    calculation?
```

J1M5aml1

         MS. RIVAS:  Your Honor, I understand what you are

saying but there is indicia that it is reliable, your Honor,

apart from the registered sales.  One example, for example,

their expert didn't even know if it was overstated or

understated.

         THE COURT:  I don't care about their expert, that's a

separate issue.  You have the burden of proof on damages.

         MS. RIVAS:  Actually, your Honor, in the *Ebin* case.

*Ebin v. Kandagis* case, docket 97, the motion for summary

judgment by the defendants in that case moved and said that the

IRI data in that case was unreliable and they moved for summary

judgment and this is what your Honor said, citing *Contemporary*

*Mission v. Famous Music Corp.*, 557 F.2d 918 (2d Cir) your Honor

quoted this case.  Under long-standing New York Law rule, when

the existence of damage is certain and the only uncertainty is

as to its amount, the plaintiff will not be denied a recovery

of substantial damages.  Moreover, the burden of uncertainty as

to the amount of damages is on the wrongdoer and the test for

the admissibility of evidence concerning prospective damages is

whether the evidence has any tendency to show their probable

amount.  This data does have the tendency to show the probable

amount.  We know the units, the defendants nationwide wholesale

units, how much they sold.  We know that it's much greater than

the IRI data, we know that it is greater than Nielsen data and

that shows reliability.

J1M5aml1

1          Additionally, Florida, this is a product that is sold

2     to, targets African American women.  Florida has the same

3     African American population that New York does and yet that,

4     for that state, Florida, it showed more units sold than in New

5     York.  The data is reliable.  Defendants use it, Fortune 500

6     companies use it.  It has --

7          THE COURT:  This is a Daubert motion.  The test is not

8     whether it's generally accepted in the industry.  That might

9     have been relevant on the hearsay part of this if you could

10    show that your expert did something and that it can rely on,

11    this type of data is generally relied on by experts but that's

12    not the issue I am raising.  I am raising the methodology

13    issue.  Daubert is all about methodology.  In fact, forget

14    about Daubert, Rule 702 is all about methodology on its face.

15         MS. RIVAS:  And the methodology he applied is the

16    methodology that valuation experts applied.  They look at this

17    data --

18         THE COURT:  No, no, no.  I come back that he may have

19    been to had do a lot of arithmetic but your adversary just said

20    that he admitted that all he did was arithmetic.

21         MS. RIVAS:  He does not say that.  He said he analyzed

22    the data, I compared the data from the nationwide figures.  He

23    compared Nielsen.  Their expert said if you add up all these

24    dates, it will come up to the number of the nationwide figure.

25         THE COURT:  The argument you are now making is that,

J1M5aml1

```
 1    if I understand it, there is some other data out there whose
 2    methodology is similarly unknown, which comes in with results
 3    that, by implication, support, corroborate the IRI.  I don't
 4    think that's relevant in any way whatsoever.  We don't know the
 5    methodology there.  And even comparing Florida and New York you
 6    would have to know a lot more about the marketplace of those
 7    two states.  To take a more extreme example, the market for
 8    bathing suits in Florida is, I'm sure, considerably different
 9    than it is in New York.
10              I keep coming back to show me where he, in his report
11    or in his deposition, he discussed the methodology used by IRI.
12              MR. SIACHOS:  Your Honor, I am glad to read it if you
13    would like me to.
14              THE COURT:  I'm sorry?
15              MR. SIACHOS:  I am glad to read it if you would like
16    me to.
17              THE COURT:  Well, no.  This is a question for
18    plaintiff's counsel.
19              MS. RIVAS:  Your Honor, I'm sorry.  I don't have that
20    but he testified that IRI reports on retail stores that make
21    over $2 million.
22              THE COURT:  Which he actually doesn't know from this
23    data, he knows from other data.  But, even putting aside that,
24    as you just told me, the critical thing is the thing they in
25    fact have apparently proprietary rates on is what they do with
```

J1M5aml1

1    that because he is not relying on that underlying data, he is

2    relying on the projections that they made based on that data.

3         MS. RIVAS:  But the projections aren't off.  I mean,

4    they don't show that they're off.  They haven't showed that

5    they're off.

6         THE COURT:  I am interested in what you read to me

7    from a prior opinion and I will take a look at that but I don't

8    think that's the test under Rule 702.  The rule, if I

9    understand your argument, to get an expert in under Rule 702,

10   the party that is opposing the introduction of the expert must

11   show that the results are off, as you say.  That is not, I

12   think, remotely what Rule 702 requires.

13        MS. RIVAS:  Well, your Honor, 703 says that if an

14   expert, if the hearsay data is reasonably relied on by experts

15   that's --

16        THE COURT:  I understand that and that may go to the

17   hearsay issue but that's not, I come back to I'm talking about

18   the methodology issue.  I don't see what the -- I mean, this is

19   a critical element in this case, damages, and your expert has

20   no idea of what their ultimate methodology is in making their

21   projections.

22        MS. RIVAS:  He did not say he has no idea.

23        THE COURT:  Well, show me where he describes their

24   methodology.

25        MS. RIVAS:  He said the data is based on scanner data,

J1M5aml1

1    this is data at the registers.  He says that at page 40, line

2    12 through 13.

3            THE COURT:  This is an unfair analogy but that won't

4    stop me.

5            So, an astrologer, if called as an expert, would say,

6    well, I rely on the movement of the planets and everyone knows

7    that the movement of the planets these days can be measured

8    very precisely so I knew that the data I had on the movement of

9    the planets was reliable but the point is it's the methodology

10   that the astrologer uses to say that from this movement or that

11   movement Nancy Reagan will have some result.

12           That's what is lacking here, the methodology.

13           MS. RIVAS:  Well, he is describing -- you mean the

14   methodology that -- the methodology --

15           THE COURT:  He didn't, himself, employ any methodology

16   with respect to the projections.  He relied exclusively on the

17   methodology about which he never inquired that was used by IRI

18   to make its projections.

19           MS. RIVAS:  He relied on his experience in working

20   with the data.  He says --

21           THE COURT:  Experience is not -- forgive me, and I am

22   giving you a hard time and I will shut up and let you speak at

23   greater length and without any interruptions from me, but I am

24   looking at Rule 702:  A witness who is qualified as an expert

25   by knowledge, skill, experience, training, or education, may

J1M5aml1

1    testify in the form of an opinion or otherwise if, and we come

2    down to C, the testimony is the product of reliable principles

3    and methods, and D, the expert has reliably applied the

4    principles and methods to the facts in the case.

5        That's where I am having difficulty seeing that you

6    satisfied that burden.

7        MS. RIVAS:  Well, he says -- where does the data come

8    from?  It is actual historical data that they're using.  He

9    says it's all scanner data, they're not making the data up.

10   They are going to super markets, Wal-Marts, Stop Shops,

11   Safeway, Albertson's.

12       THE COURT:  By the way, how does he know all of that

13   except for hearsay?  The likelihood of it is he is right but

14   not because he knows it.

15       MS. RIVAS:  Well, there is information available on

16   the IRI website about how they take -- how they get their data.

17       THE COURT:  Isn't that another form of hearsay, an

18   out-of-court statement for its truth?

19       MS. RIVAS:  He is allowed to rely on hearsay if that

20   information is what his experts in his field --

21       THE COURT:  Yes, but if he is exercising his expertise

22   but if he is only exercising his arithmetic abilities then

23   that's a non-sequitur.

24       MS. RIVAS:  He is analyzing the data to make sure that

25   all the data points that are indicative that it is IRI data is

J1M5aml1

```
 1    valid.  They had sales by four weeks, every four weeks they had

 2    sales data.  They had units sold, they had average prices, they

 3    had codes, the SKU codes.  That's all data that shows that

 4    they're collecting data from the retailers and it's all visible

 5    on the spreadsheet except he does have to read that, calculate

 6    it, your Honor, and that is his expertise.  I couldn't do it,

 7    the jury couldn't do it, the defendants couldn't do it.  He

 8    does it with regards to all damages models.  The damages model

 9    here is quite simple.  It doesn't matter that it is not a

10    regression analysis, it's a simple damages model and he has

11    used, in his regression model and his hedonic models, he has

12    always used this type of data and he regularly uses it and even

13    defendants' experts use the data too.  And he has said where it

14    comes from, you can confirm it by looking at the data that it

15    is sales data by four weeks and he can break that down

16    depending on the class period, your Honor, and that's the type

17    that is normally accepted.  It is reliable.  Defendants use it.

18    He checked their wholesale data.  Their wholesale data shows

19    that more units were sold in the country.  How is that not

20    reliable?

21          And in the Second Circuit case that your Honor cited,

22    if there is any uncertainty, that's up to the defendants.  They

23    haven't made that showing, your Honor.  All they did was hire a

24    former consultant of theirs who admitted, under oath, that he

25    was speculating.  In fact, he said I feel --
```

J1M5aml1

1          THE COURT:  There may be a good basis for striking his

2     testimony but as I am not -- you haven't yet convinced me that

3     the burden isn't on you to show that your expert either himself

4     made the projections on a methodology that he can explain,

5     which we know he knew, or have knowledge sufficient of the

6     methodology used by IRI that he could evaluate and a jury could

7     evaluate it and a Court could evaluate it.

8          So, the fact that their expert may not pass muster is

9     neither here nor there.

10          MS. RIVAS:  Well, your Honor he, as I said, and he

11     regularly uses the data, the methodology he has applied to

12     determine whether it is actual IRI data and determine whether

13     it is accurate or a conservative number, he has done those

14     checks.

15          THE COURT:  All right.  Let me -- I'm sorry.  Go

16     ahead.

17          MS. RIVAS:  The last thing I would say, your Honor, is

18     I think as a policy argument, IRI data has said they're just

19     not going to make the data available if they have to come in

20     and testify about their proprietary measures.  They're not

21     going to make it available to anyone.

22          THE COURT:  That's a shame because you didn't ask me

23     to and so it's moot but if I had ordered them to appear and

24     supply information and they had declined to do so, they

25     wouldn't be able to spend the time in the metropolitan

J1M5aml1

1    corrections center right next-door which I am sure might have

2    had some methodological impact on them.

3            MS. RIVAS:  My last point, your Honor, is we have

4    proven the existence of damages if we prove our claim.  It's

5    clear.  The named plaintiffs have.  The question is --

6            THE COURT:  But the named plaintiffs are no longer in

7    this suit.

8            MS. RIVAS:  The named plaintiffs are in the suit.

9            THE COURT:  In the trial that we have here today?

10           MS. RIVAS:  Yes.

11           THE COURT:  I thought that -- maybe I misunderstood

12   something in the pretrial consent order.  I thought they were,

13   as to their personal claims I thought those had been --

14           MS. RIVAS:  One did not take a Rule 68 offer on any

15   claims.  They made Rule 68 offers on personal injury claims,

16   not the certified claims, your Honor.  So, they have --

17           THE COURT:  No, no, no.  I'm sorry.

18           If I were to grant the motion I would have to

19   decertify the class and at that point they, if I understood the

20   pretrial consent order that you guys submitted jointly, there

21   would be nothing else to try as to the individuals.

22           MS. RIVAS:  Well, I would ask your Honor to look at

23   the Second Circuit case that I cited.

24           THE COURT:  Sure.  Give me the citation again?

25           MS. RIVAS:  The Second Circuit case is 557 F.2d 918

J1M5aml1

1   and your Honor cited it in the decision --

2            THE COURT:  I know that I -- it has been brought to my

3   attention.

4            Was there anything else you wanted to say?

5            MS. RIVAS:  No, your Honor.

6            THE COURT:  Okay.

7            MS. RIVAS:  My colleague might say something.

8            (Counsel conferring)

9            MS. RIVAS:  The last thing I would add, your Honor, is

10  there is the wholesale data by Angela Rutherford.  Again, that

11  has the units of relaxer sold.  That's, again, using that, and

12  comparing it would show the data's reliability, and that's in

13  the Rutherford declaration.  Defendant says they don't keep

14  state by state data so I think it's important to recognize

15  that, you know, if the data has indicia that it's reliable, I

16  think in this circumstance and under the Second Circuit

17  decision I told you that it should be accepted.

18           (Counsel conferring)

19           MS. RIVAS:  And the case can go forward with this

20  data.

21           THE COURT:  Wait a minute.  You are saying the case

22  can go forward, even if I strike the expert, the case could go

23  forward with the data from --

24           MS. RIVAS:  They have unit sales data, your Honor.

25           THE COURT:  Who does?

J1M5aml1

1          MS. RIVAS:  Defendant.

2          THE COURT:  Excuse me?

3          MS. RIVAS:  Defendants have units sold data,

4    nationwide data.

5          THE COURT:  But it is not their burden of proof.

6          MR. SIACHOS:  And, it is nationwide, your Honor.  And,

7    it is wholesale sales, it is not retail sales.  So, when we

8    sell to Wal-Mart, we don't have any units they sold.  We don't

9    know whether any were trashed, whether they were damaged,

10   whether they were returned, whether they were sitting stranded

11   in the Wal-Mart warehouse in Lawrence, South Carolina.  We

12   don't know.  Nobody knows.  You to have New York sales, retail

13   sales which could have been obtained by subpoena and warrant.

14          Now, one thing Mr. Weir said, and you asked for the

15   methodology and they couldn't give it, I am going to give it to

16   your Honor what he said.  He was asked what his methodology

17   was --

18          THE COURT:  Where are you reading from?

19          MR. SIACHOS:  I am reading from the deposition, I will

20   give you the page in just one second, your Honor, if you will

21   bear with me?  I apologize.  I am on page 90, line 15.

22          THE COURT:  Hold on.  (pause)  Go ahead.

23          MR. SIACHOS:  Page 90, line 14:

24   "Q  You don't know what the methodology is that IRI uses to

25   project sales data, the kind at issue in this case, do you?

J1M5aml1

1    "A   So, as part of my work in procuring IRI Nielsen data I have

2    seen presentations by both the statistical techniques that they

3    use to project the data.

4    "Q   So, why didn't you include that methodology in your report?

5    "A   Because they are confidential, IRI, Nielsen and my

6    client" --

7            I'm sorry, your Honor.  I apologize.  I am reading the

8    wrong cite.  Let me go back to the right deposition here.  If

9    you will give me just one moment?

10           He says, on page 8, lines 11 to 20.

11           THE COURT:  Hang on.  (pause)  Go ahead.

12           MR. SIACHOS:  That his job was, in particular, summing

13   up the number of units of products sold.  That's lines 11 to

14   20.

15           Then, on page 10, line 2 to page 11, line 9 he says he

16   used Excel spread sheets to generate a summation of the unit

17   sales.

18           Then, on page 70, line 25 to 71 to 72, his assignment

19   was to please tabulate the sales.

20           Page 73, line 24 to page 74, line 2, his job was to,

21   "tally the total sales."

22           He doesn't know what the margin is, he doesn't know

23   what the proprietary formula is because it is anonymous and

24   confidential.  He says multiple times throughout the deposition

25   that it is a mere estimate.  He says projections take a few

J1M5aml1

1    sales and project.  It is not even the real number of sales,

2    your Honor.

3          The plaintiffs acknowledge, they are saying what I

4    said on a phone call or what we may have said when we first saw

5    the report but interestingly, in docket 187, they said all Weir

6    did was "summarize and calculate the number of units sold."

7    Same document, page 5, Weir merely took data and summarized the

8    number.

9          Docket 200, page 1, "Weir performed basic mathematical

10   calculations and summarized calculations in a table."

11         Docket 200 again, line 1, he simply used the IRI data

12   provided and summarized the data using math.

13         Docket 207, line 14, Weir is not presenting any

14   commentary or opinion on the sales figures or potential damages

15   in this case.  That's page 1.  Then, page 14:  He is simply

16   summarizing the data using simple math.

17         Plaintiffs argued on docket 200, page 1, there is no

18   need for any rebuttal expert, plaintiffs say, because Weir has

19   no opinions or analysis to rebut.  "There is nothing to rebut

20   here.  It is simple math."

21         THE COURT:  Where is that?

22         MR. SIACHOS:  That is docket 200, page 1.

23         THE COURT:  What is docket 200?

24         MR. SIACHOS:  That is the plaintiff's opposition to

25   our initial motion to exclude Weir, which was the one that was

1  out-of-time eight months late, etc., etc.

2         THE COURT:  Yes.  Okay.

3         MR. SIACHOS:  He did supplement his report.  He was

4  supposed to just get updated data.  And interestingly, as set

5  forth in Mr. Weir's report, your Honor, his supplemental

6  report, the second time the data came from IRI it was -- it

7  just listed the told number of sales.  It doesn't have four

8  weeks out or a bunch of spreadsheets that need to be added up

9  with simple math that a first grader or fourth grader could do,

10  depending what state you are in.  It is just there, and he

11  regurgitates it, he parrots it, he repeats it.  That's not

12  expert testimony, your Honor.  That doesn't make the hearsay

13  non-hearsay.

14         And interestingly, one point that hadn't been brought

15  up and this was never brought to your Honor's attention, we

16  asked for the agreements between IRI and the plaintiff's

17  counsel for them to get this information and they agreed that

18  this data should be for attorneys eyes only.  How on earth is

19  it going to get in evidence if it's attorneys eyes only?

20         Your Honor, the problems are just overwhelming here.

21  Again, they cite the cases about summary judgment, not trial.

22  These are estimates and guesses and, again, over three years

23  that we had this case going on, almost, your Honor could have

24  ordered Amazon to produce the data.  Your Honor could have

25  ordered CVS to produce the data.  There could have been a

J1M5aml1

1    motion to compel on the subpoenas that they did serve.  They

2    served subpoenas and objection letters came back and nothing

3    was done about it.

4            Interestingly too, Mr. Weir testified that his

5    engagement goes back a number of years on this case.

6            THE COURT:  When you say nothing was -- what you mean

7    is they, in effect, withdrew their request because -- it is not

8    that I didn't do anything about it, it is that they did not ask

9    me to do anything about it.

10            MR. SIACHOS:  That's right.  That's right.

11            THE COURT:  Yes.

12            MR. SIACHOS:  And the last thing I will say is Weir

13    testified that his engagement on this case goes back a number

14    of years.  What on earth happened for the past three years and

15    why do we have to have this fire drill in December while I was

16    on vacation and do an opposition?  I don't understand.  This is

17    just inexcusable, your Honor.

18            And the last thing I will say --

19            THE COURT:  Well --

20            MR. SIACHOS:  It is their burden.

21            THE COURT:  Interrupting your vacation doesn't seem to

22    me to be without some redeeming social value.

23            MR. SIACHOS:  At least I sat on the beach with an

24    iPad.

25            But, it is not our burden, your Honor.  *Comcast* has

J1M5aml1

1    long said what damages -- everybody knows *Comcast*.  If you are

2    a class action lawyer you know the *Comcast* case and you know

3    what you have to do for class action damages and they simply

4    didn't do it and now, your Honor, Mr. Weir needs to be struck

5    and whatever happens, happens.

6              THE COURT:  I am going to go take a look at the case

7    that --

8              MS. RIVAS:  Your Honor, may I just provide a couple

9    brief comments?

10             THE COURT:  Yes.  Of course.

11             MS. RIVAS:  In the declaration of the Angela

12   Rutherford, she is the person who they delayed producing for

13   deposition.  We didn't find out until December that they don't

14   keep the state by state sales, although we had been trying to

15   get her deposition for a while, and they kept saying we are

16   going to produce her, we are going to produce her, she'll

17   testify about our sales.  She put in a declaration saying based

18   on sales volume reported by Nielsen retail sales data to date

19   have tolled 458,789 units.  She looked at Nielsen data.

20             THE COURT:  Let me make sure I understand this.

21             You are saying that you originally thought that the

22   easiest way to calculate your damages was to get L'Oréal's own

23   sales data.

24             MS. RIVAS:  That's the most.

25             THE COURT:  And when you got it, it turned out it was

J1M5aml1

```
 1   wholesale data, not retail data, and then you had to take other

 2   steps.

 3          Do I have that basically right?

 4          MS. RIVAS:  Yes.  For weeks they delayed her

 5   deposition.  We had the Nielsen data, she submitted a

 6   declaration that they used Nielsen data, but when we questioned

 7   her they said they don't keep state by state data.  What they

 8   do is they keep -- they use Nielsen data which is comparable to

 9   IRI data and in their motion, when we filed Colin Weir's motion

10   they jumped up and down, your Honor, saying you need to strike

11   him, he is an expert.  I could regurgitate all the arguments

12   they made about his expertise and what not.  I'm not going to

13   the way they did about what we said but he is an expert, he

14   uses this data in damages models.  This is a simple damages

15   model and it comports with Comcast.

16          Comcast says your damages model has to comport with

17   your theory of liability.  We meet Comcast.  Comcast has no --

18   Comcast isn't contrary to what we are doing here.  Your Honor

19   said it is unit sales multiplied by the statutory damages.

20   That's what Colin Weir has done.  He has calculated it, he has

21   used data that he regularly uses, he compared it to the Nielsen

22   data, he compared it to their wholesale data, and I think that

23   that meets our burden.  We have to show the existence of a

24   damage.  If they want to say it is uncertain they can say it

25   and they have the burden to show it, they don't have the
```

J1M5aml1

1    burden.

2         That's what that Second Circuit decision says, your

3    Honor.

4         THE COURT:  You have to let me go read it but, anyway,

5    let me see if defense counsel wanted to say anything about

6    their own data because the point that plaintiff's counsel is

7    making which has at least ostensibly some force is they thought

8    they could obtain this data most directly from him, which is

9    not an unreasonable assumption on their part and then when they

10   got it they got wholesale data and then they also got some

11   indications that you rely on Nielsen, which they would be happy

12   to rely on here since it gives a higher amount than IRI.

13        So, what about all of that?

14        MR. SIACHOS:  A couple things, your Honor.

15        First, we don't use IRI.  L'Oréal doesn't use IRI,

16   L'Oréal uses Nielsen.  Different company, different liability.

17   Everyone has heard of Nielsen, you turn on your TV you hear the

18   Nielsen ratings.

19        Second, the Nielsen data that has reported to L'Oréal

20   is on a nationwide basis.  Nobody has tried to extrapolate and

21   nobody can extrapolate what the New York sales are from Nielsen

22   or IRI unless you were to subpoena them and have them come in

23   and testify about how they came up with it.  They didn't do

24   that.  Depositions were never taken, no motion to compel, no

25   nothing.

J1M5aml1

1            So, what we have is nationwide Nielsen number that is

2      still incomplete because it doesn't go far enough back.  They

3      did use IRI at one point.  And then you can't extrapolate that

4      by then saying okay, well then, for New York it is X amount of

5      numbers.  It is 450,000 retail units as reported by Nielsen

6      using the same extrapolations, the same type of estimates that

7      IRI does, but how do we figure out New York?  You can't.  We

8      are not on the eve of trial, we are at trial.  And there is not

9      one scintilla of evidence from Nielsen or otherwise as to what

10     the New York sales are.  And from our own records, your Honor,

11     starting in July of 2017, and I just pulled up the data to

12     show, the e-mails, we told them we don't keep track of retail

13     sales, it is from third-parties, which is what then prompted

14     them, in July of 2017, to subpoena IRI.  They obtained the

15     information in July of 2017, that's attached to Weir's report.

16            Then, in October --

17            THE COURT:  And they also, if I understood what you

18     said earlier, subpoenaed some of the major retailers.

19            MR. SIACHOS:  Right.

20            THE COURT:  But then chose not to pursue that.

21            MR. SIACHOS:  And that was in October, October 31st,

22     Halloween, 2017.  We are in 2019, we have to keep that

23     straight.

24            THE COURT:  2019?  Not too likely.

25            MR. SIACHOS:  Well, no, I meant we are in 2019 now so

J1M5aml1

we have to keep in mind that's a long time ago.

        Now, the other thing they mentioned was Angela
Rutherford who is one of L'Oréal's finance people.  They said
they deposed her in December.  We have to make sure they have
this right.  They deposed in December 2017.  That was after
they had the IRI data from July of 2017, that was after they
had submitted subpoenas on October 31st, 2017.  They deposed
her in December of 2017 because we had the depositions
scheduled on August 2nd, 2017 and nobody showed up from the
plaintiff's side and we had difficulty rescheduling it.

        So, again, that's a long time ago.  We are talking,
again, 11, 12, 13 months ago -- math problems on my end -- 12,
13 months ago they took Angela Rutherford's deposition.  There
was plenty of time to do all of this.  Instead, they relied on
IRI, they relied on Colin Weir to do simple addition, no
methodology, and as such, your Honor, he should be struck.

        MS. RIVAS:  Your Honor?

        THE COURT:  Yes.  Go ahead.

        MS. RIVAS:  I need to bring to your Honor's attention
the Rutherford declaration again.  This would have been
plaintiff's trial exhibit 167 but Ms. Rutherford says L'Oréal
receives periodic reports that summarize retail sales data
reported by retailers to Nielsen but the reports did not
identify retail customers, so what, let alone the lots or
production numbers.  And then at deposition she said they rely

J1M5aml1

only on Nielsen, she said they don't rely on IRI.  She said,
under oath, they don't have state by state.  Their lawyer
represented that to us.  Nielsen and the units sold is
comparable to IRI data so it was reasonable for us to look at
IRI data.  We can prove the existence of damages, they have
apparently these periodic reports that summarize retail sales
data reported by retailers to Nielsen and they're asking your
Honor to strike an expert who normally relies on this data all
the time as being unreliable had they purportedly have some
figures.

In terms of the subpoenas, we couldn't subpoena all
the retailers that the IRI data and the Nielsen data encompass,
your Honor.  We thought that's the gold standard that that
data, our expert said that, we thought that was sufficient,
your Honor.  And, it is.

THE COURT:  Let me go take a look at the case and I
will come back and give you my ruling.

(recess)

THE COURT:  So, first, I want to express my thanks to
counsel for both sides for their excellent arguments.  The
motion is a very important one because it is, as near as I can
tell, case dispositive.

The evidence from Mr. Weir involves, frankly, very
modest expertise.  He looked at an Excel spreadsheet that had
headings that were somewhat difficult to understand and utilize

J1M5aml1

his expertise to determine which were the relevant columns but nearly everything he did after that was a matter of arithmetic. Nevertheless, some expertise was involved in the evaluation of the columns. So, I don't think the fact that the bulk of what he did is arithmetic necessarily warrants his total exclusion. I think it might narrow what he could say was his expertise as applied to this case but that's a separate issue.

The fact, though, that he exercised such modest expertise is not irrelevant to the question of whether his reliance on the IRI materials was sufficient or meets the requirements of Rule 703 such that it could be taken account of notwithstanding the fact that it was obvious hearsay, indeed as defense counsel points out, probably double hearsay.

There is certainly an aspect of his reported testimony, respective testimony that basically says I'm going to let IRI, in effect, calculate the damages, I'm just going do some arithmetic after I see which of their columns are the relevant ones. And that seems like a weak read on which to premise the admissibility, under Rule 703 or the use under 703, of the underlying critical data.

But, the thing that most troubles me, and I think in the end is most significant to the Court's analysis, is the total absence of methodology, knowledge of methodology that is critical to the ascertainment of damages.

Now, I have looked at the cases and particularly the

J1M5aml1

1    Second Circuit case, *Contemporary Mission, Inc., v. Famous*

2    *Music Corporation,* 557 F.2d 918, a 1977 decision in the Second

3    Circuit long before Daubert.  Daubert was decided in 1993 so

4    the Court doesn't even attempt to apply Daubert standards so

5    how could it when the case had not yet been decided.  It's a

6    breach of contract case, it's very, very different from this

7    case, but what it basically holds as relevant here is that if

8    you know that there were damages then it's not a ground to end

9    the case as Judge Owen, the district judge did in that case, on

10   the ground that your calculation of damages is too speculative

11   because this goes to a question of how good the methodology may

12   be.  They don't use the term methodology but that's the thrust

13   and the other side can point out, if they can, that the

14   methodology was inferior and that's not -- that goes to the

15   weight of the expert's testimony.

16          Totally missing from that case, understandably, again,

17   because it was not only before Daubert but it was before the

18   amendment to Rule 702 in the year 2000, is any suggestion that

19   a plaintiff can get away with a damages calculation that

20   doesn't expose or even purport to expose its basic methodology.

21          So, here what you have is IRI, as I understand it,

22   although a lot of this is based on hearsay as well, extracts

23   certain sales or obtains certain sales data from various

24   retailers but knows that this is just a sampling and therefore,

25   based on a methodology that it considers proprietary and that

J1M5aml1

takes the form apparently of an algorithm, calculates what it
believes is the actual sales.

Now, that would be fine even if their algorithm is, in
some respects suspect or one could argue that it was not as
good as some other algorithm or that it overstated damages or
whatever if you knew what the methodology was.  But, you don't.
IRI is proprietary but that could have been the subject of a
confidentiality order or some other way in which it could have
been handled but right now we have an expert who doesn't know
and doesn't purport to know how that algorithm was calculated,
how that methodology was arrived at by who simply says, well,
this is good stuff, everyone uses it, I will use it too.

I don't see how that meets the requirements of Rule
702.

(Continued on next page)

J1m2aml3

1      THE COURT:  The whole thrust of *Daubert* and its

2  progeny, and even more so the thrust of Rule 702 as amended in

3  2000 so as to add the language about methodology, is to focus

4  the courts on saying that experts can't just come in because

5  they are hot-shot experts, expect that every *ipse dixit* that

6  they utter meets the requirements of admissibility.

7      They have to be able to explain the methodology so

8  that it can be tested and assessed first by the court on a

9  *Daubert* hearing, then by the jury.  They have to show that the

10  methodology is the product of reliable principles and methods

11  that have been reliably applied to the facts of the case, and

12  that means, in this situation, that you have to know how IRI

13  took that partial data and translated it into a series of

14  fractions or calculations that then formed the basis for

15  everything that Mr. Weir did.

16      There are other aspects of this that trouble me.  I do

17  not see that this evidence from IRI remotely meets the residual

18  exception.  It may meet the market exception.  But, as I say,

19  I'm not resting fundamentally on the hearsay problems, although

20  I think they are not without substance.  I am not resting

21  ultimately on the fact that Mr. Weir was basically a human

22  adding machine, although that is troublesome, too.  What I am

23  resting on is the failure to obtain and explain the methodology

24  that is critical to the calculation of damages in this case.

25  And since the only evidence of damages comes from Mr. Weir's

J1m2aml3

testimony, there is some indirect data from the defendants, and

I appreciate the fact that plaintiffs initially thought they

could obtain the relevant data directly from the defendants and

not on a reusable assumption, but they learned to the contrary

no later than December 2017.  They had plenty of time to cure

the problem.  They could have subpoenaed IRI.  And if it didn't

give them what they wanted in terms of methodology, they could

have brought it to the court's attention.  This, like every

trade secret, this would have been easily dealt with at least

for pretrial purposes, *Daubert* purposes, through an appropriate

confidentiality order.

        They could have, as they apparently sought to at one

point, obtained data from various retailers.  They subpoenaed

those retailers, and then they chose not to pursue that, those

subpoenas, when the retailers objected.  If they had obtained

that data, they could then have made their own projection, and

of course we would then know for sure the methodology used,

because it would have been the plaintiffs' own methodology.  It

might have been attacked, but unless it was really completely

without substance, it probably would have been able to survive

a *Daubert* challenge.

        I am not happy about the results of this ruling.  Sit

down, sir.  Because, first, I love trials.  Second of all, this

was an interesting case.  As I said, there was already a great

deal of attention of the court.  But I see no logical

alternative to granting the motion, and the result would be

that I have to decertify the New York class, as I understand

it, but I will hear from the gentleman who just wanted to be

heard, that there is nothing left of the case at this point.

But now let me hear.

MR. GERAGOS:  Thank you, your Honor.

If I could, I take great exception to the arguments

that have been made.  Maybe I should have stood up first.

The promise or the premise from which they are

operating is that somehow they are -- and what I don't think we

focused on is their own declaration by Ms. Rutherford.  I know

it was referred to, but what Ms. Rutherford says is that they

rely on the Nielson data and that they do not have this

information specifically because they wholesale it out.

And then, on top of it, what you have here -- and this

has been kind of a problem from the beginning with this case --

this product was marketed and it was sold in the most

economically challenged communities.  Their own declaration

states that those retailers do not keep records by SKU.  Those

retailers do not keep records by product.  Those retailers sell

it.  So when they talked or they made a reference to some place

in Harlem or some place somewhere else in Florida, the problem

with this product is that it is marketed to areas and retailers

that do not have the ability or -- and this is their own

declaration -- keep the records that the court would want or a

J1m2aml3

1    federal court would want.

2            So then you are faced with -- this is if you believe

3    them, Ms. Rutherford has no way of saying how many units were

4    sold in New York State.  I would submit to your Honor that any

5    of their witnesses that they put on I would be able to take,

6    humbly, hostage and turn them into our witness, and it would go

7    to weight and not admissibility, because there is no way that

8    somebody is going to say that this corporation does not have an

9    estimated guess as to what their sales are in this particular

10   region.  I will guarantee you that that is how they compensate

11   their district managers.  I will guarantee you that that's how

12   they compensate everybody else.  Do they have it in those

13   specific units?  They know what they shipped and they know

14   where they shipped it.

15           THE COURT:  I'm sorry, but I'm a little confused here

16   because you had two years to make those kind of inquiries

17   through depositions where you could of course treat their

18   witnesses as hostile witnesses, and I see nothing in the record

19   along the lines of what you are now claiming you think you

20   would elicit at trial.

21           This case is unusual in the degree to which I have

22   already granted plaintiffs' counsel innumerable extensions and

23   overlooked violations of my scheduling orders because I wanted

24   to give, most particularly on this very issue of damages, every

25   opportunity to the plaintiff to deduce what they needed.  So to

J1m2aml3

say here in court today, Oh, Judge, if only now I could take
their witnesses as hostage and ask them the questions that I
think should have been asked but weren't, I speculate that they
would give me answers that would satisfy your Honor.  I don't
understand that as being a persuasive argument.

MR. GERAGOS:  I apologize if I wasn't clear.  That's
not what I said.  We relied on the fact that they themselves,
in August of 2017, said that they are incapable of getting this
data, and they rely on Nielson data.  And Ms. Rutherford stated
that these products get sold by retail outlets that don't have
the, whether you want to call it technology, whether it is
sophistication, that the majority -- I don't know if it was the
majority or not, but that they don't have the end user retail
data.  They know what they wholesale sold.

The methodology that was used here, rather than
focusing on IRI data, they took that wholesale data which they
listed in the Rutherford declaration in August of 2017 and they
showed how much per year they sold of wholesale data.  What's
been characterized here as rote first or fourth grade,
depending upon who your math teacher was, addition and
multiplication is the end result of the analysis.  The
foundation of that rote multiplication was the analysis of not
just our IRI, but the analysis of -- they rely on Nielson data,
the analysis that they specifically said we don't have the
SKUs.  We are unable to get to the retailers.  We could

J1m2aml3

subpoena all the retailers we want. It wouldn't matter

basically because they have said themselves those retailers

don't have it. They don't keep that information.

What this person did, what this expertise was, wasn't

to take, as we submitted on the verdict form, the 18,000

whatever times $50 of the statutory punishment. What the

expert did is, okay, you supplied me with the wholesale data.

This is what I have got. This is what you are able to give to

me. You claim you don't have the retail end user data. Well,

what I am going to do, just like you, L'Oréal, is I am going to

rely on Nielson data, I'm going to rely on IRI data, and I am

going to then calculate and I am going to test it. I'm going

to see whether or not, by relying on this data, because

specifically you don't have end user data, I'm then going to

see if it comports with what you are saying.

And it is uncontroverted -- at least they haven't

argued it today -- it is uncontroverted that it probably under

estimated what the sales were, which would be not unexpected

given the fact that the retail outlets don't have the

capability. When they are going into a liquor store, for

instance, or a convenience store, in an economically challenged

neighborhood, I don't generally, when I go into one of those, I

don't see somebody who is doing bar codes or anything else. In

fact, half the time they don't even ring it up on their cash

register, but that's a whole different area for inquiry.

J1m2aml3

1          The problem is that what this does, the practical

2     effect of what your Honor would be doing by this ruling is

3     saying as long as L'Oréal plays deaf, dumb, and blind and says,

4     We are not going to assemble the retail end user data, then

5     therefore we can put any product on the market in an

6     economically challenged area, we won't worry about it, and you

7     have to speculate as to what the damages are.

8          We have a basis for damages.  Our basis for damages is

9     that we will show that the scalp protector was useless.  The

10    court knows the factual underpinnings of this.  Once we do

11    that, we know they shipped hundreds of thousands of units,

12    wholesale units.  A portion of those units were obviously this

13    product.  They know how much of this product they shipped.  We

14    know that they shipped this product.  We know that they relied

15    on Nielson data for this product.  All of that can be testified

16    to by Mr. Weir, number one.  And, number two, it is precisely

17    what an expert would testify in a place or in a -- the universe

18    that we are in right now, where L'Oréal has played deaf, dumb,

19    and blind and says they don't know what they did with the

20    product.

21          THE COURT:  I am happy to have you go on as long as

22    you would like, but just let me interrupt at this point.

23          MR. GERAGOS:  I wish you would.  I would rather have

24    it more interactive.

25          THE COURT:  You made two different points.  The first

J1m2aml3

```
1    point is that L'Oréal is playing deaf, dumb, and blind.  I

2    repeat again, in effect, you say they are either lying or that

3    I should draw an adverse inference from what seems implausible

4    or anything, none of which was developed in discovery.  It is

5    far too late to make that argument now.

6              MR. GERAGOS:  Could I --

7              THE COURT:  Second point, you point out, and I think

8    it is relevant, that this data is difficult to obtain because

9    there are aspects to the retail market here that are special.

10   All the more reason for then hiring an expert who could speak

11   to that and evaluate with disclosed methodology how he or she

12   was able to reach a calculation in light of the vicissitudes of

13   this marketplace.  So I think that your second argument cuts

14   against you.  It really shows another reason why neither the

15   Nielson nor the IRI data, in each case of unknown methodology

16   in terms of projection, is really sensible in light of the

17   particularities of this particular marketplace.

18             MR. GERAGOS:  Wouldn't that be what the subject of a

19   Daubert hearing would be with this particular witness and with

20   Ms. Rutherford?  When Ms. Rutherford says, We know -- and

21   declares under penalty of perjury, We know that we don't have

22   the end user retail data, we know that places that are selling

23   this product do not keep it by SKU, wouldn't that be for your

24   Honor to have Mr. Weir on the stand and allow me to walk him

25   through whether or not the methodology that he used took into
```

1  account Ms. Rutherford's statement that there was retail --

2  there was no capture of the retail.

3       THE COURT:  So I considered that possibility, but it

4  seems to me that, under the current Federal Rules of Civil

5  Procedure, everything that he can testify to has to be in his

6  expert report, and so he is bound by the four corners of this

7  expert report.  And if the expert report doesn't make it, it

8  doesn't make it.

9       In addition, of course, he was the subject of a

10 deposition, and both sides could have asked him questions

11 there, although obviously the party taking the deposition

12 usually is the one who is the asker of the questions.  So I saw

13 no reason for an evidentiary hearing here.

14      MR. GERAGOS:  Except that wouldn't be that -- doesn't

15 that conflate both an expert opinion and the *Daubert*?  The

16 expert opinion and the expert report is separate and apart in

17 some sense from the *Daubert* because you are challenging, your

18 Honor is challenging, I guess, is dealing with or grappling

19 with defendants' challenge of the methodology that should have

20 and, in my opinion, under the rules, should have been brought

21 by a notice motion to challenge the methodology, not in terms

22 of a motion *in limine* at the time to strike the testimony --

23      THE COURT:  There I disagree with you because,

24 although there have been delays on both sides of this case that

25 I think is clear, there was an initial deadline for expert

J1m2aml3

reports.  You didn't file one on damages.  I gave you a second

extended deadline on expert reports.  You didn't file one on

damages.  Then you produced this report as part of an

opposition to a summary judgment motion by your adversary,

placing them in a position of having five pages to respond to

the entire motion, and even then they do raise some issues

about this, but there was nothing improper about their bringing

on this motion as a motion *in limine* any more than the numerous

motions *in limine*, including *Daubert* motions, that you brought

in this very case.

MR. GERAGOS:  The problem is that the *Daubert* hearing

and the methodology that the court is talking about, I believe

that if you had a hearing, I would proffer to the court that

Mr. Weir could testify that his methodology -- and what

Ms. Rivas argued to the court was that it was a conservative

interpretation because he recognized, based on L'Oréal's

declaration under penalty of perjury, that there was no such

data available to IRI and to the -- and to Nielson, that the

universe of this was going to be driven by the wholesale units

that were shipped.

So if the analysis or the -- what's been referred to

today as the methodology comports with the wholesale units that

were shipped, then that would appear to satisfy what are

normally considered to be *Daubert* challenges, basically that

there is some kind of indicia of reliability or

J1m2aml3

1    trustworthiness.

2              THE COURT:  Well, first, I think the very detailed

3    disclosure requirements of Federal Rule of Civil Procedure 26

4    would have mandated his including this in his expert report.

5              Second, even if that were not true, he was asked at

6    his deposition what his methodology was, and he gave his

7    answer, which is miles away, frankly, from what you are now

8    speculating his answer would be.

9              So you raised many important arguments, but I'm not

10   yet persuaded.

11             MR. GERAGOS:  Well, the damages -- I will circle back,

12   then, to when I walked in the case you were citing, which arose

13   out of a breach of contract case, where if we show that there

14   is damage and then the calculation, if you are going to say,

15   Okay, I'm not going to allow in the expert because it is rote

16   multiplication or it is rote addition, I would suggest that the

17   remedy is not to strike him altogether, I would suggest that if

18   we prove our case that there are -- there is damage that this

19   product did not work and this product failed, then it is the

20   province of the jury to decide, once they hear, if all of this

21   is not the subject of expert testimony, if all of this is rote

22   multiplication, then we don't need an expert for the damage.

23   We will prove damage and we will leave it up to the jury.

24             THE COURT:  No.  Without your expert, I don't see how

25   you get in any of the data from IRI.  You chose to release them

J1m2aml3

as witnesses in this case.  There are hearsay problems even

with an IRI employee on the stand, and then we would have the

question of methodology, they would say proprietary

information, and then I would have to have a confidential

hearing outside the presence of the jury to evaluate that,

etc., etc.

          This is far too late to --

          MR. GERAGOS:  Then forget IRI.  If the ship has

sailed, and you are saying you are not going to allow him to

rely on IRI -- for the record, obviously we disagree with

that --

          THE COURT:  Now we are clear.

          MR. GERAGOS:  Correct.

          Like I said, if I'm not persuasive, I'm not

persuasive.  I still say that we can proceed, we can proceed

with L'Oréal's own witnesses.  We can show this jury what was

shipped by wholesale.  They can make their arguments that they

don't keep retail records.  We can show where it was shipped.

They know where they shipped it to.  They know which

distribution centers it was shipped to.  They can make their

arguments, which they previously have declared under penalty of

perjury, as to retail outlets that don't keep SKUs.  And then

that becomes a province of the jury to determine what damages

are.  They have a unique argument here.  They are saying that

we need an expert or that we are providing somebody who is an

J1m2aml3

1     expert who really is not an expert.  It is a first- or

2     fourth-grader.  Well if it is a first- or --

3              THE COURT:  You haven't offered any calculation of

4     damages based upon what you just said.

5              MR. GERAGOS:  Well, we put on the verdict form that

6     there is 18,000 times 50.  We will do the calculations when I

7     have the L'Oréal witnesses up there.  They have said that there

8     is specifically -- they have given an exact number of wholesale

9     shipments nationally.  The next question is, madam witness,

10    madam whoever it is from L'Oréal, I will just call it the

11    witness from L'Oréal, You shipped how many to New York?  How

12    many units did you ship to New York?  How many retailers do you

13    have in New York who sell it?  How many units did you get back?

14    This is, ladies and gentlemen --

15             THE COURT:  None of which was asked before during

16    discovery.

17             MR. GERAGOS:  We have it in the declaration under

18    penalty of perjury.  We know exactly what they shipped.  We

19    know exactly who they went to.

20             THE COURT:  Forgive me, because I haven't looked at

21    that declaration.

22             MR. GERAGOS:  I have it.

23             THE COURT:  Let me take a look at that.

24             MR. GERAGOS:  I think it was referred to as Exhibit --

25             THE COURT:  Do they indicate there the wholesale

J1m2aml3

1    shipments to New York as opposed to nationwide?

2              MR. GERAGOS:  They indicated wholesale shipments.

3    They have the number of wholesale shipments.

4              THE COURT:  To New York?

5              MR. GERAGOS:  They do not to New York.

6              THE COURT:  No.

7              MR. GERAGOS:  I would ask the next question, where did

8    they get shipments?

9              THE COURT:  But you had an opportunity to do that.

10             MR. GERAGOS:  Why am I foreclosed from going to trial

11   because I didn't ask that?

12             THE COURT:  Because of the way the system operates,

13   which is that we don't have trial by ambush, we don't have

14   trial by last minute, oh, gee, I just thought of this.  We have

15   elaborate -- some would say too elaborate -- discovery and

16   motion practice.

17             If I were to adopt your approach, the approach would

18   be every time a case is dismissed at or near trial, the other

19   side, the losing side would be saying, well, Judge, we have got

20   a new idea here.  Let's try that out.  We didn't put it in our

21   pretrial consent order.  We didn't put it in our discovery.  We

22   didn't put it in our motion practice.  We never actually

23   thought of it until you ruled against us today, but now that

24   you are ruling against us on what we thought was sufficient, we

25   have got a whole different approach, and let us go forward.

J1m2aml3

          MR. GERAGOS:  How is it trial by ambush when they are

the ones who have the doubt?  How could it possibly be

potentially be trial by ambush?  They have --

          THE COURT:  Because all they have, as you just

explained to me, is nationwide wholesale data.  You are going

to have to make an argument as to how the jury should translate

that into New York retail data, and there is nothing before me

as to how you are going to do it.  So that's the ambush.

          MR. GERAGOS:  No, the ambush, they are uniquely

situated in knowing how much they shipped.  When you say

that -- when I say the retail data, that's different from where

they shipped the wholesale.  There is clearly, on a

preponderance standard, we know that they shipped X amount of

100,000 units.  Once they shipped X amount of 100,000 units, if

they shipped it to Amazon in Long Island City or if they

shipped it to Albany or if they shipped it to Manhattan, that's

no ambush.  That's exactly -- they know where their records

are.

          Obviously what is the ambush when two years, a year

and a half ago Ms. Rutherford declared under penalty of perjury

this is the wholesale number?  The wholesale number is

obviously based on an aggregate of where they shipped it.  They

know what that is.  Put her on the stand and say, How did you

come up with it?  Where did you come up with this number?  How

is that a trial by ambush in any way, shape, or form.  I agree

J1m2aml3

1    that it may be a retooling of how I present the evidence, but

2    because you are not allowing, or at least tentatively not

3    allowing the person to come in here to say, I'm going to do

4    what L'Oréal claims they came to do, but L'Oréal obviously has

5    some records which are the precursor to what their total is

6    that they listed under penalty of perjury in a declaration.

7            THE COURT:  All right.  Well, this is an interesting

8    dialogue and probably could be continued for some more hours.

9    I have got the gist of your arguments, but I'm not persuaded,

10   and so the court adheres to its ruling, and therefore the New

11   York class action is decertified, and since there is nothing

12   else left to be tried, the case is dismissed.  You will

13   obviously have ample opportunity on appeal to raise these

14   various arguments.

15           I do feel badly for all the lawyers who worked so hard

16   to prepare this case for trial that it came about to this

17   result, but for the reasons I have already enumerated or

18   elaborated on the record, I just think that I am compelled to

19   reach the conclusion that I have.

20           Very good.

21                                  oOo

22

23

24

25